**In re DOW CORNING CORPORATION,**
**Debtor.**

Nos. 99–CV–73941–DT, 99–CV–74218–DT, 99–CV–75380–DT, 99–CV–75799–DT, 99–CV–75922–DT, 99–CV–75923–DT, 99–CV–75924–DT, 99–CV–75925–DT, 99–CV–75927–DT, 99–CV–75929–DT, 99–CV–75930–DT, 99–CV–75958–DT, 99–CV–75959–DT, 99–CV–75960–DT, 99–CV–76007–DT, 99–CV–76008–DT, 99–CV–76009–DT, 99–CV–76063–DT, 99–CV–76214–DT, 99–CV–76215–DT, 00–CV–70029–DT, 00–CV–70076–DT, 00–CV–70176–DT, 00–CV–70177–DT, 00–CV–70178–DT, 00–CV–70179–DT, 00–CV–70337–DT, 00–CV–70338–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 13, 2000.

---

447

452

Sybil Shainwald, New York City, Stephen H. Weiner, Sybil Shainwald Assoc., New York City, for Certain Foreign Claimants.

Yeon–Ho Kim, International Law Office, Seoul, Korea, for Korean Claimants.

Harold V. Sullivan, II, Torrance, CA, for Certain Cambodia, Vietnam and Mexico Claimants.

David J. Hutchinson, Ann Arbor, MI, for Certain Brazilian Claimants.

Joel L. Miller, David B. Goroff, Hopkins & Sutter, Chicago, IL, Peter Cashman, Cashman & Partners, Sydney, NSW, Australia, for Certain Australian Claimants.

Kenneth H. Eckstein, Kramer, Levin, New York City, for Official Committee of Tort Claimants.

Barbara J. Houser, Dow Corning Corp., Auburn, MI, Rozanne M. Giunta, Lambert, Leser, Bay City, MI, David L. Ellerbe, Sheinfeld, Maley, Dallas, TX, for Dow Corning Corp.

D. Tyler Nurnberg, Hopkins & Sutter, Chicago, IL, for 1300 Australian Tort Claimants.

Donald S. Bernstein, Davis, Polk,New York City, Sheldon S. Toll, Honigman, Miller, Detroit, MI, for Official Committee of Unsecured Creditors.

## OPINION RELATING TO APPEALS FROM AND MOTIONS REGARDING THE BANKRUPTCY COURT'S NOVEMBER 30, 1999 CONFIRMATION ORDER

HOOD, District Judge.

### I. INTRODUCTION

On May 15, 1995, the Debtor Dow Corning Corporation ("Dow Corning" or "the Debtor") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor submitted two plans of reorganization before negotiating with various parties, including the Official Committee of Tort Claimants (the "Tort Claimants' Committee"). On November 8, 1998, the Debtor and the Tort Claimants' Committee (the "Proponents") submitted a Joint Plan of Reorganization, amended on February 4, 1999. The Bankruptcy Court held hearings on the confirmation of the Amended Joint Plan over the course of several weeks, commencing on June 28, 1999, with closing arguments heard on July 30, 1999. Testimonies were taken and evidence submitted during the hear-

ings. Numerous briefs and documents were filed by many parties in support of or in opposition to the confirmation of the Amended Joint Plan, including post-hearing briefs.

The Bankruptcy Court entered its Findings of Fact and Conclusions of Law and Order Confirming the Amended Joint Plan on November 30, 1999. The Bankruptcy Court also entered various opinions on this date. The Bankruptcy Court indicated that subsequent opinions would be entered in the future and on December 21, 1999, the Bankruptcy Court entered an opinion on the release and injunction issue, the best-interests-of creditors test, feasibility and whether the plan complies with other provisions of the Bankruptcy Code. In all, seven separate opinions were entered relative to the November 30, 1999 Confirmation Order.[1] Not all of the parties or all of the issues in the opinions were appealed. The Court will address the opinions appealed from below.

The following parties filed appeals and/or motions relating to the Confirmation Order which are currently before the Court:[2]

| Case No. | Date filed with Bankruptcy Court | Appellant/Movant |
| --- | --- | --- |
| 99–CV–73941 | August 9, 1999 | Certain Foreign Claimants |
| 99–CV–74218 | August 25, 1999 | Korean Claimants |
| 99–CV–75380 | November 5, 1999 | United States of America |
| 99–CV–75799 | December 1, 1999 | United States of America |
| 99–CV–75922 | December 9, 1999 | Physician Claimants |
| 99–CV–75923 | December 8, 1999 | New Zealand Claimants |
| 99–CV–75924 | December 9, 1999 | Class Five Nevada Claimants |
| 99–CV–75925 | December 9, 1999 | Class Five Texas Children Claimants represented by the Lacy firm |
| 99–CV–75927 | December 9, 1999 | Australian Claimants |
| 99–CV–75929 | December 10, 1999 | Certain Foreign Claimants represented by the Shainwald firm |
| 99–CV–75930 | December 8, 1999 | Official Committee of Physician Creditors |
| 99–CV–75958 | December 10, 1999 | Helene D. Schroeder, *pro se* |
| 99–CV–75959 | December 10, 1999 | Sue Olexa, *pro se* |
| 99–CV–75960 | December 10, 1999 | Marti Jacobs, *pro se* |
| 99–CV–76007 | December 13, 1999 | Beatrix Shishido, *pro se* |
| 99–CV–76008 | December 13, 1999 | Karen L. Hustead |
| 99–CV–76009 | December 13, 1999 | Pamela Dowd, *pro se* and Maribeth West, *pro se* |

1. The following are the opinions entered by the Bankruptcy Court relating to the Confirmation Order: *In re Dow Corning Corp. (Amended Opinion on the Classification and Treatment of Claims)*, 244 B.R. 634 (Bankr. E.D.Mich.1999); *In re Dow Corning Corp. (Amended Opinion on Good Faith)*, 244 B.R. 673 (Bankr.E.D.Mich.1999); *In re Dow Corning Corp. (Amended Opinion on Cram Down of Class 4: Is it Fair and Equitable to Cram Down Commercial Claims with Interest Less than Contract Rate?)*, 244 B.R. 678 (Bankr. E.D.Mich.1999); *In re Dow Corning Corp. (Amended Opinion Regarding Cram Down on Class 18)*, 244 B.R. 696 (Bankr.E.D.Mich. 1999); *In re Dow Corning Corp. (Amended Opinion Regarding Cram Down on Class 15)*, 244 B.R. 705 (Bankr.E.D.Mich.1999); *In re Dow Corning Corp. (Amended Opinion on 11 U.S.C. § 1129(a)(9) Objections of the I.R.S. and Texas Comptroller)*, 244 B.R. 718 (Bankr. E.D.Mich.1999); and *In re Dow Corning Corp. (Opinion on Best–Interests–of–Creditors Test, Feasibility, and Whether Plan Proponents comply with the Applicable Provision of Title 11)*, 244 B.R. 721 (Bankr.E.D.Mich.1999).

2. The following appeals were voluntarily dismissed prior to the issuance of this opinion: 99–CV–73574–DT, Debtor Acquisition Co., Appellant; 99–CV–73657–DT, Halcyon, et al, Appellants; 99–CV–73658–DT, Angelo Gordon Co., et al., Appellants; 99–CV–73659–DT, Davidson Kempner, et al., Appellants; and 99–CV–76010–DT, Linda Saenz, *pro se*, Appellant.

| 99–CV–76063 | December 16, 1999 | Class Five Pennsylvania Claimants, Pennsylvania Coordinated Silicone Breast Implant Litigation |
| 99–CV–76214 | December 29, 1999 | Dow Chemical |
| 99–CV–76215 | December 29, 1999 | Corning, Inc. |
| 00–CV–70029 | December 30, 1999 | Dow Corning and Official Committee of Tort Claimants |
| 00–CV–70076 | December 30, 1999 | Rita Altig, et al. |
| 00–CV–70176 | January 10, 2000 | Hartford Accident & Indemnity Co., et al. |
| 00–CV–70177 | January 10, 2000 | Lloyds of London, et al. |
| 00–CV–70178 | January 10, 2000 | Korean Claimants |
| 00–CV–70179 | January 6, 2000 | Dow Corning and Official Committee of Tort Claimants' Motion to Withdraw the Reference |
| 00–CV–70337 | January 19, 2000 | Dow Chemical |
| 00–CV–70338 | January 19, 2000 | Corning, Inc. |

The general issues on appeal include: the classification and treatment of claims; the injunction and release; the cap on punitive damages; whether the proposed plan is fair; and the United States' motion to compel. This Court entered an order consolidating the briefing schedule of all the appeals relating to the Confirmation Order entered by the Bankruptcy Court. On April 12 and 13, 2000, the Court held hearings on the appeals, allowing counsel representing the appellants and appellees, *pro se* individuals and other interested parties to present arguments. Some parties filed supplemental briefs after the hearings. For the reasons set forth below, the Court AFFIRMS the Bankruptcy Court's November 30, 1999 Confirmation Order and REVERSES in part its December 21, 1999 Opinion on the Injunction and Release issue as it relates to the November 30, 1999 Order.

## II. BACKGROUND

In 1943, The Dow Chemical Company ("Dow Chemical") and Corning Glass Works (now Corning, Incorporated ("Corning, Inc.")), formed Dow Corning Corporation for the purpose of developing and producing products based on silicone chemistry. Today, Dow Holdings, Inc. (a wholly owned subsidiary of Dow Chemical) and Corning, Inc. are the sole shareholders of the Debtor, each owning 50% of the Debtor's common stock. *See generally In re Dow Corning Corp.*, 187 B.R. 919 (E.D.Mich.1995), *rev'd in part*, 103 F.3d 129 (6th Cir.1996) and *In re Dow Corning Corp.*, 211 B.R. 545, 550 (Bankr.E.D.Mich. 1997).

The Debtor and its subsidiaries produce thousands of silicone-based products both for non-medical and medical uses. In the early 1960s, Drs. Thomas Cronin and Frank Gerow, plastic surgeons, developed the idea of placing silicone gel inside a sealed packet which would be surgically implanted inside a woman's breasts and collaborated with the Debtor to create what is now known as a silicone-gel breast implant. *In re Dow Corning Corp.*, 211 B.R. at 550. The Debtor introduced silicone-gel breast implants to the market in 1964. *Id.* There were problems with the breast implants, including leakage and rupture. *Id.* As a result of various complaints, inserts were placed in the packages warning recipients of the potential non-pathogenic side effects. *Id.* at 551. The Debtor did not face significant legal actions during this time period because of the warnings in the packets. *Id.*

Reports in the 1980s suggested that silicone gel may cause systemic disease in humans. *Id.* Women began filing lawsuits during this period alleging that silicone gel caused an auto-immune connective tissue disease such as lupus, Scleroderma or rheumatoid arthritis. *Id.* Later on, suits were filed alleging symptoms such as

aches and pains, fatigue, insomnia, memory loss and headaches. *Id.* After a successful suit against the Debtor in 1984, the Debtor modified its package inserts acknowledging that there were "reports of suspected immunological responses to silicone mammary implants" and that "convincing evidence does not exist to support a causal relationship between exposure to silicone materials and the acquisition or exacerbation of a variety of rheumatic and connective tissue disorders." *Id.* (citation omitted)

The Debtor ceased marketing the silicone gel for breast implantation in March of 1992. Two months later, the Food and Drug Administration ("FDA") ordered that implants containing the gel be taken off the market. *Id.* After the implants were withdrawn from the market, lawsuits against breast implant manufacturers dramatically increased with more than 3,000 suits filed against the Debtor in 1992, followed by 8,000 and 7,000 new cases in 1993 and 1994, respectively. *Id.* Lawsuits were also filed in Canada against the Debtor. *Id.*

In 1992, the Judicial Panel on Multidistrict Litigation consolidated all the breast implant litigation brought in federal courts for administration of pre-trial matters pursuant to 28 U.S.C. § 1407. *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 793 F.Supp. 1098 (Jud.Pan.Mult.Lit.1992). MDL–926 was assigned to the Honorable Sam C. Pointer, Jr. of the Northern District of Alabama.[3] Efforts were made to achieve a global settlement in the MDL–926 which led to a proposed $4,225,070,000 global settlement which was approved by Judge Pointer in 1994. *Lindsey v. Dow Corning Corp. (In re Silicone Gel Breast Implant Prods. Liab. Litig.)*, No. CV 92–P–10000–S, Civ. A. No. CV94–P–11558–S, 1994 WL 578353, at *1 (N.D.Ala. Sept.1, 1994). The Debtor had agreed to contribute $2.02 billion to the global settlement. Approximately 440,000 women filed claims with the global settlement fund in 1995, many more than were anticipated by the parties. Based on the number of claims filed, the claimants would have received only a small percentage of what was previously promised. Some estimated that the defendant manufacturers would have had to jointly contribute another $24 billion to the settlement fund to pay all the claimants the amount promised. *In re Dow Corning Corp.*, 211 B.R. at 552. More than 15,000 class members chose to opt out of the proposed settlement to preserve their right to pursue individual trials. *Id.* The global settlement fell apart in 1995.

The Debtor, faced with approximately 90 state trials in breast implant suits in 1995 with overlapping dates, believed that it would be financially and logistically impossible to defend itself. *Id.* In 1994 alone, the Debtor claimed it incurred more than $200 million in litigation costs. *Id.* The Debtor also faced a number of lawsuits involving nonbreast implant medical products. *Id.* at 553. As a result of its legal predicament, the Debtor filed chapter 11 bankruptcy on May 15, 1995. At that time, the Debtor was a defendant in over 19,000 individual silicone-gel breast implant class actions, 45 putative silicone-gel breast implant class actions, and 470 lawsuits involving nonbreast implant medical products at the time it filed its petition. *Id.*

Immediately after filing for bankruptcy, the Debtor sought to transfer all of the breast implant actions to the Eastern District of Michigan, including actions against its two shareholders, Dow Chemical and Corning, Inc. Other breast implant manufacturers, including Medical Engineering Corporation/Bristol–Myers Squibb, Minnesota Mining and Manufacturing Company and Baxter Healthcare Corp. and Baxter International, Inc. also requested that the cases against them be transferred to this Court. This Court granted the Debtor's request as to the claims against the Debtor

---

3. On April 3, 2000, Judge Pointer retired. The Honorable Edwin L. Nelson was assigned to succeed Judge Pointer as the MDL–926 panel judge.

but denied the transfer relating to the claims against the Debtor's shareholders and the non-Debtor breast implant manufacturers. *See In re Dow Corning Corp.* 187 B.R. at 931–32 and *Memorandum Opinion and Order on the Non–Debtors' Motion to Transfer,* Case No. 95–CV–72397–DT (E.D.Mich. Sept. 12, 1995). The Sixth Circuit reversed this Court holding that the Court had jurisdiction over the Debtor's shareholders and the non-Debtor breast implant manufacturers and remanding the matter in order that this Court analyze the transfers under abstention principles. *See Lindsey v. O'Brien, Tanski, Tanzer and Young Health Care Providers of Connecticut (In re Dow Corning Corp.),* 86 F.3d 482, 493–94 (6th Cir.1996). On remand, this Court declined to exercise jurisdiction over the Debtor's shareholders and the non-Debtor breast implant manufacturers based on abstention principles. *See In re Dow Corning Corp.,* No. 95–CV–72397–DT, 1996 WL 511646 (E.D.Mich. July 30, 1996). On a Writ of Mandamus motion, the Sixth Circuit reversed this Court's ruling only with respect to the Debtor's shareholders. *See Lindsey v. Dow Chemical Co. (In re Dow Corning Corp.),* 113 F.3d 565 (6th Cir.1997). This Court thereafter entered an Order Transferring all breast implant claims against Dow Chemical and Corning, Inc. to the Eastern District of Michigan. *See Order Transferring Breast Implant Cases,* Case No. 95–CV–72397–DT (E.D.Mich. May 13, 1997). To date, there are approximately 14,795 breast implant cases against Dow Chemical and Corning, Inc. filed before this Court. The transferred cases before this Court against Dow Chemical and Corning, Inc. are currently held in abeyance pending the outcome of the Debtor's bankruptcy action.

The Debtor has since proceeded with its bankruptcy action. The United States Trustee appointed various committees, including the Official Committee of Tort Claimants which represented the interests of the thousands of personal injury claimants before the Bankruptcy Court. The other committees appointed by the United States Trustee included the Official Committee for the Commercial Claimants and the Official Committee for the Physician Claimants. The Debtor proposed two plans of reorganizations which were vigorously opposed by the Tort Claimants' Committee. This Court and the Bankruptcy Court, appointed a Mediator, Professor Francis E. McGovern, to assist in the negotiation of a consensual Plan between the Debtor, the Bankruptcy Committees, the United States Trustee, Dow Chemical and Corning, Inc. *See Order Appointing Mediator,* Case No. 97–CV–00001–DT (E.D.Mich. Nov. 11, 1997). The Debtor thereafter began to seriously negotiate with the various Committees, especially the Tort Claimants' Committee, which resulted in the proposed Amended Joint Plan filed by the Debtor and the Tort Claimants' Committee, which is currently before the Court for review.

The Court will address the following issues below: the appealability of the December 21, 1999 Opinion; the release and injunction decision addressed in the December 21, 1999 Opinion; the parties' specific arguments relating to the release and injunction; classification, treatment, fairness standards, and the best-interest-of creditors test; each parties' specific arguments relating to the classification, treatment, fairness, and the best-interest-of creditors test; the United States' appeal from the order addressing its motion to compel; the Case Management Order; and motions to intervene and/or file *amicus* briefs.

## III. *JURISDICTION AND STANDARD OF REVIEW*

The district court has jurisdiction over appeals from final orders of the bankruptcy court in core proceedings. 28 U.S.C. §§ 157(b)(1) and 158(a)(1). The confirmation of a plan is a core proceeding. 28 U.S.C. § 157(b)(2)(L). A bankruptcy court's findings of fact are reviewed under

a clearly erroneous standard, while its conclusions of law are reviewed *de novo.* *Mapother & Mapother, P.S.C. v. Cooper (In re Downs),* 103 F.3d 472, 476–77 (6th Cir. 1996); Bankr.R. 8013. Where a bankruptcy court's determination involves a mixed question of fact and law, the district court "must break it down into its constituent parts and apply the appropriate standard of review for each part." *Wesbanco Bank Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.),* 106 F.3d 1255, 1259 (6th Cir.1997) (*citing Investors Credit Corp. v. Batie (In re Batie),* 995 F.2d 85, 88 (6th Cir.1993)).

## IV. *MOTIONS TO INTERVENE AND/OR TO FILE AMICUS BRIEF*

The Pennsylvania Physicians and Hospitals filed a Motion to Intervene in the appeal of the Class 5 Pennsylvania Claimants. Uneeda Laitinen, *pro se,* an implant claimant, also filed a Motion to Intervene in the appeals of the Dow Corning Plan for Reorganization. The Washington Legal Foundation filed a Motion to File Brief as *amicus curiae* in support of the Proponents' position regarding the Bankruptcy Court's December 21, 1999 Opinion.

▪ The parties seeking intervention cite Fed.R.Civ.P. 24 as authority to intervene in the appeals. Rule 24 allows intervention as of right or by permission in an "action" before the district court. *See* Fed.R.Civ.P. 24(a) and (b). "Action" is defined as a "[c]ivil action . . . commenced by filing a complaint with the court." Fed. R.Civ.P. 2 and 3.

▪ In the Motions to Intervene before this Court, the parties seek intervention in "appeals" filed by certain parties from the Bankruptcy Court. The parties are not seeking to intervene in "actions" currently before the Court which were filed by way of a "complaint" but are seeking to intervene in "appeals" filed in this Court. The parties seeking to intervene have not cited any authority nor has this Court found any

such authority, which would allow this Court, sitting as an appellate court, acting under the jurisdiction conferred to district courts by 28 U.S.C. § 158(a) to allow intervention. Bankruptcy Rules 8001 and 8002 set forth the manner in which a party may file an appeal from a bankruptcy court's order. If any party does not follow the rules regarding filing appeals from bankruptcy court orders, the Court does not have jurisdiction over that party on appeal under 28 U.S.C. § 158(a). "If a timely notice of appeal is not filed, no appeal may be taken later." *See* Committee Note, Bankr.R. 8002. The parties seeking to intervene in the appeals have not shown that this Court has the authority to allow non-parties to the appeal to intervene on appeal. The Court's interpretation of Fed. R.Civ.P. 24 is not authority for this Court to allow parties to intervene on appeal. Rule 24 applies to an original civil action filed before this Court by way of a complaint and not by way of a bankruptcy appeal. The Court will not allow the Pennsylvania Physicians and Pennsylvania Hospitals and Uneeda Laitinen to intervene on appeal. The Court, however, will consider the briefs as motions to file an *amicus curiae* brief.

▪ Appellate courts have allowed briefs of an *amicus curiae.* The Federal Rules of Appellate Procedure 29 sets forth the manner in which an *amicus curiae* brief may be filed. *Amicus curiae* briefs may be filed only by leave of court or by consent of the parties stated in the brief. Fed.R.App.P. 29(a). The motion to file an *amicus curiae* brief must be accompanied by the proposed brief and state the movant's interest *and* the reason why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case. Fed.R.App.P. 29(b).

▪ The Pennsylvania Physicians and Hospitals' brief states that their interest in the appeals stem from the Bankruptcy Court's December 21, 1999 Opinion regarding the release and injunctive issues. They state that neither the Proponents nor

any other party have addressed their concerns that the December 21, 1999 Opinion may affect the physicians and hospitals' rights under the Amended Joint Plan. The Pennsylvania Physicians and Hospitals argue that their brief is therefore desirable and relevant to the disposition of the case. The Court finds that the Pennsylvania Physicians and Hospitals' brief addresses issues affecting the rights of the physicians and hospitals which no other party has raised before this Court with respect to the December 21, 1999 Opinion. The Pennsylvania Physicians and Hospitals' brief will be allowed as an *amicus curiae* brief.

Uneeda Laitinen's Motion for Intervention, received by the Clerk's Office on April 12, 2000, is essentially a concurrence with the arguments Appellant Marti Jacobs has brought before the Court. Laitinen, as a claimant in the bankruptcy proceeding, does have an interest in the appeals before the Court. Although not particularly helpful to the Court, to the extent that Laitinen seeks to place on the record her concurrence with Jacobs' position on appeal, the Court will allow Laitinen to so state on the record by allowing her "Motion for Intervention" to be filed as an *amicus curiae* brief.

The Washington Legal Foundation states that its interest in the appeals before the Court are twofold: 1) it has an interest in opposing the proliferation of product-liability class actions as a threat to free enterprise and prosperity; and 2) that the rule of law be upheld involving in bankruptcy laws. The Washington Legal Foundation believes that their brief would assist the Court and its views are relevant to the appeals. The Tort Claimants' Committee responded to the Washington Legal Foundation's motion stating that it has no objection if the Court wishes to accept the proposed *amicus curiae* brief but the Tort Claimants' Committee makes it clear that it only agrees with the Washington Legal Foundation's conclusion and not the basis for the conclusion. The Nevada Claimants oppose the Washington Legal Foundation's brief because they claim the brief would not assist the Court but merely advocates for the Shareholders. The Court will allow the Washington Legal Foundation's brief as an *amicus curiae* because it does have an interest in the appeals and the brief is relevant to the issues before the Court on appeal.

## V. UNTIMELY NOTICE OF APPEAL

In its January 24, 2000 Scheduling Order regarding the appeals, the Court allowed parties to file motions to dismiss any pending appeal. Other than the motion to dismiss filed by the United States, no other motions were filed to dismiss any pending appeal. Other than the United States' motion to dismiss addressed by the Court above, the issue of whether certain parties filed timely Notices of Appeal was not argued vigorously by any party. Because filing a notice of appeal is jurisdictional, the Court will determine whether a party's filing of the notice of appeal was timely.

Bankruptcy Rule 8002(a) provides that a "notice of appeal shall be filed with the clerk within 10 days of the date of the entry of the judgment, order, or decree appealed from." Generally, a bankruptcy judge may extend the time for filing the notice of appeal if the request is made by a written motion and filed before the time for filing a notice of appeal has expired. Bankr.R. 8002(c)(1) and (2). However, the bankruptcy judge cannot extend the time for filing a notice of appeal if the order confirms a plan. Bankr.R. 8002(c)(1)(F). The 10 day period of time begins to run the day after the entry of the order and includes intermediate weekends and legal holidays. Bankr.R. 9006(a). The last day of the period is also included, unless it is a weekend day or a legal holiday. *Id.* As the rule is jurisdictional, failure to file a timely notice requires an appeal be dismissed for lack of jurisdiction. *Walker v. Bank of Cadiz (In re LBL Sports Ctr., Inc.),* 684 F.2d 410, 412 (6th Cir.1982). The rule has been strictly construed, requiring strict

compliance with its terms. *Hotel Syracuse, Inc. v. City of Syracuse Indus. Dev. Agency (In re Hotel Syracuse, Inc.)*, 154 B.R. 13, 15 (N.D.N.Y.1993). The notice of appeal itself is not a request for an extension under Rule 8002 since a request must be made by motion. *See Pryor v. Marshall*, 711 F.2d 63, 64–65 (6th Cir.1983) (holding Fed.R.App.P. 4(a)(5) requires an appellant to file a timely motion requesting an extension of time).[4] Delays due to the mail are not grounds for excusable neglect. *See In re LBL Sports Center, Inc.*, 684 F.2d at 412. The Sixth Circuit has noted that although a person proceeding *pro se* may not fully understand the rules or procedure, he or she is still required to comply with the rules and that a *pro se* status does not exempt a person from complying

with the rules. *See Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir.1991).

A review of the record before the Court and the Bankruptcy Court, indicates that Notices of Appeal listed below were not timely filed, therefore, the Court has no jurisdiction over those appeals. A party seeking an appeal from the November 30, 1999 Confirmation Order must have filed a notice of appeal before the Bankruptcy Court on or before December 10, 1999. A notice of appeal from the December 21, 1999 Opinion must have been filed on or before January 3, 2000 (the New Year holiday, January 1, a Saturday, was observed on December 31, 1999). The following appeals were untimely filed and will be dismissed for lack of jurisdiction:

| Case No. | Date filed with Bankruptcy Court | Appellant |
| --- | --- | --- |
| 99–CV–76007 | December 13, 1999 | Beatrix Shishido, *pro se* |
| 99–CV–76008 | December 13, 1999 | Karen L. Hustead, *pro se* |
| 99–CV–76009 | December 13, 1999 | Pamela Dowd, *pro se* and Maribeth West, *pro se* |
| 99–CV–76063 | December 16, 1999 | Class Five Pennsylvania Claimants, Pennsylvania Coordinated Silicone Breast Implant Litigation |
| 0–CV–70076 | December 30, 1999 | Rita Altig, et al. |
| 0–CV–70176 | January 10, 2000 | Hartford Accident & Indemnity Co., et al. |
| 00–CV–70177 | January 10, 2000 | Lloyds of London, et al. |

Appellants Shishido, Hustead, Dowd and West, the Class Five Pennsylvania Claimants, and the Altig Claimants filed their notices of appeal from the November 30, 1999 Confirmation Order beyond the 10 day appeal time period of December 10, 1999. Although the Altig Claimants' Notice of Appeal indicates they were appealing from the Bankruptcy Court's December 21, 1999 Opinion, the substance of their appeal goes to the issues addressed in the November 30, 1999 Confirmation Order and not to the issues raised in the December 21, 1999 Opinion which modified

the November 30, 1999 Confirmation—specifically the release and injunction provisions issues. The Altig Claimants do not appeal the Bankruptcy Court's opinion on the release and injunction provisions raised in its December 21, 1999 Opinion. The Altig Claimants have not argued that the balance of the Bankruptcy Court's December 21, 1999 Opinion modified its November 30, 1999 Confirmation Order. The Insurers notices of appeal from the December 21, 1999 Opinion regarding the release and injunction provisions were also filed beyond the 10 day appeal time period

---

4. Rule 8002(c) is an adaptation of Federal Rule of Appellate Procedure 4(a)(5). Fed. R.Bank.P. 8002 advisory committee's notes.

which expired on January 4, 2000. Because the briefs on appeal submitted by the parties address issues that have been raised by other parties who filed timely appeals, the Court will consider the briefs submitted as *amicus curiae* briefs.

## VI. APPEALABILITY OF THE DECEMBER 21, 1999 OPINION

### A. Parties filing Appeals and Motions regarding the December 21, 1999 Opinion

The Shareholders, Dow Chemical and Corning, Inc., and the Proponents, the Debtor and the Tort Claimants' Committee, filed separate appeals from the December 21, 1999 Opinion seeking review of the Bankruptcy Court's release and injunction opinion. A Motion to Vacate the December 21, 1999 Opinion and a Motion to Withdraw the Reference were also filed by the Proponents relating to the injunction issue. The Shareholders filed a document before the Bankruptcy Court entitled "Notice of Shareholders of Failure to Satisfy Condition" which was stricken by the Bankruptcy Court. The Shareholders filed an appeal of the Bankruptcy Court's Order striking the Notice. Certain insurance companies also filed an appeal from the December 21, 1999 Opinion. A Motion to Dismiss the appeals relating to the December 21, 1999 Opinion was filed by the United States of America ("United States").

### B. United States' Motion to Dismiss Appeal

#### 1. Background of the December 21, 1999 Opinion

The United States filed a Motion to Dismiss the Appeals relating to the December 21, 1999 Opinion of the Bankruptcy Court addressing the Release and Injunction provisions of the Joint Plan because the Notices of Appeals were filed more than ten days after the November 30, 1999 Confirmation Order. The United States, joined by several parties (the "Plan Opponents"), argue that any appeal from the November 30, 1999 Confirmation Order should have been filed within ten days from that date, as opposed to ten days from December 21, 1999, the date the Opinion was issued on the Release and Injunction provisions. The Proponents, Shareholders and the Settling Insurers argue that their Appeals are timely because the December 21, 1999 Opinion changed the November 30, 1999 Confirmation Order as to the release and injunction issues.

The Joint Plan provides that "All Persons who have held, hold or may hold Products Liability Claims, whether known or unknown, shall be deemed to have forever waived and released all such rights or claims against the Released Parties." Joint Plan, § 8.3. The released parties include the "Shareholders" and the "Proponents". The Joint Plan further provides that "all Persons who have held, hold, or may hold Released Claims, whether known or unknown ... shall be permanently enjoined" from pursuing those claims against the Released Parties. Joint Plan, § 8.4.

In response to the Amended Joint Plan, several claimants vehemently argued that the injunction provision violated the Bankruptcy Code. According to the Proponents and Shareholders, the crux of the debate centered around whether a release that applied to all claimants was legal. Even though there was disagreement over the validity of the injunction provisions, the Proponents argue that all parties involved agreed that the scope of the provision was to release the Shareholders and Proponents from all product liability claims, regardless of whether the claimants voted for or against the Joint Plan or did not vote at all. In support of this assertion, the Proponents and Shareholders cite excerpts from filings made by the Nevada objectors, the Australian complainants, and the Official Committee of Unsecured Creditors which reference the injunction provision as applying to "all" tort claimants and the resulting lack of options.

The Proponents and Shareholders believe that the release and injunction sections of the Joint Plan make it clear that they are released from any and all products liability claims. This means that anyone with a claim relating to an implant or any of the other claims being released, will not be able to sue or continue suit against any of the released parties, including Dow Corning, Dow Chemical, Corning Inc. and the Settling Insurers.

The Bankruptcy Court's Confirmation Order stated that "[t]he Plan, including its attached and incorporated separate agreements, compromises, settlements, and assumptions and rejections of executory contacts and unexpired leases, is confirmed." *Order Confirming Amended Joint Plan of Reorganization as Modified,* p. 1. The Confirmation Order does not specifically address the release and injunction provisions at issue. The Findings of Fact and Conclusions of Law state the following:

21. The Settling Physicians, the Settling Insurers, Corning, Inc. and The Dow Chemical Company will all make important contributions to the reorganization as part of a confirmed Plan.

22. The release and injunction provisions with respect to the Settling Physicians, Settling Insurers, Corning, Inc. and The Dow Chemical Company are essential to reorganization pursuant to this Plan.

23. A large majority of the creditors impacted by the release and injunction provisions approved the Plan.

24. There is a close connection between the claims of the Settling Physicians, the Settling Insurers, Corning, Inc. and the Dow Chemical Company on the one hand and the claims against the Debtor on the other hand.

25. The Plan provides for the payment of all of the claims affected by the release and injunction provisions of the Plan.

*November 30, 1999 Findings of Fact and Conclusions of Law Regarding Confirmation of the Joint Plan of Reorganization,* p. 5. The Conclusions of Law state:

D. The Plan complies with the applicable provisions of title 11 United States Code. 11 U.S.C. § 1129(a)(1). *See* separate opinion to be issued later with respect to this issue.

*Id.*

The Proponents and Shareholders argue that the findings set forth in ¶¶ 21–25 are precisely the factors that courts have held may in certain circumstances warrant approval of plans of reorganization containing release and injunction provisions that bar claims against non-debtors by all claimants, regardless of how or whether they voted on confirmation. *See November 30, 1999 Findings of Fact,* ¶¶ 21–25. The United States agrees with the Proponents and Shareholders in this regard and maintains that the November 30, 1999 Confirmation Order was in fact an approval of the reorganization plan. As a result of the November 30, 1999 Confirmation Order, a number of claimants who had voted against the Joint Plan, including the United States, promptly filed Notices of Appeal.

On December 21, 1999, the Bankruptcy Court issued an opinion which was described as "the last in a series of opinions serving to supplement and explain the findings and conclusions previously submitted." *In re Dow Corning Corp. (Opinion on Best–Interests–of–Creditors Test),* 244 B.R. at 726. Contained within this opinion was a discussion regarding the Joint Plan's release and injunction provisions. The Bankruptcy Court opined that those provisions apply only to claimants who voted in favor of confirmation, but not to claimants who voted against the Joint Plan or who did not vote at all. In essence, the Bankruptcy Court reasoned that it lacked the power to release claims held by non-voters or objectors. The Bankruptcy Court also noted that since the release and injunctive provisions were only

applicable to those claimants who voted in favor of the Plan, there was no need for an injunction. According to the Bankruptcy Court, the creditors that voted for the Plan agreed to relinquish their claims against the released parties, and as a result, the Proponents would not suffer irreparable harm. *Id.* at 745–46.

The Proponents and the Shareholders filed notices of appeal within (10) days of the December 21, 1999 Opinion asserting that the Opinion significantly altered the previous judgment entered by the court. The United States moved to dismiss the appeals, arguing that (1) the Proponents and Shareholders failed to appeal within ten days of the November 30 Confirmation Order, and (2) the December 21 Opinion is not independently appealable.

### 2. *Finality of the December 21, 1999 Opinion*

■ This Court has jurisdiction to hear appeals "from final judgments, orders and decrees" entered by bankruptcy courts. 28 U.S.C. § 158(a). The time limit to pursue an appeal in a bankruptcy case is more accelerated than that applicable to generic non-bankruptcy civil cases. Specifically, Rule 8002(a) of the Bankruptcy Rules states that "[t]he notice of appeal shall be filed with the clerk within 10 days of the date of the entry of the judgment, order or decree appealed from."

The Proponents and Shareholders argue that they filed a notice of appeal from the December 21 opinion as well as from the November 30 Confirmation Order to the extent that it was amended or modified by the December 21 Opinion. It is undisputed that the Proponents failed to appeal within the required ten days of the November 30, 1999 Order, but did file a Notice of Appeal within the ten days after the December 21 Opinion was issued. The question is whether the December 21 Opinion satisfies the requirement for a final judgment as outlined in 28 U.S.C. § 158(a). the Court finds the Opinion is a final order and this Court has jurisdiction

to hear the Proponents and Shareholders' appeal pursuant to Bankruptcy Rule 8002 and 28 U.S.C. § 158(a).

■ The Supreme Court has promulgated a test for determining when parties should be allowed to appeal an order entered subsequent to a court's final judgment. The Supreme Court wrote:

> [T]he mere fact that a judgment previously entered has been reentered or revised in an immaterial way does not toll the time within which review must be sought. Only when the lower court changes matters of substance or resolves a genuine ambiguity, in a judgment previously rendered should the period within which an appeal must be taken or a petition for certiorari filed begin to run anew. The test is a practical one. The question is whether the lower court, in its second order, has disturbed or revised legal rights and obligations which, by its prior judgment, had been plainly and properly settled with finality.

*Federal Trade Commission v. Minneapolis–Honeywell Regulator Co.,* 344 U.S. 206, 73 S.Ct. 245, 97 L.Ed. 245 (1952). The Supreme Court also indicated that the question of whether the time for petitioning for appeal should be enlarged "cannot turn on the adjective which the court below chose to use in the caption of its second judgment." *Id.* at 212, 73 S.Ct. 245.

This test was adopted by the Sixth Circuit in *Green v. Nevers,* 196 F.3d 627 (6th Cir.1999) and *Cuyahoga Valley Railway Company v. Tracy,* 6 F.3d 389 (6th Cir. 1993). In *Green,* a plaintiff attempted to appeal an order that was entered subsequent to a court's final decree. The Sixth Circuit reasoned that the second order merely amended the first order by correcting "a minor technical error" and therefore did not toll the time for filing a notice of appeal. *Green,* 196 F.3d at 631. In accordance with the *Minneapolis–Honeywell* case, the Sixth Circuit concluded that be-

cause there were no substantive changes or resolution of genuine ambiguity, the second order did not restart the time for appeal. *Id.*

Similarly in *Tracy,* the Sixth Circuit determined that the defendants' attempt to appeal from a subsequent order which it contended modified certain aspects of the original order was untimely. The defendants argued that because the second order modified certain aspects of the court's first order, every item in the first order was subject to appeal. The issue that the defendants sought for review was not altered or even mentioned in the second court order. The *Tracy* court held that "the relevant case law in no way suggests that once one issue has been modified, all of the issues from the original order are fair game for appeal." *Tracy,* 6 F.3d at 395. The district court's later modification of the first order was completely unrelated to the issue the defendants disputed and therefore did not alter the state of repose. *Id.* The Sixth Circuit has also determined that "[A] decision is final for purposes of appeal if an appeal is the only method of obtaining review." *United States v. Lee,* 786 F.2d 951 (9th Cir.1986).

Here, the December 21 Opinion revised the November 30 Confirmation Order in a material way. The Bankruptcy Court specifically stated in its December 21, 1999 Opinion that Claimants who voted against the Joint Plan or who did not vote at all, are not deemed to have released the non-debtors and could still bring suit against the Proponents and the Shareholders. For the first time, the Bankruptcy Court articulated the scope and effect of the release and injunction on all of the parties. The November 30 Confirmation Order did not elaborate on or explain interpret these provisions. The Bankruptcy Court simply stated that "the Plan, including its attached and incorporated separate agreements, compromises, settlements, and assumptions and rejections of executory contracts and unexpired leases [was] confirmed." *November 30,*

*1999 Confirmation Order,* p. 1. The Findings of Fact and Conclusions of Law issued on the same date, reference the provisions, but fail to detail the ramifications they have on the parties. The Findings of Fact, in ¶¶ 21–25, address factors that courts have articulated to support the imposition of releases and injunctions. The Conclusions of Law do not address the injunction and release issues but merely state that "[t]he Plan complies with the applicable provisions of title 11 United States Code. 11 U.S.C. § 1129(a)(1). *See* separate opinion to be issued later with respect to this issue." *November 30, 1999 Findings of Fact,* ¶ D. Nowhere in the Bankruptcy Court's November 30, 1999 Findings of Fact and Conclusions of Law nor the November 30, 1999 Confirmation Order does it expressly state that the release and injunction provisions only apply to those who approved the Plan.

The December 21 Opinion revised the scope of the injunction/release provisions and made these provisions applicable only to those parties who voted in favor of the confirmation plan. If this Court accepts the United States' argument and concludes that the November 30 Confirmation Order was the Bankruptcy Court's final decree, then the entire plan, as written, was confirmed on that date. The release and injunction provisions would then apply to *"all* Persons who have held, hold, or may hold Products Liability Claims whether known or unknown." Joint Plan, § 8.3 (italics added). Since, this was clearly not the Bankruptcy Court's interpretation when the November 30 Confirmation Order was entered, the subsequent December 21 Opinion changed the legal rights and obligations of the parties, as written under the Joint Plan.

The Proponents seek review of the subject matter that was substantially altered by the December 21 Opinion. As noted in *Tracy,* an appeal may be barred if the parties seek review of an entire order simply because one provision has been altered by a subsequent judgment. In the instant

case however, the Proponents seek review of the only significant change in the December 21 Opinion, specifically, Section IV of the Opinion—the applicability and scope of the release/injunction provisions.

If this Court denies the Proponents' review of their appeal, there will be no alternative means for them to seek review of the December 21 Opinion. Based on *Lee*, the opinion qualifies the as a final decision for purposes of appeal. In accordance with *Minneapolis–Honeywell* and *Lee*, the December 21 Opinion is appealable. The December 21 Opinion materially altered the November 30 Confirmation Order, and the Proponents have no other way to assert their objections except through appeal. Since the Bankruptcy Court did not specifically address the injunction and release issues either in its Findings of Fact and Conclusions of Law or in the November 30 Confirmation Order, the Proponents reasonably believed that the reorganization plan had been confirmed as written, and all issues had been settled with finality. The Appellants who objected to the Plan also reasonably believed that the injunction and release provisions had been confirmed by the Bankruptcy court's November 30 Confirmation Order as evidenced by their own timely appeals of the confirmation of those provisions.

 As indicated above, this Court has jurisdiction to hear appeals "from final judgments, orders, and decrees" entered by bankruptcy courts. 28 U.S.C. § 158(a). The Sixth Circuit has adopted the Supreme Court's definition of a final order as one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Whittington v. Milby*, 928 F.2d 188, 191 (6th Cir.1991) (quoting *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945)). This Circuit has also emphasized that the requirement of finality is to be given a practical rather than a technical construction. *Id.* (citing *Eisen v. Carlisle & Jac-*

*quelin*, 417 U.S. 156, 171, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)).

 In cases of marginal finality, the Sixth Circuit has adopted what has become known as the *Gillespie* doctrine. *Vause v. Capital Poly Bag, Inc.*, 886 F.2d 794, 797 (1989). In certain close cases where finality cannot be conclusively resolved, the court has determined that the "danger of denying justice by delay outweighs the inconvenience and costs of piecemeal review, particularly when the questions on appeal are fundamental to the further outcome of the case." *Id.* (quoting *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964)). The *Gillespie* doctrine, therefore, "permits the courts of appeals to decide the merits in cases of marginal finality where the course of litigation would be impeded, rather than advanced, by dismissing the appeal." *Id.*

The Proponents contend that the Bankruptcy Court's statement on January 10, 2000 that the December 21 Opinion "did not amend, modify or otherwise change the order confirming the plan" does not establish that the December 21 Opinion did not modify the November 30 Confirmation Order. Nor should it matter that the December 21 ruling is labeled an "opinion" instead of an "order." In support of this contention, the Proponents quote the Ninth Circuit which has stated that:

> [f]or purposes of determining appealability of an order, "the trial judge's characterization of his own action cannot control the classification of the action." The court should instead focus on the effect of the ruling rather than the label placed on it.

*Lee*, 786 F.2d at 955 (quoting *United States v. Scott*, 437 U.S. 82, 96, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978)) (other citations omitted). The Proponents also cite *American Motors Corp. v. FTC*, 601 F.2d 1329, 1331 n. 2 (6th Cir.1979) and *United States v. Battisti*, 486 F.2d 961, 967 (6th Cir. 1973), which stand for the proposition that appealability of an order depends on its

substantial effect versus the label attached to it.

The argument asserted by the Proponents has been upheld in the Seventh and Third Circuits. In *Charles v. Daley,* 799 F.2d 343 (7th Cir.1986), a district court entered an award of attorney fees in favor of the plaintiff on October 1, 1984. The order awarded fees but did not stipulate which defendants would be responsible for payment. The accompanying opinion said that the "defendants" would pay, but it referred to three intervenor-defendants as intervenors. One reading of the order made the intervening defendants jointly and severally liable for the $200,000 attorney fee award. Another reading of the order did not make them liable at all. The intervenors requested clarification and modification of the order and filed a timely motion to suspend the finality of the judgment until the court ruled on their motion. On April 22, 1985, the district court denied their motion for clarification and modification and entered another order indicating that the plaintiff's fees and costs would be borne equally by the defendants. The district court's April 22 order both denied the intervenors motion and amended the original judgment entered on October 1, 1984.

The *Daley* court applied the holding of *Minneapolis–Honeywell* and concluded that there was a genuine ambiguity in the court's original order dated October 1, 1984. The subsequent April 22 order not only dispelled the ambiguity but also made substantive changes. By dividing liability among the groups of defendants, and making the intervenors jointly and severally liable for the plaintiff's attorney fees and costs, the April 22 order became a new order, affording the aggrieved parties time to seek alteration or appeal. *Daley,* 799 F.2d at 348. The *Daley* court noted that "the sort of alteration that restarts all periods of time is one that changes matters of substance, or resolves a genuine ambiguity, in a judgment previously rendered." *Id.* (quoting *Minneapolis–Honeywell,* 344 U.S. at 211, 73 S.Ct. 245). The

Third Circuit has also determined that "an order substantively changing a judgment, constitutes a new judgment with its own time for appeal at least where the change is the subject matter to be reviewed." *Keith v. Truck Stops Corporation of America,* 909 F.2d 743, 746 (3rd Cir.1990).

■ Applying the rationale of the Ninth, Seventh and Third Circuits to the case at bar, the December 21 Opinion is appealable. A trial court judge's characterization of the rulings he/she enters is of no moment. It is the effect of these rulings which determines their appealability. The December 21 Opinion clarified and substantively changed the applicability of the release and injunction provisions.

Applying the *Whittington* holding to the case at bar, it is practical to interpret the December 21 Opinion as the Bankruptcy Court's final order on the release and injunction issues. As indicated in *Whittington,* an order is not final unless all issues have been addressed and resolved. It is clear that this requirement was not satisfied until the Bankruptcy Court issued the December 21 Opinion on the release and injunction issues. Since all parties placed significant importance on the release and injunction provisions, it is impractical to interpret the November 30 Order as final when key components to the reorganization plan were changed by the December 21 Opinion.

The *Gillespie* doctrine directs that any issue that is fundamental to the future outcome of a case should meet the finality requirement and should be appealable. There is no question that this is a fundamental issue that has the potential of seriously affecting the Proponents and/or Shareholders in the future. Applying the *Gillespie* doctrine to the facts of the instant case it is clear that the requirement of finality has been met, and the Proponents and Shareholders will be allowed to appeal the December 21 Opinion.

### 3. *Notice/Due Process*

The Proponents and Shareholders contend that it would violate due process if they were barred from appealing the December 21 ruling when they filed notices of appeal within 10 days of the Bankruptcy Court's announcement of notification. According to the Proponents, "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The notice must also be of such nature "to reasonably convey the required information and afford a reasonable time for those interested to make their appearance." *Id.* Applying the *Mullane* holding, the Sixth Circuit has also determined that the failure to give adequate notice is violative of procedural due process. *Verba v. Ohio Casualty Insurance Co.,* 851 F.2d 811, 815 (6th Cir.1988).

When the Bankruptcy Court issued its Findings of Fact and Conclusions of Law on November 30, the court indicated that several of its findings would be more fully explained in a subsequent separate opinion. There was no indication however, that the language confirming the release and injunction provisions would be interpreted other than as intended by the Proponents. The parties reasonably concluded that the Bankruptcy Court had adopted these provisions as written in the Joint Plan. This is evidenced by the actions of the parties following the issuance of the November 30 Confirmation Order. The Nevada Claimants specifically stated that the basis of their appeal centered around the permanent injunction provision. The United States also questioned the injunction provision and whether the bankruptcy court erred in confirming a Plan which releases entities from the claims of all parties and enjoins all parties from all

actions against the Released Parties for future claims. The Proponents, along with the Plan Opponents, thought that the release and injunction provisions, as written in the Joint Plan, required "all" claimants to release the Debtor, the Shareholders and the Settling Insurers. Not until the issuance of the December 21 Opinion did the parties become aware of the Bankruptcy Court's reasoning. The Bankruptcy Court's interpretation of the release and injunction provisions altered the plain language of the reorganization plan from "*all* persons who have held, hold, or may hold Released Claims, whether known or unknown" to make the provisions applicable only to "those persons who accepted the plan." *Best–Interests Opinion,* 244 B.R. at 745.

Upon review of the November 30 Confirmation Order and Findings of Fact and Conclusions of Law, there is no indication that the court intended to interpret the release and injunction provision as the Bankruptcy Court finally did in its December 21 Opinion. The Proponents had no formal notice of the Bankruptcy Court's reasoning or intentions with regard to the release/injunction provisions. Once the December 21 Opinion was issued, putting the Proponents on notice of the court's final holding, a timely appeal was filed. As noted in *Mullane,* because the Proponents were not given notice of the applicability of the November 30 Confirmation Order, it would be a violation of due process to deny them an opportunity to present their objections to the December 21 Opinion.

### 4. *Conclusion*

The December 21 Opinion qualifies as a final judgment which gives this Court jurisdiction to hear the Proponents' for appeal. The November 30 Confirmation Order stated that the amended reorganization plan had been confirmed in its entirety. From this statement, there is no indication that the Bankruptcy Court planned by its subsequent opinions to in-

terpret any of the Plan's provisions differently from the plain language of the Plan. As a result, the Proponents were not given notice of their need to appeal until after the Bankruptcy Court issued the December 21 Opinion which substantially altered the applicability of the release and injunction provisions. It would be violative of procedural due process to deny the Proponents the only opportunity they have in which to address their objections to the modifications contained within the December 21 Opinion. The December 21 Opinion falls within the definition of a final order. It was a clear articulation by the Bankruptcy Court of its holding regarding the release and injunction provisions.

### C. *Proponents' Motion to Withdraw the Reference*

■ Alternatively, the Proponents have filed a Motion to Withdraw the Reference should the Court decide not to consider their appeal on the merits. 28 U.S.C. § 157(d) provides that "[t]he district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." "Cause" is not defined. In order to determine "cause,"

> The district court should consider the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process.

*Holland America Ins. Co. v. Succession of Roy,* 777 F.2d 992, 999 (5th Cir.1985). Although not explicitly required for withdrawal *sua sponte,* it has been held by some courts that after a core proceeding is finally disposed of by the bankruptcy court, a district court must proceed under its appellate jurisdiction as opposed to utilizing its original jurisdiction by withdrawing the reference. *In re Pruitt,* 910 F.2d 1160, 1168 (3rd Cir.1990). Once core pro-

ceedings become final, withdrawing the reference would be without cause. *Id.; Carlton v. Baww, Inc.,* 751 F.2d 781, 788, n. 10 (5th Cir.1985). The Seventh Circuit has stated:

> The timing of the court's withdrawal of the reference here, even if not improper, seems to be in conflict with the statutory objectives of utilizing the expertise of bankruptcy judges, reducing forum shopping and preserving the appellate processes provided by the Bankruptcy Act.

*In the Matter of Powelson,* 878 F.2d 976, 983 (7th Cir.1989). Although the statute does not expressly forbid the withdrawal of reference after a final order has been entered, such withdrawal appears to violate the intent of Congress as reflected in the statutory scheme taken as a whole. *Id.* at 983–84. Congress has established a structure within the bankruptcy court system which allows for the district courts to supervise the bankruptcy courts in two different capacities: first, withdrawal of the reference and the reinstatement of the district court's original jurisdiction under 28 U.S.C. § 158(d) and second, through the appellate process in 28 U.S.C. § 157(a). "[A]llowing the withdrawal of the reference to occur at any time, and especially after the appeal process has begun, would seriously disturb the statutory objective of 'preserving the appellate processes provided by the Bankruptcy Act.'" *In re Pruitt,* 910 F.2d at 1169 (concurring opinion), *citing Powelson,* 878 F.2d at 983. Although the precise issue has not been addressed by the Sixth Circuit, the Sixth Circuit has stated that short circuiting the orderly procedure for the administration of bankruptcy stays without recognizing the legal effect of the bankruptcy stay to a case before the trial court is not favored. *NLT Computer Servs. Corp. v. Capital Computer Sys., Inc.,* 755 F.2d 1253, 1258 (6th Cir.1985).

A final confirmation order has been entered in this matter. The Court will not on this occasion withdraw the reference at

this late stage based on the statutory scheme as a whole. The Court will not exercise both its original and appellate jurisdiction to review the issues raised in the same order.

## VII. *RELEASE AND INJUNCTION PROVISIONS*

### A. *Sections 8.3 and 8.4 of the Joint Plan*

Section 1129(a) sets forth 13 requirements for confirmation of the plan. One of those requirements is found in 11 U.S.C. § 1129(a)(1) which provides that a plan cannot be confirmed unless it "complies with the applicable provisions of [the Bankruptcy Code]." The Bankruptcy Court has the authority to approve reorganization plans, including any provision "not inconsistent with the applicable provisions of [the Code]." 11 U.S.C. § 1123(b)(6).

Section 8.3 of the Plan (the "release provision") provides that personal-injury claims against various parties are deemed waived and released upon the effective date of the confirmation of the Plan. Section 8.4 (the "injunction provision") provides that holders of the claims are enjoined from commencing or continuing any action seeking to enforce their claims against the Released Parties, including the Debtor–Affiliated Parties (the Debtor, the Reorganized Debtor, the Joint Ventures and Subsidiaries, and their respective Representatives), the Shareholder–Affiliated Parties (the Shareholders and their past and present Affiliates and their Representatives), the Settling Insurers, the Settling Physicians, and the Settling Health Care Providers. Amended Joint Plan, §§ 8.3, 8.4.

In its opinion issued on December 21, 1999, the Bankruptcy Court, explained its Findings of Fact as to the release and injunction provisions. The Bankruptcy Court concluded that the release and in-

junction provisions are consistent with the Bankruptcy Code. *Best–Interests Opinion,* 244 B.R. at 740. However, the Bankruptcy Court interpreted the provisions to apply only to those persons who voted in favor of the Plan based on non-bankruptcy law, in particular the *Grupo Mexicano*[5] case. The Bankruptcy Court found that §§ 8.3 and 8.4 are permissible and that the Plan can be confirmed by applying §§ 8.3 and 8.4 only to those creditors who voted to accept the Plan. The Bankruptcy Court concluded that §§ 8.3 and 8.4 are appropriate provisions and not inconsistent with the Code when applied in this way. *Best–Interests Opinion,* 244 B.R. at 745. The Bankruptcy Court noted that if the terms of the Plan were plain and construed to include "all persons" holding claims of the type described in the provisions, then the court would have no choice but to deny confirmation of the Plan. 244 B.R. at 745.

Prior to the issuance of the December 21, 1999 Opinion appeals were filed from the November 30, 1999 Confirmation Order on the release and injunction issues by certain personal injury claimants arguing that the release and injunction provisions releasing, in particular, the Shareholders, are improper. After the Bankruptcy Court's issuance of its December 21, 1999 Opinion, the Proponents and the Shareholders filed appeals on the release and injunction portion of that Opinion claiming that the Bankruptcy Court's interpretation of the release and injunction provisions as binding only on those who voted to accept the Plan.

There is no dispute that the Debtor is discharged and, essentially released, from the various claims against it. The Court will address below the state of the law on the release and injunction issues, as it applies to non-debtors, whether the Bankruptcy Court erred in its interpretation of the release and injunction provisions, and each party's arguments as to whether the

**5.** *Grupo Mexicano de Desarrollo v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999).

release and injunction provisions are proper.

### B. *Jurisdiction/Authority*

The release and injunction provisions of the Plan are construed a non-debtor discharge. The starting place for analysis of non-debtor discharge is whether the bankruptcy court has jurisdiction under 28 U.S.C. § 1334(b). *Matter of Zale Corp. (Feld v. Zale Corp.)*, 62 F.3d 746, 751 (5th Cir.1995). Generally, bankruptcy jurisdiction is not conferred for the convenience of those not in bankruptcy. *In re Pacor, Inc. v. Higgins*, 743 F.2d 984, 996 (3rd Cir.1984), *rev'd on other grounds, Things Remembered, Inc. v. Petrarca*, 516 U.S. 124, 134–35, 116 S.Ct. 494, 133 L.Ed.2d 461 (1995). Unless the parties involved are the debtor and the creditors, or the bankruptcy court has "related to" jurisdiction over certain parties, the bankruptcy court has no jurisdiction to enter orders pertaining to parties who are not related to the bankruptcy action.

The Released Parties under §§ 8.3 and 8.4 of the Plan include, the Settling Physicians, the Settling Health Care Providers, the Debtor–Affiliated Parties, the Shareholder–Affiliated Parties, and the Settling Insurers. Amended Joint Plan, § 8.3. In this case, the Sixth Circuit has ruled that § 1334(b) "related to" jurisdiction exists over the actions pending against the Shareholders, Dow Chemical and Corning, Inc. *In re Dow Corning Corp. (Lindsey I)*, 86 F.3d 482, 494 (6th Cir.1996). The Sixth Circuit has also ruled that § 1334(b) jurisdiction covers the joint insurance policies between the Debtor and the Shareholders. *Id.* at 495. This Court also has § 1334(b) jurisdiction over the Settling Physicians and the Settling Health Care Providers because they have claims against the Debtor for indemnification and/or contribution and some physicians have direct tort claims against the Debtor arising from the Debtor's misrepresentations in the marketing, sale, and provision

of breast implants and other products for use in a Physician Claimant's medical practice.

The next consideration is whether the bankruptcy court has the authority to enter the particular kind of relief sought—a non-debtor discharge. *American Hardwoods, Inc. v. Deutsche Credit Corp.*, 885 F.2d 621, 624 (9th Cir.1989). While a bankruptcy court may have subject matter jurisdiction to hear a dispute between non-debtors, it may lack the authority to enter a particular type of relief. *In re Arrowmill Development Corp.*, 211 B.R. 497, 503 (Bankr.D.N.J.1997).

### C. *Discharge/11 U.S.C. § 524(e)*

In bankruptcy, a discharge is an involuntary release by operation of law of asserted and non-asserted claims by a creditor against an entity who has filed a petition under the bankruptcy code and who has abided by its rules. *In re Arrowmill*, 211 B.R. at 504. Upon confirmation of a plan, a Chapter 11 debtor receives a discharge of its debts which arose before confirmation. 11 U.S.C. § 1141(d)(1). 11 U.S.C. § 524(e) limits the scope of the discharge. A "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity, for such debt." 11 U.S.C. § 524(e). The circuit courts are divided over the issue of non-debtor discharge—whether a party, other than a debtor, may receive a discharge of a debt in the context of the debtor's bankruptcy action. Three lines of cases have been identified emerging from the various decisions. *In re Arrowmill*, 211 B.R. at 504.

The first line of cases holds that the bankruptcy court has the authority to confirm reorganization plans which discharge non-debtors even if there are objecting creditors. *Monarch Life Ins. Co. v. Ropes & Gray (In re Monarch Capital Corp.)*, 173 B.R. 31 (D.Mass.1994), *aff'd*, 65 F.3d 973, 980 (1st Cir.1995); *MacArthur Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 837 F.2d 89, 93 (2d Cir.1988); *Securities and Exchange Comm'n v. Drex-*

el Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2nd Cir.1992); Menard–Sanford v. Mabey (In re A.H. Robins Co., Inc.), 880 F.2d 694 (4th Cir.1989); Republic Supply Co. v. Shoaf, 815 F.2d 1046, 1053 (5th Cir.1987); and Matter of Munford, Inc. (Munford v. Munford, Inc.), 97 F.3d 449, 454 (11th Cir.1996).

The second line of cases holds that the bankruptcy court does not have the authority to discharge or release a non-debtor. In re Zale Corp., 62 F.3d at 756 (5th Cir.); Hall v. Nat'l Gypsum Co., 105 F.3d 225, 229 (5th Cir.1997); Zerand–Bernal Group, Inc. v. Cox, 23 F.3d 159, 163 (7th Cir.1994); In re American Hardwoods, 885 F.2d at 626 (9th Cir.); Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss), 67 F.3d 1394, 1402 (9th Cir.1995); and In re Western Real Estate Fund, Inc. (Landsing Diversified Properties–II v. First Nat'l Bank and Trust Co. of Tulsa), 922 F.2d 592, 602 (10th Cir.1990), modified sub nom., Abel v. West, 932 F.2d 898 (10th Cir.1991).

The third line of cases holds that bankruptcy courts may discharge or release non-debtors from their debts only if the affected creditors consent. In re AOV Indus., Inc., 792 F.2d 1140, 1145–46 (D.C.Cir.1986); and Matter of Specialty Equip. Co., Inc., 3 F.3d 1043, 1047 (7th Cir.1993) (disavowing its prior case, Union Carbide Corp. v. Newboles, 686 F.2d 593 (7th Cir.1982), which prohibited non-debtor releases.).

The Third Circuit recently addressed the validity of non-debtor releases although it declined to establish a rule regarding the conditions under which non-debtor releases and permanent injunctions are appropriate or permissible. In re Continental Airlines (Gillman v. Continental Airlines), 203 F.3d 203, 214 (3rd Cir.2000). The Third Circuit ruled that under any of the tests recognized by various courts, the non-debtor release provision before that court could not pass muster. Id. The Third Circuit recognized the following factors required of non-consensual releases: 1) fairness; 2) necessity to the reorganization; and 3) specific factual findings to support the conclusions. Id. Although the Third Circuit noted that several of the bankruptcy courts in its circuit have stated that non-debtor releases are permissible only if consensual, at least with respect to direct (as opposed to derivative) claims, the Third Circuit noted that none of these cases involved the mass litigation found in Robins, Manville, or Drexel. Id., n. 11.

The Sixth Circuit has not ruled upon the issue of whether a bankruptcy court has the authority to grant a post-confirmation permanent injunction for the benefit of non-debtor third parties although it has discussed preliminary injunction issues relating to bankruptcies. In re Richard Potasky Jeweler, Inc. (Greenblatt v. Richard Potasky Jeweler, Inc.), 222 B.R. 816, 824 n. 14 (S.D.Ohio 1998).

The underlying reason for the differing views among the circuits stems from the interpretation of §§ 524(e) and 105(a). Some courts have ruled that § 524(e) has a preclusive effect over the bankruptcy court's broad equitable powers found in § 105(a). Section 524(e) states that the discharge of the debtor's debt does not affect the liability of any other entity for such debt. On its face, § 524(e) does not set forth a per se rule prohibiting permanent injunctions as to non-debtors. In re Potasky Jeweler, 222 B.R. at 824. However, some courts have ruled that § 524(e) prohibits permanent injunctions as to non-debtors, referencing § 524(e)'s predecessors, §§ 16 and 22(b) of the Bankruptcy Act of 1898, which included mandatory language prohibiting the release of certain parties. In re American Hardwoods, Inc., 885 F.2d at 625. The current language found in § 524(e) contains no explicit reference to third party non-debtors. In re Potasky Jeweler, 222 B.R. at 825. The conclusion by some courts is that the interplay between § 105 and § 524(e) barring third party injunctions is

unwarranted, based on the plain language of both statutes. *Id.* When interpreting the provisions of the Code, a court should be guided by the plain meaning of the statute. *See Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. Partnership,* 507 U.S. 380, 387–89, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). When the plain meaning of a statute is clear, the court's inquiry is at an end. *United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 240–42, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). A court should interpret the Code in a manner that avoids a conflict between its various sections. *Id.* at 245–47, 109 S.Ct. 1026. Based on the current language of § 524(e), since it does not expressly prohibit third-party injunctions and given that Congress decided to exclude the mandatory language found in the predecessor of § 524(e) which expressly prohibited the release of certain parties, § 524(e) is not a source of authority prohibiting third-party injunctions.

### D. *Equitable Power/11 U.S.C. § 105(a)*

The bankruptcy court's equitable powers are derived from 11 U.S.C. § 105(a) which provides, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The plain meaning of § 105(a) authorizes the bankruptcy court to enter only orders that are necessary to carry out the other provisions of the Code. *Wasserman v. Immormino (In re Granger Garage, Inc.),* 921 F.2d 74, 77 (6th Cir.1990). "Whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). Section 105, standing alone, cannot serve as a source of authority for granting a permanent injunction. *In re Potasky,* 222 B.R. at 825. "In the context of chapter 11 proceedings, the key to granting a permanent injunction 'has been whether the injunction requested was nec-essary or appropriate to carry out the discharge provisions of [§ 1141].'" *Id., citing* 2 Collier on Bankruptcy ¶ 105.03[2][b][ii], at 105–43 (15th ed. rev. 1996) (internal quotations omitted).

Section 1141 only allows the discharge of property belonging to the debtor's estate in a plan of reorganization, "after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors...." 11 U.S.C. § 1141(a). Section 1141 is a source of authority for a permanent injunction pursuant to § 105(a), if the injunction has a direct and immediate connection to the property contained in or the administration of the debtor's plan of reorganization. *In re Potasky,* 222 B.R. at 826; *Zale Corp.,* 62 F.3d at 760–61. "To the extent that property is within the bankruptcy court's jurisdiction, section 105 permanent injunctions would seem to [be] 'necessary and appropriate' to ensure the effectiveness of the discharge of section 1141." *In re Potasky,* 222 B.R. at 826, *citing* 2 Collier on Bankruptcy § 105.03[2][b][ii][A] at 105–45 n. 84 (15th ed. rev.1996).

Section 1123(b)(3) is another source of authority for a bankruptcy court to exercise the equitable powers found in § 105(a). *In re Potasky,* 222 B.R. at 826, n. 16. Section 1123(b)(3) states that a plan of reorganization may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3). An injunction must promote what is "necessary and appropriate" to "carry out the provisions of section 1123(b)(3). *In re Potasky,* 222 B.R. at 826, n. 16, *citing* 2 Collier on Bankruptcy ¶ 105.03[2][b][ii][C], at 105–46 n. 90 (15th ed. rev.1996).

A third source of authority for a bankruptcy court to exercise equitable power is found in 11 U.S.C. § 1123(b)(6) which allows a plan to "include any other appropriate provision not inconsistent with the applicable provisions of this title."

Section 105(a), along with § 1123(b)(6) provide the bankruptcy courts with broad authority to approve plans of reorganization that include provisions affecting creditors' rights to recover against non-debtors, if the provisions are necessary to carry out the plan. *Energy Resources,* 495 U.S. at 549, 110 S.Ct. 2139. The Supreme Court also noted that the bankruptcy court had authority under § 1129(a)(11) to assure itself that the reorganization would succeed. *Id.*

### E. *Unusual Circumstances Test*

The Third Circuit noted in *In re Continental Airlines,* that there are cases which involve mass litigation as in *Robins, Manville, or Drexel* in which injunctions have been ordered by the court in the bankruptcy context. These cases are characterized as "unusual circumstances cases." *In re Potasky,* 222 B.R. at 826. The district court in *In re Potasky* noted:

> Those courts holding that under 'unusual circumstances' a bankruptcy court may grant a permanent injunction to relieve third party non-debtors from liability are not at odds with this principle. In the cases adopting the unusual circumstances test, the courts have noted that the following circumstances justified the granting of a permanent injunction:
>
> (1) That the suit against the non-debtor was, in essence, a suit against the debtor or will deplete assets of the estate;
>
> (2) The non-debtor contributed substantial assets to the debtor's estate as part of the debtor's plan of reorganization; and
>
> (3) The injunction is essential to reorganization. Without the injunction the entire reorganization plan would unravel.

*Id.* Other nonessential factors which show that an injunction against non-debtors provided for by a plan is fair, include: 1) that a substantial majority of the creditors agreed to the injunction, specifically, the impacted class of creditors; 2) the plan for reorganization provided for full payment of the creditor's claims; and 3) the injunction affected only a small percentage of the claimants. *Id.,* n. 18. The Third Circuit noted the following factors, "[t]he hallmarks of permissible non-consensual releases-fairness, necessity to the reorganization, and specific findings to support these conclusions ..." *In re Continental,* 203 F.3d at 214.

As noted by the district court in *In re Potasky,*

> In those cases where the courts found that unusual circumstances were present, the injunctions served either to marshal assets of the debtor's estate or to channel the claims of creditors to assets of that estate. The existence of these assets, however, depended upon the action of a third party non-debtor. By permanently enjoining suits against these third party non-debtors, the courts created a legal environment that enabled the non-debtor to take the necessary steps which would lead to the creation of assets for the debtor's estate.

222 B.R. at 826–27. Section 524(e) did not preclude those courts from granting an injunction, nor did the granting of the injunction fall outside of the discharge provisions of § 1141 because the courts were dealing with the property of the debtor's estate. *Id.*

### F. *Bankruptcy Court's December 21, 1999 Opinion*

The Bankruptcy Court expressly found that "neither § 524(e) nor § 524(g) precludes a court from granting non-debtor discharges." *Best–Interests Opinion,* 244 B.R. at 740. The Bankruptcy Court concluded that "§§ 8.3 and 8.4 are not inconsistent with the Code even if they apply to creditors who did not accept the Plan." *Id.* However, the Bankruptcy Court found that based on other "non-bankruptcy law," the release and injunction provisions are inappropriate as to non-accepting creditors. *Id.*

The Court agrees with the Bankruptcy Court that the release and injunction provisions are not inconsistent with the Code, even if they apply to creditors who did not accept the Plan. Based on the discussion above, § 524(e) does not limit the Bankruptcy Court's equitable powers under § 105(a) to issue permanent injunctions to non-accepting creditors. 11 U.S.C. §§ 1141(a), 1123(b)(3), 1123(b)(6) and 1129(a)(11) are sources of authority from which the Bankruptcy Court can exercise its equitable powers under § 105(a) to issue permanent injunctions. Based on the above discussion, there is sufficient authority in the Code to justify the court's issuance of an injunction. The Bankruptcy Court went beyond the Bankruptcy Code to find that it had no authority to issue an injunction against those who did not accept the Plan. The Bankruptcy Court cites *Grupo Mexicano de Desarrollo v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999), to support its conclusion that based on non-bankruptcy law, the release provision could not apply to those creditors who did not vote in favor of the Plan. A preliminary injunction was issued by the district court in *Grupo Mexicano* enjoining the dissipation or transfer of the defendant's assets pending adjudication of the plaintiff's claim for the amount on the notes at issue. The Supreme Court found that the injunction was improper based on the "well-established general rule that a judgment establishing the debt was necessary before a court of equity would interfere with the debtor's use of his property." *Id.* at 321, 119 S.Ct. 1961. The Supreme Court in its decision found that a district court did not have the authority to issue a preliminary injunction which affected a debtor's property without a judgment establishing the debt, outside of a bankruptcy action. *Id.* The Supreme Court found that equity "is confined within the broad boundaries of traditional equitable relief," but that equity would not permit "a type of relief that has never been available before." *Id.* at 322, 119 S.Ct. 1961. Because no judgment had

been entered against the defendant to establish the debt, the district court's issuance of the preliminary injunction enjoining defendant from transferring certain assets was beyond its equitable authority.

The Supreme Court noted that in addition to general equitable powers under the Judiciary Act of 1789, a district court had injunctive authority under certain statutes—the statute authorizing issuance of tax injunctions in the *Grupo Mexicano* case. *Id.* at 326, 119 S.Ct. 1961. The Bankruptcy Court in this case, as noted above, had various statutory authorities to issue a permanent injunction under the Bankruptcy Code. This Court is cognizant that the Supreme Court has stated that even if consistent with the Code, a bankruptcy court order might be inappropriate if it conflicted with another law that should have been taken into consideration in the exercise of the court's discretion. *Energy Resources*, 495 U.S. at 550, 110 S.Ct. 2139. In *Energy Resources*, the Supreme Court discussed a possible conflicting IRS statute, finding that the statute "plainly does not require us to hold that the orders at issue here, otherwise wholly consistent with a bankruptcy court's authority under the Bankruptcy Code, were nonetheless improvident." *Id.* at 551, 110 S.Ct. 2139. The Supreme Court found that the bankruptcy court did not transgress any limitation on its broad power under the Code. *Id.* Here, other than the United States, no party has identified a possible conflicting statute outside the Bankruptcy Code which may limit the Bankruptcy Court's powers under the Code.

 The Bankruptcy Court's conclusion that it has no authority to issue a nonconsensual permanent injunction of non-debtor parties is reversed. There is sufficient statutory authority under the Bankruptcy Code to issue a permanent injunction in favor of non-debtor parties and the *Grupo Americano* case does not prohibit the Bankruptcy Court from issuing such an injunction. As noted above, in addition to § 105, courts have recognized §§ 1141,

1123(b)(3), 1123(b)(6) and 1129(a)(11) as statutory authorities for the Bankruptcy Court to issue injunctions in favor of non-debtor parties based on non-consensual releases.

 The Bankruptcy Court's findings of fact support a finding in favor of an injunction and are not clearly erroneous The Bankruptcy Court found that: 1) the Settling Physicians, the Settling Insurers, and the Shareholders will make important contributions to the reorganization; 2) the release and injunction provisions are essential to the reorganization pursuant to the Plan; 3) a large majority of the creditors impacted by the release and injunction provisions approved the Plan; 4) there is a close connection between the claims of the non-debtors and the claims against the Debtor; and 5) the Plan provides for the payment of all of the claims affected by the release and injunction provisions of the Plan. These findings support injunctive relief based on statutory authority under the Code and the "unusual circumstance" case criteria. The evidence presented at the confirmation hearing supports the Bankruptcy Court's findings.

There is no dispute that this case "is one of the world's largest mass tort litigations, and the threatened consequences of the thousands of product liability claims arising from its manufacture and sale of silicone breast implants and silicone gel, [is the reason] Dow Corning filed a petition for reorganization ..." *In re Dow Corning*, 86 F.3d at 485. "The potential for Dow Corning's being held liable to the nondebtors in claims for contribution and indemnification, or vice versa, suffices to establish a conceivable impact on the estate in bankruptcy. Claims for indemnification and contribution, whether asserted against or by Dow Corning, obviously would affect the size of the estate and the length of time the bankruptcy proceedings will be pending, as well as Dow Corning's ability to resolve its liabilities and proceed with reorganization." *Id.* at 494. Pursuant to the Sixth Circuit's mandate, all the

claims against the Shareholders were transferred to this District. To date, there are approximately 14,795 cases filed with this Court against the Shareholders. The cost to defend these number of cases by the Shareholders would have a substantial affect on the insurance policies shared with the Debtor. *Id.* at 494–95. Any indemnification and contribution sought by the Shareholders against the Debtor relating to the manufacture of the breast implants would also substantially affect the Debtor's estate. The bankruptcy action before this Court is an unusual case. The Bankruptcy Court erred in its conclusion of law that the bankruptcy court has no authority, statutory or otherwise, to issue a non-consensual permanent injunction in favor of non-debtor parties.

### G. *The Parties' Arguments*

#### 1. *Proponents' Arguments*

The Proponents (the Debtor and the TCC) argue that the December 21, 1999 Opinion is contrary to the plain meaning of the Joint Plan. The Joint Plan states that the release and injunction apply to "all Persons who have held, hold, or may hold Products Liability Claims, whether known or unknown." Joint Plan, § 8.3. There is no ambiguity in the Plan language according to the Proponents, therefore, the Bankruptcy Court's interpretation that the release only applied to "some" persons was wrong. All the parties, understood that the release and injunction provisions were non-consensual. Only the Bankruptcy Court read otherwise. The Amended Joint Disclosure Statement, approved by the Bankruptcy Court, and sent to all Claimants with the Joint Plan, made clear that under § 8.3 of the Joint Plan, "the Shareholders [and other Released Parties] ... will be released from any and all Products Liability Claims.... This means that anyone with a Claim relating to a Breast Implant or any of the other Claims being released will not be able to sue any of the Released Parties, including Dow Corning, Dow Chemical, Corning and the Settling

Insurers." D.Ct.R. 19, Tab 2 at 89. The Personal Injury Claimants also received a Special Note stating: "The Plan also provides that no further suits for claims based on the manufacture of silicone products may be brought against Dow Corning or its shareholders—Dow Chemical and Corning Incorporated." *Id.*, Tab 3 at 2.

The Proponents agree with the Bankruptcy Court's ruling that the release and injunction provisions in §§ 8.3 and 8.4 of the Joint Plan "are not inconsistent with the Code." The Proponents point out that the Bankruptcy Court, in addition to its equitable powers in § 105(a), failed to look to § 1123(b)(6) as a source of power for the approval of the Joint Plan's release and injunction provisions. The Proponents claim that the Bankruptcy Court did not follow the Supreme Court's holding in *Energy Resources.* The Supreme Court held that the statutory directives found in §§ 105(a) and 1123(b)(6) give the Bankruptcy Courts, as courts of equity, broad authority to modify creditor-debtor relationships. 495 U.S. at 549, 110 S.Ct. 2139.

The Proponents further argue that the Bankruptcy Court failed to address the Sixth Circuit's views concerning the importance of resolving the Claims against the Shareholders together with the Claims against the Debtor. The Sixth Circuit found that the claims for indemnification and contribution against or by Dow Corning and the overwhelming number of cases asserted against Dow Corning and the Shareholders would have an affect on the size of the bankruptcy estate, the length of time the bankruptcy proceedings will be pending, and the assets in the joint insurance held by Dow Corning and the Shareholders. *In re Dow Corning*, 86 F.3d at 495.

The Proponents contend that the Bankruptcy Court's finding that the release and injunction provisions are contrary to non-bankruptcy law is in error. In any event, the Proponents argue that the non-bankruptcy law cited by the Bankruptcy Court supports the Bankruptcy Court's equitable

authority to order the full release of all Claims. In *Grupo Mexicano,* the Supreme Court stated that the limitations on the power to award injunctive relief does not apply to a court if a specific statute allows such power. The Bankruptcy Court's power emanates not from the general equitable jurisdiction but from two sections of the Bankruptcy Code, § 1123(b)(6) and § 105(a). The Proponents argue that the release and injunction provision serve the public's interest because the Joint Plan will permit the prompt and efficient resolution of tens of thousands of outstanding Tort Claims, provide for the adjudication and payment of all Claims that are not settled, and allow the Debtor to continue in business.

For the reasons set forth above, the Court finds that the release and injunction provisions are proper in this case.

### 2. *Nevada Claimants*

The Nevada Claimants timely filed an appeal from the Bankruptcy Court's November 30, 1999 Confirmation Order. The Nevada Claimants filed briefs taking two positions on the release and injunction issue: 1) that any injunction enjoining tort claimants who enter the Plan's Settlement Facility to release non-debtor third-parties, is not fair and is not the law; and 2) even with the proviso that non-accepting tort claimants can choose to enter the Litigation Facility the third party release is not justified. The Nevada claimants agree with the Bankruptcy Court's December 21, 1999 Best Interest of Creditors Opinion that the release required as a condition to receiving settlement funds does not apply to claimants who did not vote for the plan; the release provision of the Plan is not part of the Bankruptcy Court's authority in equity; Section 105(a) is not authority for the Bankruptcy Court's injunctive powers; and the injunction provision violates 11 U.S.C. § 524(e).

As discussed above, the Bankruptcy Court does have authority under § 105(a)

and various sections of the Bankruptcy Code to issue an injunction in favor of third-party non-debtors, especially in an unusual circumstances case such as exists in this bankruptcy. The Plan provides for claims against the Debtor and the non-debtors to be channeled to the Litigation Facility if the claimants choose not to enter into the Settlement Facility. The release and injunction provisions do not apply to claimants who choose to bring their claims against the Debtor and the non-debtors via the Litigation Facility. Contributions of assets, including insurance proceeds, meet the index of good faith and in this instance justify the release and injunction as to the Shareholders and the Settling Insurers. *Manville*, 837 F.2d at 91.

### 3. *Class 5 Texas Children/Lacy Claimants*

The Lacy Appellants in their response state that if the December 21st opinion of the Bankruptcy Court is stricken, the Bankruptcy Court erred in permanently enjoining the children claimants from prosecuting future claims against Dow Chemical, a non-party. The Lacy Appellants agree with the Bankruptcy Court's December 21 Opinion that the release does not apply to claimants who did not vote for the plan.

Under the Plan, the Shareholders have agreed to fund the Plan in the amount of $2.35 billion (NPV) of their equity. 7/2/99 Tr., pp. 36, 44. The Shareholders agreed to the Joint Plan even though their equity in Dow Corning would be depleted by as much as $2.35 billion in exchange for the Shareholders' rights to make claims against the insurance policies shared with Dow Corning. 6/28/99 Tr., pp. 158–59; 7/14/99 Tr., pp. 29–30, 94; 7/2/99 Tr., p. 40; 7/14/99 Tr., p. 34.

The record supports the Bankruptcy Court's findings that the Shareholders and the Settling Insurers "will all make important contributions to the reorganization as part of a confirmed Plan" and that the

release and injunction provisions "are essential to the reorganization pursuant to this Plan." 11/30/99 Findings of Fact, ¶¶ 21–22. Cases have held that contributions of assets, including insurance proceeds, meet the index of good faith and, in this instance, justify the release and injunction as to the Shareholders and the Settling Insurers, even though claimants did not vote in favor of the Joint Plan. *Manville*, 837 F.2d at 91; *In re Drexel Burnham*, 960 F.2d at 293.

### 4. *Marti Jacobs*

Jacobs claims that the third-party releases should only be required of claimants in the Settlement Facility after the Plan is modified by the Plan Proponents. Jacobs agrees with the Bankruptcy Court that, at a minimum, those who voted against the Plan cannot be deemed to have released Dow Chemical. Jacobs argues that the release should be based on whether a claimant opts out of the Settlement Facility.

Modification of a Plan may be made by the proponent of a plan or the reorganized debtor at any time before confirmation. 11 U.S.C. § 1127(a) and (b). In this case, the Joint Plan has been confirmed by the Bankruptcy Court. Unless the Bankruptcy Court's Confirmation Order is reversed by this court or a court above, the Joint Plan stands as confirmed. The third-party release and injunction provisions cannot be changed as confirmed. For the reasons set forth above, there is sufficient authority under the Code and case law to support releases and injunctions in favor of the Shareholders in this bankruptcy action.

### 5. *Australian Claimants*

The Australian Claimants argue that the Debtor's affiliates have made no contributions to the funds or other consideration to the settlement. The Australian Claimants agree with the Bankruptcy Court that §§ 8.3 and 8.4 bind only those claimants who voted in favor of confirmation of the

Joint Plan. The Australian Claimants argue that the Plan does not meet the factors set forth in the *Robins* case.

The record below indicates that the Shareholders and the Debtor's affiliates have made significant contributions to fund the Joint Plan. The evidence at the confirmation hearing showed that the funding provided under the Joint Plan was "on a consolidated basis of Dow Corning Corporation and all of its subsidiary companies." 7/14/99 Tr., p. 102. Sections 8.3 and 8.4 bind all claimants whether they voted in favor of or against the confirmation of the Join Plan, as discussed above.

In *In re Robins*, a release and permanent injunction in favor of third-party nondebtors were approved by the bankruptcy court based on the following factors: 1) that the chapter 11 petition was triggered by a mass tort; 2) claimants alleged that certain third party non-debtors were liable; 3) the release was essential to the reorganization; 4) the plan had overwhelming support from the constituency affected by the release; 5) a capped fund was established to pay tort claims; and, 6) the funds set aside for the tort claimants were to pay the claims in full. *In re Robins*, 880 F.2d at 698–702.

The objecting parties have failed to show that the Bankruptcy Court clearly erred in its findings of fact as to the release and injunction provisions. The Plan in this case meets all the factors set forth in *Robins*. There is no dispute that the Debtor filed the chapter 11 petition based on the thousands of breast implant claims against it. *In re Dow Corning*, 86 F.3d at 485–86. Claimants in this case allege that the Shareholders are also liable to them. The Bankruptcy Court found that there is a close connection between the claims against the third-party nondebtors and the claims against the Debtor. 11/30/99, Findings of Fact, ¶ 24. The Bankruptcy Court also found that the release was essential to the reorganization and that the third-parties made important contributions to the reorganization of the

Plan. 11/30/99 Findings of Fact, ¶¶ 21–22. The Bankruptcy Court further found that a large majority of the creditors impacted by the release and injunction provisions approved the Plan. 11/30/99 Findings of Fact, ¶ 23. The Bankruptcy Court determined that the Plan provides for the payment of all of the claims affected by the release and injunction provisions of the Plan. 11/30/99 Findings of Fact, ¶ 25. In its Best Interest of Creditors Opinion, the Bankruptcy Court concluded that based on the evidence presented at the confirmation hearing, the funding of the Litigation Facility was adequate. *Best–Interests Opinion*, 244 B.R. at 730, 731. The testimony of Tommy Jacks, a plaintiff's personal injury lawyer and a member of the Official Committee of Tort Claimants, was that the $400,000,000.00 net present value funding of the Litigation Facility was adequate to satisfy the non-settling claims in full. 244 B.R. at 730. Mr. Frederick C. Dunbar further testified that, based on a scientific approach in the calculation of whether the Litigation Facility was adequately funded, 7,513 people would choose the Litigation Facility. 244 B.R. at 731. The total nominal legal costs to resolve the breast implant and other claims and the administrative costs resolving these claims would be about $157.6 million, with a net present value of about $83 million. *Id.* Mr. Dunbar concluded that the $400 million net present value funding of the Litigation Facility is almost five times that necessary to satisfy all the claims channeled to the Litigation Facility. *Id.* The Bankruptcy Court found that even the witness called by the objecting claimants, Mr. John C. Thornton, corroborated Mr. Dunbar's conclusions. *Id.*

### 6. *Helene D. Schroeder*

Ms. Schroeder, a claimant with a silicon gel chin implant, objects to the release as it applies to any claims against the attorneys representing the Tort Claimants' Committee. Schroeder agrees with the Bankruptcy Court's December 21, 1999

Opinion limiting the release to those who voted in favor of the Plan. Schroeder claims that a Bankruptcy Court has no jurisdiction to alter the rights of creditors to collect debts from third parties and that the bankruptcy court only has jurisdiction over the Debtor and its property.

The Bankruptcy Court's December 21, 1999 Opinion did not address the issue of whether the release and injunction provisions found in §§ 8.3 and 8.4 applied to claims against the attorneys representing the Tort Claimants' Committee. The release provision applicable to the various committees is found in § 8.10 of the Joint Plan which states:

> Upon the Effective Date, the Tort Committee, the Commercial Committee, the Physicians Committee, and each of their respective members, representatives and professionals, and all other professionals retained in the Case pursuant to § 327 of the Bankruptcy Code shall be deemed released from all claims and causes of action relating to the bankruptcy estate of Dow Corning or that have been or could be asserted by any party in interest in the Case of any Person acting on behalf of such party in interest.

Amended Joint Plan, § 8.10, p. 30.

 The bankruptcy court has the power to approve the releases and issue an injunction with respect to the trustee, temporary receivers and creditors' committees for matters in connection with the chapter 11 case. *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723, 753 (Bankr. S.D.N.Y.1992). Section 1103(c) of the Code grants to official creditors committees broad authority in formulating a plan for reorganization and performing "such other services as are in the interest of those represented." 11 U.S.C. § 1103(c). There is an implication that the Code grants committee representatives fiduciary duty to the committee's constituents. *In re Mesta Mach. Co.,* 67 B.R. 151, 156 (Bankr.W.D.Pa.1986). The fiduciary duty "extends to the class as a whole, not to its

individual members." *In re Drexel Burnham,* 138 B.R. at 722. At the same time, § 1103(c) gives rise to "an implicit grant of limited immunity." *Id.* at 722 (*quoting In re Tucker Freight Lines, Inc.,* 62 B.R. 213, 216 (Bankr.W.D.Mich.1986)). The qualified immunity "corresponds to, and is intended to further, the Committee's statutory duties and powers." *Pan Am Corp. v. Delta Air Lines, Inc.,* 175 B.R. 438, 514 (S.D.N.Y.1994). Such immunity applies to conduct within the scope of the authority conferred to the committee either by statute or the bankruptcy court. *Id.* To overcome this immunity, the party alleging breach of fiduciary duty must prove that the committee engaged in willful misconduct or "ultra vires" activity. *Id.*

A claim that the committee members have acted outside the scope of their duties must first be brought to the Bankruptcy Court. Schroeder claims that the Tort Claimants Committee engaged in willful misconduct because they did not represent the interest of all personal injury claimants. Schroeder argues that the Committee only represented the interest of the breast implant claimants and not the non-breast implant claimants. There is nothing on the record which indicates that the Bankruptcy Court has had an opportunity to review such a claim. In any event, Schroeder has not presented sufficient evidence that the Tort Claimants Committee engaged in willful misconduct or conducted ultra vires activity.

 Inasmuch as Schroeder is claiming that the Bankruptcy Court does not have the authority to approve the release provision pertaining to the Tort Claimants Committee representatives, this Court has found that the Bankruptcy Court does have such an authority. Sections 1102 and 1103 authorize the United States trustee to appoint various committees. Any expenses and salaries to committee members are borne by the Debtor. Any claims against the Tort Claimants Committee may give rise to indemnification or contri-

bution claims by the Committee against the Debtor's estate. The Debtor's assets would then be implicated. Based on the analysis previously made, the Bankruptcy Court has the authority to approve the Joint Plan which contains a release and injunction in favor of the Tort Claimants' Committee under 11 U.S.C. § 105(a) and §§ 1141(a), 1123(b)(3), 1123(b)(6) and 1129.

### 7. *United States*
#### a. *Claims against the Debtor*

The Government agrees with the Bankruptcy Court's December 21 Opinion rejecting the Joint Plan's release and injunctive provisions as to the United States' Claims under the Medicare Secondary Payer Statute, 42 U.S.C. § 1395y and the Medical Care Recovery Act, 42 U.S.C. § 2651, against non-debtor third parties. The United States argues that 11 U.S.C. §§ 105 and 1123(b)(6) confer no substantive rights at all. The Bankruptcy Court lacks the power to release or enjoin creditor claims against non-debtors and that only creditors consenting to the release and injunction could be bound by the provisions.

The United States claims that *Energy Resources* supports the United States' argument more than the Proponents' arguments. This Court's analysis of the *Energy Resources* case establishes that the Supreme Court recognizes the bankruptcy court's broad authority to modify creditor-debtor relationships under §§ 105(a), 1123(b)(5) and 1129. *Energy Resources*, 495 U.S. at 549, 110 S.Ct. 2139. This Court's reading of *Energy Resources* differs from the United States' reading of the case. In *Energy Resources*, the Supreme Court concluded that the statute cited by the IRS, by its terms, does not protect against the bankruptcy court's authority under the Code to designate where tax payments may come from.

■ The United States argues that the Supreme Court's decision in *Callaway v. Benton*, 336 U.S. 132, 69 S.Ct. 435, 93 L.Ed. 553 (1949) is on point and favors the affirmance of the December 21 Opinion. In the *Callaway* case, the Supreme Court disapproved the permanent injunction of a suit by a shareholder stating that the bankruptcy statute does not give the bankruptcy court the right to require acceptance by a lessor not in reorganization of an offer for the purchase of its property. 336 U.S. at 136–41, 69 S.Ct. 435. The Court held that third-party claims are beyond the control of the bankruptcy court and cannot be enjoined, even if doing so is "essential" to the Debtor's reorganization. The United States' position that the *Callaway* case is on point is to no avail given that the basis of the Supreme Court's holding that the bankruptcy court lacked the power to permanently enjoin actions against non-debtors has since been changed. At the time, the *Callaway* decision was based on the bankruptcy court's "exclusive and nondelegable control over the administration of an estate in its possession" and "exclusive jurisdiction of the debtor and its property wherever located." 336 U.S. at 142, 69 S.Ct. 435. The Supreme Court noted that, "[t]here can be no question, however, that Congress did not give the bankruptcy court exclusive jurisdiction over all controversies that in some way affect the debtor's estate." *Id.* Since *Callaway*, 28 U.S.C. § 1334(b) has been expanded to give the bankruptcy courts jurisdiction over cases "arising in or related to cases under title 11." The Sixth Circuit has held that the Congressional intent was "to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *In re Dow Corning*, 86 F.3d at 489, *citing Celotex Corp. v. Edwards*, 514 U.S. 300, 308, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995). Proceedings "related to" a bankruptcy proceeding include "suits between third parties which have an effect on the bankruptcy estate." 514 U.S. at 308, n. 5, 115 S.Ct. 1493. "[A] finding of definite liability of [an] estate as a condition precedent to holding an action

related to a bankruptcy proceeding" is not required. 86 F.3d at 491. The United States further argues that the Fourth Circuit's *A.H. Robins* decision is wrong and is distinguishable in any event. As to the *Robins* case, the Court finds that it is applicable to this case and the factors have been met, as noted above.

Based on the above discussion, the Bankruptcy Court has jurisdiction over the claims against the third-parties in this case and to issue an injunction in this matter.

### b. *Settling Insurers*

With respect to the Settling Insurers, the United States argues that vacating the Bankruptcy Court's December 21, 1999 Opinion would destroy the United States' statutory rights against the Settling Insurers which were explicitly preserved by the Bankruptcy Court's orders authorizing the settlements between the Debtor and the Settling Insurers. The Approval Orders entered by the Bankruptcy Court contained the following language:

> Notwithstanding any provision of the Settlement Agreement or any other provisions of this Order, nothing in the Settlement Agreement or this Order shall limit any rights of the United States or its agencies against the Insurers, Dow Corning, or the Settlement Funds. Moreover, notwithstanding any provision of the Settlement Agreement or any other provision of this Order, nothing in the Settlement Agreement shall release the Insurers or Dow Corning from any obligations they may have under federal statutes and regulations, including but not limited to obligations that have arisen or may arise under the Medicare Secondary Payer Statute, 42 U.S.C. § 1395y, and its implementing regulations, 42 CFR 411. The United States and its agencies do not consent to the jurisdiction of this Court beyond any waiver of sovereign immunity.

August 11, 1995 Approval Order, ¶ 13A; March 25, 1996 Approval Order, ¶ 11. The United States claims that the December 21, 1999 Opinion, as it stands, preserves its rights against the Settling Insurers as stated in the Approval Orders. Vacating the December 21, 1999 Opinion would destroy the language of the Approval Orders preserving the United States' rights against the Settling Insurers.

The Approval Orders do state that "[n]otwithstanding any provision of the Settlement Agreement or any other provisions of this Order, nothing *in the Settlement Agreement or this Order* shall limit any rights of the United States or its agencies against the Insurers." August 11, 1995 Approval Order, ¶ 13A; March 25, 1996 Approval Order, ¶ 11 (emphasis added). However, the Approval Orders do not protect the United States' rights from subsequent orders to be entered by the Bankruptcy Court, including the Bankruptcy Court's Confirmation Order or any subsequent orders relating to the merits of the United States' claims. It is noted that the Bankruptcy Court's December 21, 1999 Opinion does not specifically address the issue raised by the United States on the release and injunction issue as it relates to the Settling Insurers. Because the contributions of assets, including insurance proceeds, meet the index of good faith, the release and injunction as to the Settling Insurers is appropriate. *Manville,* 837 F.2d at 91.

The Sixth Circuit noted the importance of the joint insurance held by the Debtor and its Shareholders:

> Dow Corning, Dow Chemical and Corning Incorporated are co-insured under various insurance policies, which together provide over $1 billion in coverage. Dow Corning's interest in the policies is one of the largest assets of its bankruptcy estate. In addition, Dow Corning recently entered into ten new insurance settlements under which the estate will receive, if approved by the bankruptcy court, approximately $350 to $450 million in cash. Most of these settlement involve policies under which

Dow Chemical or Corning Incorporated is a co-insured.

Dow Corning, Dow Chemical, and Corning Incorporated claim that the district court's order, by allowing thousands of claims to proceed separately against Dow Chemical and Corning Incorporated, will diminish the value of this major bankruptcy asset to the extent that settlements, judgment and defense costs incurred by the shareholders will exhaust policy limits otherwise available to Dow Corning, its creditors, and individuals asserting claims in the bankruptcy proceedings....

*In re Dow Corning Corp.*, 86 F.3d at 494. Any release and injunction must apply not only to the Shareholders but to the Settling Insurers as well. Based on the analysis previously made, the release and injunction provisions apply to the United States' claims against the Settling Insurers, as well as the Shareholders.

**8. *Pennsylvania Class 5 Claimants***

The Pennsylvania Class 5 Claimants argue that based on cases from the Ninth and Tenth Circuit, the non-debtor releases are not sufficient as a matter of law. The cases that have upheld the non-debtor releases show that there was consideration to the debtor. The Pennsylvania Class 5 Claimants object to the releases as they pertain to Settling Physicians and Health Care Providers. The Pennsylvania Class 5 Claimants argue that the release and injunction provisions do not meet the five prongs set forth in the *Robins* case. First, the Pennsylvania Class 5 Claimants' tort claims will not be paid in full because they are required to release all doctors. Second, there was no overwhelming approval of the Plan because there was no overwhelming support of the Plan by the Pennsylvania Class 5 Claimants. Third, there is no substantial contribution as to the surgeons, doctors and healthcare providers under the Plan. Fourth, the release, as to the physicians and healthcare providers, is not necessary to the Debtor's reorganization. Finally,

there is no close connection between the claimants' claims versus the healthcare providers and the Debtor. There is no identity interest as to the healthcare providers.

In response to the Pennsylvania Class 5 Claimants, the Class 12 Physicians and Class 13 Health Care Providers ("Settling Physicians and Health Care Providers") seek to intervene in the appeals because they claim that no one represents their interests and they are not part of any Committee. They argue that while the Plan seems to "deem" Released Claims as to the Settling Physicians and Settling Health Care Providers as occurring on the Effective Date of the Plan, these claims are in reality not released until a Claimant affirmatively elects to become a "Settling Personal Injury Claimant," and the physician and/or health care provider affirmatively elects to become a "Settling Physician" or "Settling Health Care Provider." This two-tier mechanism provides that the Settling Physicians and Settling Health Care Providers obtain releases and injunctions that are expressly, inherently consensual, unlike the releases afforded to the Debtor–Affiliated and Shareholder–Affiliated Parties. The Settling Physicians and Health Care Providers argue that the December 21, 1999 Opinion, if it applies, only applies to those non-consensual releases/injunctions affecting the Debtor–Affiliated and Shareholder–Affiliated Parties, but not to Settling Physicians or Settling Health Care Providers. The Plan provides no election process to a Claimant prior to releasing claims against the Debtor–Affiliated and Shareholder Affiliated Parties, whereas, a Claimant must first elect to become a "Settling Personal Injury Claimant" and the physician/healthcare provider affirmatively elects to become a "Settling Physician" or "Settling Health Care Provider." The Class 12 Physicians and Class 13 Healthcare Providers seek a ruling that the December 21, 1999 Opinion does not apply to their situation because the release and injunction provisions as

they apply to the Settling Physicians and Healthcare Providers are consensual in nature because of the two-tier election mechanism under the Plan.

The Court notes that the December 21, 1999 Opinion states that other released parties under §§ 8.3 and 8.4 "include ... health-care providers in Classes 12 and 13 *who settle their respective claims against the Debtor."* *Best–Interests Opinion,* 244 B.R. at 736 (emphasis added). The Proponents of the Plan do not address this issue in their briefs. The Court will consider the Class 12 Physicians and Class 13 Healthcare's Motion to Intervene as Motion to file an Amicus Curiae brief given that this matter is on appeal from the Bankruptcy Court and intervention is not procedurally proper on appeal as noted above.

Specifically, as it relates to the Class 12 Physicians and Class 13 Healthcare Providers, § 8.3 states:

> Except as otherwise expressly provided in this Plan and in this section 8.3, in consideration of ... (d) *the release of Claims against the Debtor–Affiliated Parties by the Settling Physicians and Settling Health Care Providers,* on the Effective Date ... (ii) all Persons who hold or may have held Personal Injury Claims shall be deemed to have forever waived and released all such rights or Claims, whether based upon tort or contract or otherwise, that they heretofore, now or hereafter possess or may possess against the Settling Physicians (except for Malpractice Claims) or the Settling Health Care Providers (except for Malpractice Claims) ...

> \* \* \* \* \* \*

> This section 8.3 shall not operate as a release or waiver of any Malpractice Claim held against a Settling Physician or a Settling Health Care Provider by a Settling Personal Injury Claimant. Malpractice Claims, if any, asserted by Settling Personal Injury Claimants shall be resolved in the courts where actions

based on such Claims have been (or may be) filed. Moreover, this section 8.3 shall not operate as a release or waiver in favor of the Settling Physicians and the Settling Health Care Providers of the rights or Claims of Non–Settling Personal Injury Claimants. Such rights and Claims shall be preserved, subject to section 8.5 of this Plan. This Section 8.3 shall not operate as a release or waiver of those Claims preserved under the Domestic Health Insurer Settlement Agreement.

§ 8.3, Amended Joint Plan of Reorganization (emphasis added). Section 8.5 of the Amended Plan provides for the channeling of the claims by *"Non–Settling Personal Injury Claimants against the Settling Physicians and the Settling Health Care Providers (other than Malpractice Claims)."* "Non–Settling Personal Injury Claimants" are "those Personal Injury Claimants (other than Claimants in Classes 6A, 6B, 6C and 6D) who are not Settling Personal Injury Claimants." § 1.110, Amended Joint Plan of Reorganization. "Settling Personal Injury Claimants" are those "Personal Injury Claimants (other than Claimants in Classes 6A, 6B, 6C and 6D) who elect to settle their Claims under the terms of the Settlement Facility, together with those Personal Injury Claimants who do not timely return an Election Form." § 1.161, Amended Joint Plan of Reorganization. "Settling Health Care Providers" are those "who timely elect to settle their Claims against the Debtor" and "Settling Physicians" are those "who timely elect to settle their Claims against the Debtor." §§ 1.159 and 1.162, Amended Joint Plan of Reorganization.

Based on the express language of the Plan, it is clear that any "release" of claims against the Physicians and the Healthcare Providers do not include malpractice claims. Section 8.3 clearly states that malpractice claims against the Physicians and Healthcare Providers are not deemed released under the Plan. Additionally, § 8.3

provides that in order for § 8.3 to apply, the Physicians and Healthcare Providers must first become "Settling Physicians" and "Settling Health Care Providers." In order to do that, the Settling Physicians and Settling Health Care Providers must "release" their "Claims" against the Debtor and its affiliates by timely electing to settle their Claims against the Debtor and its affiliates. §§ 8.3(d), 1.159 and 1.162, Amended Joint Plan of Reorganization.

Section 8.3 does not automatically release the Physicians and Healthcare Providers. A Personal Injury Claimant must first elect to settle her Claims against the Debtor. A Physician and/or Healthcare Provider must also elect to settle their Claims against the Debtor. Otherwise, § 8.3 does not apply. The consideration under § 8.3 as it applies to the Physicians and Healthcare Providers is that they must release their Claims against the Debtor in order for § 8.3 to apply to the Claims by the Personal Injury Claimants against the Physicians and Healthcare Providers. As argued by the Class 12 Physicians and Class 13 Healthcare Providers, in order for the release provision to apply, a two-step process is involved: the Personally Injury Claimant must elect to settle their Claims against the Debtor and the Class 12 Physicians and Class 13 Healthcare Providers must also elect to settle their Claims against the Debtor. If the Personal Injury Claimant chooses not to settle their Claims with the Debtor, then those Claims are dealt with pursuant to the Litigation Facility Agreement. If the Physicians or Healthcare Providers choose not to settle their Claims against the Debtor, then, even if the Personal Injury Claimants elect to settle their Claims with the Debtor, the Claims against the Physicians or Healthcare Providers are resolved in the Litigation Facility. If the Personal Injury Claimants do not elect to settle their Claims with the Debtor, but the Physicians or Healthcare Providers elect to settle their Claims against the Debtor, then the Claims against the Physicians or Healthcare Pro-

viders are not deemed released but are channeled to the Litigation Facility under § 8.5.

The Court finds that the Release provision only applies to Personal Injury Claimants and Physicians and/or Healthcare Providers when both elect to become settling parties. A voluntary and consensual release is not a discharge in bankruptcy and does not run afoul with the Bankruptcy Code. *See In re Arrowmill,* 211 B.R. at 506. If the Personal Injury Claimants elect to settle their claims against the Debtor, their Claims would be paid in full because any malpractice claims against the Physicians and/or Healthcare Providers, whether they have elected to settle or not, are not deemed released under § 8.3. Any Personal Injury Claimant is allowed to pursue malpractice claims against a physician where the cause of action was or is to be filed based on the express language of § 8.3.

Although the Pennsylvania Class 5 Claimants argue that *within* the Pennsylvania Class 5 Claimants, there was no overwhelming approval of the Plan, the Bankruptcy Court's finding that "a large majority of the creditors impacted by the release and injunction provisions approved the Plan" is supported by the record and is not a clearly erroneous finding. The Bankruptcy Court's finding that the "important contributions to the reorganization" are made by the Settling Physicians is also supported by the record. The Settling Physicians and the Settling Healthcare Providers release of their Claims against the Debtor, if they so elect, is an important contribution and consideration to the reorganization. Any release by the Settling Physicians and the Settling Healthcare Providers would contribute to the Estate of the Debtor. The Bankruptcy Court's finding that the Release, as to the Physicians and Healthcare Providers, are "essential" to the reorganization of the Plan is not clearly erroneous and is supported by the record. The Bankruptcy

Court's finding that there is a "close connection" between the claims of the Physicians and the Healthcare Providers on the one hand and the claims against the Debtor on the other hand is also supported by the record and is not clearly erroneous. The Claims by the Physicians and the Healthcare Providers against the Debtor involve the Debtor's misrepresentations about the breast implants and/or raw materials in its marketing to the Physicians and Healthcare Providers. The Claims by the Personal Injury Claimants against the Debtor involve its misrepresentations and the manufacture of the breast implants and or raw materials to the Claimants. The Claims are closely connected. The Release provision, as it applies to the Class 5 Pennsylvania Claimants and the Settling Physicians and Settling Healthcare Providers also meets the best interest of creditors test.

### 9. *Settling Insurers*

Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies ("London Market Insurers"), join in the arguments of the Proponents and the Hartford Insurers. The Bankruptcy Court entered an order approving the settlement between the Debtor and the London Market Insurers. The London Market Insurers claim that the releases contained in the Joint Plan were a key element of the consideration that the London Market Insurers received in exchange for their settlement payments to the Debtor. The London Market Insurers contend that if the December 21 Opinion stands, it would be an impermissible modification of the London Market Insurers' settlement and the settlement would be a nullity. The insurance issue was a hotly contested litigation in the Wayne County Circuit Court, State of Michigan. After lengthy hearings before the Bankruptcy Court, the settlement was approved between the London Market Insurers and the Debtors. The effectiveness of the settlement was expressly conditioned upon the entry of an approval order containing releases of the London Market Insurers effective against non-parties to the bankruptcy case. The money provided by the London Market Insurers and the other Settling Insurers has formed the bedrock of the Plan of Reorganization. Any modification of the settlement by the December 21, 1999 Opinion should be vacated.

On August 11, 1995, the Bankruptcy Court entered an order approving a compromise between the Debtor and Hartford Accident and Indemnity Company, Hartford Fire Insurance Company, Nutmeg Insurance Company, First State Insurance Company, First State Underwriters of New England Reinsurance Corp. and Twin City Fire Insurance Company (the "Hartford Insurers"). The Hartford Insurers also join in and incorporate by reference the arguments made by the Proponents and the London Market Insurers. The Hartford Insurers argue that they have been previously released by the Approval Order of the Bankruptcy Court. The releases granted to the Hartford Insurers were the key consideration received by the Hartford Insurers in exchange for $107,500,000.00 paid to the Debtor. To the extent that the December 21, 1999 Opinion is interpreted to modify the releases previously granted to the Hartford Insurers, such a purported modification is a nullity because the Bankruptcy Court lacked jurisdiction to modify a previously approved settlement agreement. *Mallory v. Eyrich*, 922 F.2d 1273, 1279 (6th Cir.1991) (a district court possesses no discretion to alter the terms of a settlement agreement).

The Approval Orders and various Settlement Agreements between the Debtor and the Settling Insurers apply because the Release provision specifically addresses those Settlement Agreements between the Settling Insurers and the Debtor. In particular, § 8.3 state:

> Except as otherwise expressly provided in this Plan in this section 8.3, in consideration of ... (c) the undertakings of the Settling Insurers *pursuant to their*

*respective settlements with the Debtor,* ... (i) all Persons who have held, hold, or may hold Products Liability Claims, whether known or unknown, shall be deemed to have forever waived and release all such rights or Claims, whether based upon tort or contract or otherwise, that they heretofore, now or hereafter possess or may possess against ... the Settling Insurers.

§ 8.3 Joint Amended Plan of Reorganization. The Settling Insurers and the Debtor have voluntarily agreed to the releases, with the approval of the Bankruptcy Court. Voluntary and consensual releases are not a discharge in bankruptcy and do not run afoul with the Bankruptcy Code. *See In re Arrowmill,* 211 B.R. at 506. Additionally, for the reasons set forth previously, the release and injunction provisions apply to the Settling Insurers.

### H. *In re: Telectronics Case*

The Nevada Claimants and the Class 5 Texas Children Claimants filed supplemental briefs calling the Court's attention to the Sixth Circuit's recent decision in *In re Telectronics Pacing Systems, Inc.,* 221 F.3d 870 (6th Cir.2000). Specifically, the Claimants argue that this Court should find that the Shareholders in this case should not be released based on the Sixth Circuit's ruling in *In re Telectronics* that in a limited fund class action settlement, a parent corporation should not be released as part of the settlement because the class members would have no recourse against the parent companies. The Proponents filed a response to the Nevada and Class 5 Texas Children Claimants' supplemental briefs arguing that the Sixth Circuit's reasoning in *In re Telectronics* on the release issue does not apply in this bankruptcy action where the bankruptcy plan in this case was overwhelmingly approved by the creditors and all claimants will be paid in full under the plan.

*In re Telectronics,* a multi-district litigation proceeding in the Southern District of Ohio, involved a products liability class-action litigation brought on behalf of individuals implanted with the Telectronics Accufix Atrial "J" pacemaker lead. *In re Telectronics,* 221 F.3d at 874–75. Defendant TPLC manufactured and distributed the leads in the United States between 1988 and 1994. *Id.* Defendant Telectronics Pacing Systems, a holding company, is the sole owner of Defendant TPLC. *Id.* Defendant Nucleus, Ltd., a holding company and an Australian company, owned Defendants TPLC and Telectronics Pacing Systems. *Id.* Defendant Pacific Dunlop, Ltd., also an Australian company, purchased Nucleus in 1988 becoming the beneficial owner of Defendants TPLC and Telectronics Pacing Systems. *Id.* Defendants Nucleus and Pacific Dunlop were alleged to be liable to the plaintiffs on the ground that they are alter egos or agents of their subsidiaries, Defendants TPLC and Telectronics Pacing Systems. *Id.*

Fed.R.Civ.P. 23(b)(1)(B) is used in a class action proceeding in cases where there is only a "limited fund" from which claims are aggregated against. *Id.* at 876–77. The district court, after a fairness hearing required by Fed.R.Civ.P. 23(e), approved the settlement and certified the class as a mandatory, non-opt-out class under Fed.R.Civ.P. 23(b)(1)(B). *Id.* at 875–76. The district court certified the non-opt-out class because it found that there was a "limited fund" from which the injured plaintiffs could be paid. In finding a "limited fund," the district court only determined the assets of the subsidiary, TPLC, and not the assets of Nucleus or Pacific Dunlop, its parent companies. *Id.* The district court found that the assets of the Australian companies should not be included in determining the total assets available to the settlement fund because: 1) it believed that the court was unlikely to obtain jurisdiction over the Australian companies; 2) the time and costs of litigation against a foreign defendant made litigation infeasible; and 3) the jury in the summary trial had not found the two Australian companies liable. *Id.*

The district court determined the assets of TPLC to be about $78 million, which were divided into four funds, including a $47 million Patient Benefit Fund to compensate the class action members, an Operating Fund of $20 million, a $7 million Litigation Fund to go toward non-lead-related litigation, and a Reserve Fund of $4 million to pay expenses in other unrelated litigation. *Id.* Pacific Dunlop agreed to contribute an additional $10 million to the Patient Benefit Fund, raising that fund to $57 million. *Id.* As part of the Rule 23(b)(1)(B) class action settlement, the Australian parent companies were released from liability. *Id.* at 878–79. Several objectors filed appeals from the district court's approval of the settlement.

On appeal, the Sixth Circuit applied the Supreme Court's decision in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999). In the *Ortiz* case, the Supreme Court held that one of the characteristics of a Rule 23(b)(1)(B) "limited fund" class action settlement is that, "the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims." 119 S.Ct. at 2311. In *In re Telectronics*, there was no dispute that TPLC, standing alone, did not have the necessary assets to cover the expected liability. *In re Telectronics*, 221 F.3d at 878–79. The objectors argued that the case was not a true "limited fund" case because the assets of the Australian parent companies were not included. They further argued that the Australian parent companies' assets should not be excluded from the calculation of the "fund available" under Rule 23(b)(1)(B) because they were solvent companies and could be potentially liable. *Id.*

The Sixth Circuit reversed the approval of the class action settlement under Fed. R.Civ.P. 23(b)(1)(B) because it found that the district court's finding that there were limited assets available to the defendants to fund the class action payments was not supported by the record. The two Australian companies appear not to have limited funds and are able to bear the expense of litigation and pay damages. *Id.* Because the district court believed that TPLC would not settle without the release of the two parent companies, the district court approved the settlement. *Id.* The district court concluded that the loss of the settlement constituted a "risk" within the meaning of Rule 23(b)(1)(B) sufficient to allow the settlement to go forward. *Id.* The Sixth Circuit found that the "risk" of losing the settlement was not sufficient to support a finding that the fund was limited because risk is always inherent in litigation. *Id.* at 880. The Sixth Circuit also found that the district court's finding that it may not be able to exercise personal jurisdiction over the Australian companies conflicted with the district court's earlier finding in its order denying the motion to dismiss the Australian defendants for lack of personal jurisdiction. In that opinion, the district court found that the Australian companies exercised a great deal of control over TPLC, including monthly reviews of the subsidiaries' reports and providing strategic planning and advice to the subsidiaries. *Id.* at 878–79. The Sixth Circuit concluded that the district court confused the ability of plaintiffs to prevail on the merits against the Australian companies with the ability to pay a judgment, which are two separate issues. *Id.* at 879–80. But for the settlement, the Sixth Circuit found that there would be no limited fund because the class members could pursue their claims against the Australian companies, along with TPLC. *Id.* at 879–80. The Sixth Circuit then noted that it could not approve a settlement release of parent companies from all liability because it would leave class members with no recourse against the parent companies. *Id.* at 879–80.

The scenario before the Sixth Circuit in the *In re Telectronics* case substantially differs from the case before this Court. The *Telectronics* case is a Rule 23(b)(1)(B)

limited fund class settlement case. The instant case is a bankruptcy action. The Sixth Circuit in *In re Telectronics* clearly distinguished the case before it from a bankruptcy action by noting that this country has a comprehensive bankruptcy scheme and bankruptcy requires vigorous examination of various expenses. *Id.* at 880. The Sixth Circuit noted that a large mass tort action or other litigation will put a company into bankruptcy but that a district court's discharge of a parent company's debt in advance of bankruptcy would usurp the bankruptcy scheme through settlement. *Id.* The Sixth Circuit did not make a blanket rule that the release of a parent company was improper in all cases, including in a bankruptcy action. The Sixth Circuit found that the release was improper in *In re Telectronics* was because in a class action suit, unless there are sufficient facts to show that there are limited funds from the assets of "all" defendants, a Rule 23(b)(1)(B) class action settlement is improper. The Sixth Circuit found that the district court did not make sufficient findings as to the parent companies' assets, including the court's failure to undertake an independent risk analysis on whether the insurance policy coverage was sufficient. *Id.* at 879–80. The Sixth Circuit further found that because it appeared that the parent companies may have sufficient assets to pay the cost of litigation and compensate any injuries and that the district court may be able to exercise personal jurisdiction over the parent companies, the district court's finding that there was a "limited fund" from which the class action members could be paid from was not supported by the record. *Id.* at 879–80. The Sixth Circuit's main concern was that the class members had no recourse, at all, against the parent companies, who may have sufficient assets to pay any damages, if the parent companies were released under the settlement agreement. Here, the claimants under the Amended Joint Plan will only release the Shareholders if they choose to settle their claims with the Settlement Facility. The Claimants in this bankruptcy action, have a recourse against the Shareholders should they choose to litigate their claims in the Litigation Facility. Any claims litigated in the Litigation Facility would be paid in full. The evidence before the bankruptcy court shows that the cap imposed on the Litigation Facility is more than sufficient to cover any successful claims against the Litigation Facility. The Sixth Circuit's due process concerns regarding the parent companies in *In re Telectronics* are not present under the Amended Joint Plan. The Sixth Circuit's decision in *In re Telectronics* does not apply to the bankruptcy action before this Court.

### I. Conclusion re Release and Injunction Provisions

Reviewing *de novo* the Bankruptcy Court's legal conclusion expressed in its December 21, 1999 Opinion that it had no jurisdiction to issue an injunction, for the reasons set forth above, the Court finds that the Bankruptcy Court erred in its conclusion. However, under a clearly erroneous standard, the Bankruptcy Court did not clearly err in its findings of fact regarding the release and injunction provisions in its November 30, 1999 Findings of Fact and Conclusions of Law because the findings were supported by the record before the Bankruptcy Court. The Court reverses the Bankruptcy Court's legal conclusion regarding the release and injunction provisions expressed in its December 21, 1999 Opinion, for the reasons set forth above. The Court affirms the Findings of Fact and Conclusions of Law and the Bankruptcy Court's November 30, 1999 Confirmation Order.

### VIII. CLASSIFICATION, TREATMENT, FAIRNESS AND BEST INTEREST

#### A. Background

Various parties have filed appeals from the Bankruptcy Court's Confirmation Order and Amended Opinions on the classifi-

cation and treatment of claims, the fairness of the Amended Joint Plan and whether the Amended Joint Plan is in the best interest of creditors. There are 33 classes and subclasses under the Amended Joint Plan.[6] The appeals before this Court based on classification, good faith, treatment, and the best interest of creditor test involve the following classes: Class 5 Domestic Breast Implant Claims; Class 6.1 Foreign Breast Implant Claims; Class 6.2 Foreign Breast Implant Claims; Class 9 Domestic Other Products Personal Injury Claims; Class 12 Physician Claims; and Class 15 Government Payor Claims. Many arguments presented by the parties are the same for each issue. The Court will generally address the applicable law as to each issue and then address each parties' arguments in the following order: the Domestic Claimants, the Foreign Claimants, the Class 9 Domestic Other Products Claimants, the Class 12 Physician Claimants and the Class 15 United States' Claims.

### B. *Standard*

#### 1. *Classification/11 U.S.C. § 1122(a)*

11 U.S.C. § 1122(a) provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." "Substantially similar" has been defined as "similar in legal nature, character or effect." *In re Dow Corning Corp. (Classification and Treatment Op.)*, 244 B.R. at 644. The claims need not be identical. *Id.* at 655; 7 Collier on Bankruptcy ¶ 1122.03[3][a]. There is no requirement that claims be classified according to their values. *In re Resorts Int'l, Inc.*, 145 B.R. 412, 448 (Bankr.D.N.J.1990). Although § 1122(a) speaks only to the types of claims that can be classified together, the Sixth Circuit has held that substantially similar claims may be classified separately

unless the classification is used to line up votes in favor of the plan, or if a shareholder and creditors who are not intimately connected with the enterprise are placed together, or where a breach of fiduciary obligation or unfair dealings are at issue. *In re U.S. Truck Co.*, 800 F.2d 581, 586–88 (6th Cir.1986). The bankruptcy court has "broad discretion to determine proper classification according to the factual circumstances of each individual case." *Id.* at 586.

The Bankruptcy Court extensively analyzed the current state of the law on the classification issue stating that the Sixth Circuit has adopted a "legitimate reason" standard as to whether classification is proper. *Classification and Treatment Op.*, 244 B.R. at 645, *citing Aetna Cas. & Surety Co. v. Clerk (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2nd Cir.1996), *In re Stratford Assocs. Ltd. Partnership*, 145 B.R. 689, 696 (Bankr.D.Kan.1992), and *In re Barakat*, 99 F.3d 1520, 1526 (9th Cir. 1996). The Bankruptcy Court believes that this standard is wrong as a matter of law but is bound by the Sixth Circuit precedent in *U.S. Truck. Classification and Treatment Op.*, 244 B.R. at 651. The Bankruptcy Court suggests that the standard to be applied, based on the plan language of 11 U.S.C. § 1122(a), is to ascertain only whether the claims within that class are substantially similar in character to each other. *Id.* Section 1122(a) should not be viewed as prohibiting a plan proponent from placing substantially similar claims in different classes regardless of whether it has proven a "legitimate reason" for doing so. *Id.* at 650. Concerns as to whether a proposed plan is abusive of the bankruptcy process and whether the plan does not unfairly discriminate against and is fair and equitable to any class that rejects it are addressed through the good faith requirement under § 1129(a)(3), other provisions in § 1129(a) and the cram

---

**6.** All the classes are delineated in the Bankruptcy Court's December 2, 1999 *Amended Opinion on the Classification and Treatment of Claims*, 244 B.R. at 641, n. 1. *See Amended Joint Plan of Reorganization*, Art. 3.

down provision in § 1129(b). *Id.* at 650–51.

■ Based on the statutory language found in both §§ 1122(a) and 1129, the Court agrees with the Bankruptcy Court's analysis that the only inquiry a bankruptcy court is required to make under § 1122(a) is whether the claims within a class are substantially similar. If the claims are found to be substantially similar and objections are made as to whether the plan proponent submitted a plan in good faith-specifically that the classifications were made to gerrymander votes or in violation of fiduciary obligations, the inquiry should be made under § 1129(a)(3). If the claims are not found to be substantially similar then the plan cannot be confirmed. A plan proponent would still be required to submit proof, perhaps not as extensive as required by the "legitimate reason" standard, as to whether the claims are substantially similar, especially if objections are made that the claims in a class are not substantially similar.

This Court's reading of *U.S. Truck* does not necessarily contradict the Bankruptcy Court's analysis. The Sixth Circuit did not expressly hold that the plan proponent was required to show a "legitimate reason" as to why similar claims were classified separately. It appears that the Sixth Circuit's main concern was that the classification of claims not to be used to gerrymander votes or that unfair dealing and breach of fiduciary obligations occurred in the classification of claims. *In re U.S. Truck,* 800 F.2d at 586–87. The Bankruptcy Court's analysis does not contradict the Sixth Circuit's concern in *U.S. Truck* that potential abuse could occur if there were not some limit on the plan proponent's power to classify claims. The Sixth Circuit acknowledged the less restrictive language used by Congress in § 1122 but questioned whether Congress intended the plan proponent to have such broad power over classification. *Id.* at 586. If similar claims are placed in separate classes, the only restriction *U.S. Truck* places on the

debtor's broad power to classify claims is that the similar claims not be classified separately in order to obtain votes. *Id.*

The first case cited by the Sixth Circuit in *U.S. Truck, First Nat'l Bank of Herkimer v. Poland Union,* 109 F.2d 54 (2d Cir.1940), dealt with a class which contained shareholders and other creditors who were not so intimately connected with the enterprise. This classification guaranteed a vote in favor of the plan because the shareholders stood to profit from the plan. The second case cited was *American United Mut. Life Ins. Co. v. City of Avon Park,* 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91 (1940). The plan in *American United* was not confirmed because it was not clear whether the agent soliciting the votes for the plan in the same class disclosed his interest in the plan. The agent administering the plan also held claims on which he would enjoy profit if the plan was confirmed. The Sixth Circuit in *U.S. Truck* approved the analysis of these two cases in affirming the district court's finding that the "interests" of the Teamsters Committee "differed substantially" from the other creditors who were placed in a different class. *U.S. Truck,* 800 F.2d at 587. The Teamsters Committee objected to the plan because the Teamsters Committee believed its claims based on the collective bargaining agreement, which were placed in a separate class, should be classified in the same class with the secured claims.

In *U.S. Truck,* the real issue was whether the Teamsters Committee's claim and the secured claims were properly classified separately based on the substantial similar standard under § 1129(a). Although the Sixth Circuit noted that there should be some restrictions on the debtor's power to place similar claims in separate classes such as gerrymandering of votes, that issue was not before the court because the debtor admitted to the district court that it separated the classes in order to line up the votes in favor of the plan. *U.S. Truck,* 800 F.2d at 586, n. 8. Even with this admission, the Sixth Circuit did not reject

the confirmation of the plan because it agreed with the district court that the claims were properly separately classified because the "interest" of the claimants were *not* substantially similar. *Id.* at 587.

Based on *U.S. Truck* it appears that the inquiry regarding classification is whether the claims are substantially similar, as the Bankruptcy Court suggests the plain language of the statute provides. If similar claims are placed in separate classes the classes are properly constituted. Any good faith issues are resolved under § 1129(a)(3). The Sixth Circuit's opinion also notes that by allowing similar claims to be classified in separate classes, a particular class "is still protected by the provisions of subsections (a) and (b), particularly the requirements of subsection (b) that the plan not discriminate unfairly and that it be fair and equitable." *Id.* at 587.

Because the Bankruptcy Court has applied the higher "legitimate reason" standard to the parties' objections, this Court's inquiry will be whether the Bankruptcy Court's finding as to the classifications issue was clearly erroneous, based on the Bankruptcy Court's application of the "legitimate reason" standard even though *U.S. Truck* does not expressly hold that the "legitimate reason" standard is adopted in the Sixth Circuit.

### 2. *Within Class Treatment/11 U.S.C. § 1123(a)(4)*

▮ Section 1123(a)(4) applies to the treatment of claims within the same class. A plan is required to "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). Section 1123(a)(4) "is not to be interpreted as requiring precise equality of treatment, but rather, some approximate measure [of equality]." *In re Resorts*, 145 B.R. at 447. The appropriateness of whether a plan provides different treatment to claims which are legitimately classified in separate classes arises, if at all, only in the context of cram down under 11 U.S.C. § 1129(b).

The Bankruptcy Court rejected the reasoning found in *In re AOV Indus., Inc.*, 792 F.2d 1140 (D.C.Cir.1986) regarding within-class treatment under § 1123(a)(4). In *In re AOV*, the D.C. Circuit stated that inequality under § 1123(a)(4) includes a situation where there is payment of different percentage settlements to co-class members and that the "other side of the coin" is where there is unequal consideration tendered for the equal payment. *Id.* at 1152. Under the plan in *AOV*, the class at issue included all general unsecured creditors. *Id.* at 1150. The objecting party in the class possessed a direct claim against certain third parties whereas the remaining class members possessed only derivative claims against third parties. *Id.* at 1151. The D.C. Circuit held that because the party that had a direct claim gave up more consideration than the parties with only derivative claims under the settlement offer, the party with the direct claim was treated unequally. *Id.* at 1152–53.

▮ This Court agrees with the Bankruptcy Court's conclusion that the reasoning in *In re AOV* regarding equal treatment within a class should be rejected. The claims at issue in this case involve disputed and unliquidated claims. In the *In re AOV* case, the claims were undisputed and liquidated. Requiring a bankruptcy court to inquire as to the amount of consideration involved in each claim involving a disputed and unliquidated personal injury claim, especially in a mass tort situation, would be an unrealistic, unworkable and an unduly burdensome position for the bankruptcy court to be in. Settlement negotiations would not be effective under such a standard and the bankruptcy court would be placed in a situation where it would become involved in the negotiation process. The *In re AOV* case also failed to consider the second half of the language found in § 1123(a)(4) which expressly al-

lows for disparate treatment of a claim if the claimant "agrees to a less favorable treatment." 11 U.S.C. § 1123(a)(4). Agreeing to settle, instead of litigating a claim, would permit a claimant to be treated differently, such as giving up more valuable consideration, in exchange for the settlement offer. This treatment is allowed under § 1123(a)(4). The primary treatment under the Amended Joint Plan is the same for each tort claimant-to enter the Litigation Facility. The secondary treatment is to accept the settlement offer of the Settlement Facility. Based on the express language of § 1123(a)(4), under a *de novo* review, the Bankruptcy Court did not err in holding that a claimant who elects to settle under the Amended Joint Plan agrees to a less favorable treatment than the litigation option, and that this agreement complies with the second clause of § 1123(a)(4).

### 3. *Good Faith/11 U.S.C. § 1129(a)(3)*

▬▬▬ A number of Appellants argue that the Plan was not proposed in good faith. 11 U.S.C. § 1129(a)(3) provides:

(a) The court shall confirm a plan only if all of the following requirements are met:

\* \* \* \* \* \*

(3) The plan has been proposed in good faith and not by any means forbidden by law.

A bankruptcy court's finding that a debtor's plan is proposed in good faith is a finding of fact reviewed under the clearly erroneous standard. *In re Caldwell*, 851 F.2d 852, 858 (6th Cir.1988). The Sixth Circuit has addressed the good faith requirement relating to confirmation of a plan filed under chapters 12 and 13. The identical statutory language was considered. The Sixth Circuit held that good faith must be reviewed based on the totality of the circumstances. Good faith is defined by factual inquiry. *In re Laguna Assoc. Ltd. Partnership*, 30 F.3d 734, 738 (6th Cir.1994), *quoting In re Okoreeh–Baah*, 836 F.2d 1030, 1033 (6th Cir.1988).

Pre-petition behavior is irrelevant. *Good Faith Opinion*, 244 B.R. at 675. The focus is on the plan itself. *Id., In re Madison Hotel Assoc.*, 749 F.2d 410, 425 (7th Cir. 1984). Good faith may exist "when there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Nikron, Inc.*, 27 B.R. 773, 778 (Bankr.E.D.Mich.1983). A plan's proposal must be: a) in good faith, and, b) not by a means forbidden by law. *In re Sovereign Group, 1984–21 Ltd.*, 88 B.R. 325, 328 (Bankr.D.Colo.1988) (*citing* 5 Collier on Bankruptcy ¶ 1129.02 (15th ed.1984)); *In re Food City, Inc.*, 110 B.R. 808, 811–12 (Bankr.W.D.Tex.1990).

The Bankruptcy Court noted that the term "good faith" is not defined in the Bankruptcy Code. *Good Faith Opinion*, 244 B.R. at 675. The Bankruptcy Code referred to "good faith" as a "fuzzy" concept, intended to "allow courts to utilize their gut feelings about a plan's effects." *Id.* But the Bankruptcy Court did not exercise its "gut feelings" about the Plan. Only after a painstakingly careful review of the Plan did the Bankruptcy Court note concrete reasons for concluding the Plan was proposed in good faith. He noted that the Plan was proposed as a "legitimate effort to rehabilitate a solvent but financially distressed corporation" faced with massive pending and potential future tort claims against it. *Id.* at 676–77. Such rehabilitation he found to be an articulated goal of chapter 11. *Id.* at 677. He further found the use of chapter 11 to resolve mass tort litigation is not violative of the § 1129(a)(3) good faith requirement citing *In re Johns–Manville Corp.*, 68 B.R. 618, 632 (Bankr.S.D.N.Y.1986). *Id.*

The Bankruptcy Court further found that the process of negotiating the Joint Plan supported a finding that the Plan was proposed in good faith. He noted especially the persuasive testimonies of Tommy Jacks, Scott Gilbert, Ralph Knowles and Arthur Newman which referenced the "in-

tense arms-length negotiation" between the parties, the involvement of the Court's experienced Special Master Francis McGovern and the input of qualified experts. *Id.* According to the Bankruptcy Court, the Plan effectively does what chapter 11 was designed to do. In this case, the Plan employs procedures that resolve the mass tort litigation, pay the Debtor's creditors, allow the Debtor to remain a viable corporation able to provide a return for Shareholders, pay taxes and provide jobs. *Id.*

Some Appellants have included an objection based on good faith in the arguments in support of their objections. The individual arguments that the Plan was not proposed in good faith are more fully addressed herein. Reviewing the Bankruptcy Court's factual findings under a clearly erroneous standard, the Court finds that the Bankruptcy Court did not clearly err in finding that the Amended Joint Plan was proposed in good faith, as more specifically addressed below under each party's arguments.

### 4. *Best Interest of Creditors Test/11 U.S.C. § 1129(a)(7)*

Objections were made based on § 1129(a)(7). One objection is that the disallowing punitive damages claims violates § 1129(a)(7). Another objection is that the cap on the litigation fund also violates § 1129(a)(7).

■ Section 1129(a)(7) requires that each claimant under a Chapter 11 plan of reorganization either accept the plan or "receive or retain under the plan . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7)(A)(ii). This provision is known as the best-interest-of-creditors test. This provision protects the interests of dissenters within a class by placing a floor on the bargain agreed to by the majority. Section 1129(a)(7)(A)(ii) ensures that the dissenting claimants receive in

payment of their claims no less than they would receive if the debtor were liquidated under chapter 7.

■ To determine whether a plan is in the best interest of the creditors, a bankruptcy court must review the facts before it by a preponderance of the evidence. *In re Trevarrow Lanes, Inc.*, 183 B.R. 475, 479 (Bankr.E.D.Mich.1995). The Court finds that under the clearly erroneous standard, the Bankruptcy Court's factual findings on the best-interest-of-creditors issue was supported by the record and the Bankruptcy Court did not clearly err in its findings as more specifically set forth under the parties' arguments below. The parties' individual arguments regarding the best interests of creditors test are addressed herein.

### C. *Parties' Arguments*

#### 1. *Class 5 Domestic Claimants*

The Amended Joint Plan of Reorganization classified breast implant claimants into three classes: Class 5 (Domestic Claimants); Class 6.1 (Foreign Claimants from countries with common law legal systems and/or with GDPs at least 60% of that of the United States); and Class 6.2 (Foreign Claimants from countries who do not have a common law legal system and have GDPs less than 60% of that of the United States).

#### a. *Nevada Claimants*

The Nevada Claimants consist of 45 claimants who objected to the proposed Amended Joint Plan. The Nevada Claimants agree that their claims are substantially similar with the other claimants in Class 5 as to their claims against the Debtor. However, the Nevada Claimants argue that their claims are not substantially similar to the other claimants in Class 5 because the Nevada Claimants have a judgment against Dow Chemical giving them certain rights that the other claim-

ants do not have against Dow Chemical.[7] They argue that Dow Chemical is now collaterally estopped from relitigating the issue of liability in Nevada. The Nevada Claimants assert that their claims against Dow Chemical cannot be subjected to a *Daubert* hearing. They also maintain that their claim under the classification issue is closely tied to the non-debtor discharge and good faith issues. They argue that either their claims be classified separately or their claims must be treated differently in order to receive "equal treatment" because of their rights against Dow Chemical based on the judgment the Nevada Claimants have against Dow Chemical. The Nevada Claimants also argue that because they have asserted punitive damages, their claims are different from other claimants who do not have punitive damages claims. The Nevada Claimants further argue that the Litigation Fund Facility is underfunded, and, therefore is not fair.

The Bankruptcy Court found the Nevada Claimants' collateral estoppel argument unpersuasive, noting that new scientific developments do not support the claimants' position that silicon gel causes disease citing the Institute of Medicine Report and the MDL–926 Science Panel Report. *Classification and Treatment Op.*, 244 B.R. at 655, n. 9. The Bankruptcy Court also found collateral estoppel was irrelevant to proper classification under § 1122(a) because the Plan classifies claims against the Debtor, not its Shareholders. 244 B.R. at 655. The Nevada Claimants acknowledge that in future breast implant trials involving Dow Chemical in Nevada Dow Chemical would be entitled to present new scientific evidence revealed since the *Mahlum* case was tried. Again, the Nevada Claimants also acknowledge that as to the Debtor, their claims are substantially similar to the other claimants in Class 5.

▬ The Court agrees with the Bankruptcy Court's conclusion that Dow Chemical would not be collaterally estopped from presenting new evidence in Nevada in future trials against Dow Chemical in light of the Nevada Claimants' concession on that point. Under § 1122(a), it is the nature and character of the claims *against* the Debtor which must be reviewed and not against third-parties. *See AOV Indus.*, 792 F.2d at 1150–51 ("the focus of the classification is the legal character of the claim as it relates to the assets of the debtor" and "[t]he existence of a claim against a third-party guarantor does not change the nature of a claim vis-a-vis the bankrupt estate and, therefore, is irrelevant to a determination of whether claims are 'substantially similar' for classification purposes."). The Bankruptcy Court did not address the Nevada Claimants' argument that Dow Chemical is collaterally estopped from relitigating its liability if the Nevada Claimants decide to elect litigation under the Joint Plan. However, the collateral estoppel issue may be addressed by way of a motion before the court handling the Nevada Claimants' litigation under the Joint Plan should the Nevada Claimants elect to litigate.

▬ Regarding the *Daubert* issue, claims proceeding against Dow Chemical by way of trial would be governed by the Federal Rules of Evidence, including Rule 702 addressing expert testimony. *Brooks v. American Broadcasting Companies*, 999 F.2d 167, 173 (6th Cir.1993). The difference between state law evidentiary rules and federal law evidentiary rules under *Daubert* does not go to the question of how a claimant's claim is classified or how a claim is treated within a class. It is the nature of the claim and not how evidentiary rules affect the claim that determines how a claim is to be classified. *AOV Indus.*, 792 F.2d at 1150. As to whether the claim is being treated fairly within the class, the inquiry is whether the claim is subject to the same process in satisfying the claim as the other claims within the class. *In re Central Medical Center, Inc.*,

---

7. *See Dow Chemical v. Mahlum,* 114 Nev. 1468, 970 P.2d 98 (1998).

122 B.R. 568, 575 (Bankr.E.D.Mo.1990). The evidentiary issues only come into play if the claimant chooses to litigate the claim and at such time those issues may be brought before the trial judge.

■ The Nevada Claimants' argument that they should be treated differently within Class 5 because of their judgment against Dow Chemical is without merit. The primary treatment provided under the Plan for Claimants in Class 5 is the opportunity for a claimant to litigate the claim against the Litigation Facility. *Classification and Treatment Op.*, 244 B.R. at 660. The secondary treatment is the settlement option. *Id.* at 669. Although settlements are strongly favored and encouraged by law, settlement is merely an option to litigation which the claimant may voluntarily elect. *See, e.g., Franks v. Kroger Co.*, 670 F.2d 71, 72 (6th Cir.1982). There is no requirement that settlement offers be proportional within a class in light of the second clause in § 1123(a)(4) which provides that disparate treatment of a claim is permissible if the holder of that claim "agrees to a less favorable treatment." 11 U.S.C. § 1123(a)(4). The requirement under § 1123(a)(4) that all claims be treated equally is satisfied when the class members are subject "to the *same process* for claim satisfaction." *In re Central Medical Center*, 122 B.R. at 575. Under a *de novo* review, the Bankruptcy Court did not clearly err in its conclusion that because the primary treatment provided under the Plan for Class 5 Claimants is the opportunity to elect litigation against the Litigation Facility the equal treatment requirement under § 1123(a)(4) has been met.

■ The Nevada Claimants contend that they should be treated differently within Class 5 because they are entitled to a claim of punitive damages claims. In its best-interest-of-creditors opinion, the Bankruptcy Court noted that under 11 U.S.C. § 726(a), unsecured creditors are entitled to be paid not just the compensatory damages of their claim, but any exemplary, punitive or multiple damages, before equity is entitled to receive any distribution in a chapter 7 bankruptcy. *Best–Interests Opinion*, 244 B.R. at 728.[8] Under the Joint Plan, the equity security holders will retain their shares in the reorganized debtor while creditors who might be entitled to punitive or multiple damages would receive nothing for those claims. *Id.* The Bankruptcy Court stated that a theoretical right to recovery is of no moment unless those creditors are actually entitled to such damages. *Id.* The Bankruptcy Court found that based on the evidence presented at the hearing, a chapter 7 trustee would not pay punitive damages if the claims were liquidated. *Id.*

Based on the evidence presented at the hearing, the Bankruptcy Court's finding regarding punitive damages is not clearly erroneous. At the onset, the Nevada Claimants' punitive damages award was set aside. *See Dow Chemical Co. v. Mahlum*, 114 Nev. 1468, 970 P.2d 98 (1998). Mr. Arthur B. Newman, a senior managing director of The Blackstone Group, testified that in his opinion, in the aggregate, creditors would receive, under the Plan, no more than what creditors would receive in a chapter 7. (Conf.Hrg.Tr., 7/14//99, p. 99) Before any unsecured claims can be paid, they must first be liquidated in a chapter 7 case. The cost of liquidating hundreds of thousands of claims would be monumental. *Best–Interests Opinion*, 244 B.R. at 728. The chapter 7 trustee would probably defend liability, especially punitive damages. Frederick C. Dunbar, a senior vice-president at National Economic Research Associates, Inc., testified that he had studied every breast implant verdict on the past 3 ½ years and found that no punitive damage verdict has been rendered since 1992. (Conf.Hrg.Tr., 6/30/99, p. 48) The objectors did not present any evidence to support their argument that the claimants are enti-

---

**8.** The Bankruptcy Court did not address the punitive damages issue in its Classification Opinion but in its Best–Interest–of–Creditors Opinion.

tled to punitive damages. The Bankruptcy Court did not clearly err in its finding that punitive damages would not be paid by a trustee in a chapter 7 case. Based on this finding, the Nevada Claimants' argument that they should be classified differently fails because no additional consideration is provided to them for the extinguishment of their punitive damages claims.

■ As to the Nevada Claimants' argument that the funding of the Litigation Facility is insufficient, the Bankruptcy Court found that the "evidence was overwhelming that $400 million net present value would be more than sufficient to pay all personal injury claims resolved through litigation in full even after factoring in the costs of the process." *Best–Interests Opinion*, 244 B.R. at 729.

Mr. Tommy Jacks, a plaintiff's personal injury lawyer who represented many clients suing the Debtor, and a member of the Official Committee of Torts Claimants, testified that based on his experience as a lawyer, the number of claimants electing settlement will be much greater than those who will elect litigation. The time factor and litigation environment, with the new reports regarding silicone gel causing diseases, will result in fewer claimants electing litigation. Mr. Jacks concluded that based on these reasons, the $400,000,000 amount of funding the Litigation Facility is sufficient to pay all claims in full. (Conf. Hrg.Tr., 6/28/99, pp. 161–63.)

The Bankruptcy Court was very impressed by the Proponents' witness on this issue—Mr. Dunbar. Mr. Dunbar estimated that 7,513 people would elect to litigate against the Litigation Facility. Mr. Dunbar's methodology was based on the Revised Settlement Plan in the MDL 926 proceedings in the Northern District of Alabama. Because of the enhancements under the Joint Plan as opposed to the RSP, Mr. Dunbar testified that even more people would elect to settle in this case. Mr. Dunbar also relied upon the data from another mass-tort bankruptcy case, *A.H. Robins Co.*, for his conclusion on the num-

ber of claimants who will elect to litigate. Mr. Dunbar then determined the average award for each claimant proceeding to litigation. Mr. Dunbar compared the case at bar with the Dalkon Shield Claimants Trust experience from the *A.H. Robins* bankruptcy action. Professor Georgene M. Vairo, the chairperson of the Board of Trustees of the Trust since 1989, corroborated Mr. Dunbar's testimony. Mr. Dunbar testified that the average award would be $11,700.00 in nominal terms, for a total of approximately $88 million for all the claimants. Mr. Dunbar added in the administrative costs of resolving the claims which he estimated at $43.6 million, for a total of about $131.6 million. Other silicone gel implant claims would amount to approximately $26 million. The total amount to dispose of all the disputed personal injury claims, including administrative and legal expenses, would be approximately $157.6 million. Over a 16–year life and with a 7% discount rate, the net present value of the figure is about $83 million.

The Bankruptcy Court found no credible evidence to rebut the testimonies presented by the Proponents. Reviewing the Bankruptcy Court's factual findings under a clearly erroneous standard, the Bankruptcy court did not clearly err in its finding that the $400 million net present value funding of the Litigation Facility is almost five times what it will be necessary to satisfy all the claims against the Litigation Facility. *Best–Interests Opinion*, 244 B.R. at 731.

#### b. *Marti Jacobs*

Jacobs claims that her objections were not addressed by the Bankruptcy Judge. She argues that the Plan was not filed in good faith. The Settlement facility is not feasible or fair. Jacobs claims that Class 5 was not an accepting class because only 61% of Class 5 Claimants accepted the Plan out of 175,679 Class 5 Claimants who were eligible to vote. Jacobs also claims that if the votes of future claimants were separated, Classes 5 to 7 would not have

been accepting classes and the cram down rules would be applicable to all personal injury claimants classes. Jacobs further claims that the Personal Injury Claimants were not fully informed when they voted because Annex A was not served upon voting Creditor/Personal Injury Claimants. Annex A contained all of the Eligibility Criteria under the Settlement Facility, the Claims Resolution Procedures, the Litigation Facility Agreement and the proposed Case Management Order. Jacobs argues that the classification of the personal injury claimants was designed to gain votes. The 180 days for a claimant to decide whether to opt in to the Settlement Facility or the Litigation Facility is too short of a time period. She claims that the treatment of claims within the class is unfair because there is no middle level for more severe neurological diseases nor compensation for loss of wages, additional out-of-pocket expenses due to surgical reconstruction beyond explanations, no compensation after two years of ruptures, and future claimants who have not yet manifested disease are short changed. Jacobs also contests the composition of the Tort Claimants' Committee. Jacobs also objects to the manner in which the Bankruptcy Court conducted the proceedings below and rulings made by the Bankruptcy Court during the hearing, claiming that there was lack of representation of actual Personal Injury Claimants.

Jacobs contends that the Proponents did not present sufficient evidence at the hearing to satisfy the best interests of creditors test. She claims the expert testimony of Arthur Newman regarding the sufficiency of the fund had no legitimate basis since Mr. Newman had never been a chapter 7 trustee and had never worked on a chapter 7 liquidation. Jacobs charges there is no evidence that a trustee would use the same general grid and payment scheme as the Joint Plan does. The Joint Plan violates the best interest test because it proposes a cap on the claims of creditors who choose to litigate against the Litigation Facility and because the Debtor is solvent and

remains so after confirmation. The Proponents have not met their burden that the claimants at the end of the litigation will receive the full amount of their claim. Also, the bar in the Litigation Facility against the right to pursue punitive damage awards violates the best interest test given that the Debtor will have $1 billion in equity. The alternative litigation procedures depressed the present value of potential recoveries against the Litigation Facility thus it does not satisfy the best interests test. The Joint Plan fails the best interests test because it fails to provide the spouses of implant recipients any recovery under the grid. There is no evidence that spouses would not recover in a chapter 7 case. The Joint Plan fails the best interests test because in a liquidation, equity would recover nothing until creditors were paid in full. 11 U.S.C. § 726(a). Here, the over $1 billion in equity will inure to the benefit of the Shareholders even though the foreign claimants are not being paid in full and will receive only 35% to 60% of what the U.S. claimants with identical claims will receive.

The Bankruptcy Court's Opinions, Findings of Fact and Conclusions of Law on the Plan confirmation issues do not expressly mention Jacobs' objections. A review of the hearing transcript and record below indicate that Jacobs had the opportunity and did in fact present her objections before the Bankruptcy Court in writing and on the record. (*See e.g.,* Conf. Hrg.Tr. 7/1/99 at 155–56; 7/2/99 at 117–18; 7/27/99 at 151–56, 260–72; 7/30/99 at 120–39.) The Bankruptcy Court did address Jacobs' general objections to the classification and treatment of the claims under the Plan and whether the Plan was in the best interests of creditors, fair and proposed in good faith.

 With regards to whether the Plan was filed in good faith, based on the evidence presented at the hearing, the Bankruptcy Court did not clearly err in its finding that the Proponents of the Plan

have met their burden of showing that the Plan was proposed and formulated in good faith under § 1129(a)(3). The Bankruptcy Court found that the legal costs and logistics of defending the worldwide product liability lawsuits against the Debtor threatened its vitality by depleting its financial resources and preventing its management from focusing on core business matters. *See In re Dow Corning Corp.*, 211 B.R. 545, 552–53 (Bankr.E.D.Mich.1997). The Bankruptcy Court further found that "the Plan was proposed in a legitimate effort to rehabilitate a solvent but financially-distressed corporation, besieged by massive pending and potential future product liability litigation against it—an articulated policy objective of chapter 11." *Good Faith Opinion*, 244 B.R. at 677. The Bankruptcy Court noted that,

> As testified by Tommy Jacks, Arthur B. Newman, Scott Gilbert and Ralph Knowles, the Plan was the result of intense arm's-length negotiations between parties represented by competent counsel who were guided by an experienced Court-appointed mediator and the findings and recommendations of highly qualified experts. The Plan incorporates procedures to effectively resolve the multitude of tort claims that drove the Debtor into bankruptcy and will allow the Debtor to emerge from bankruptcy as a viable corporation with the ability to pay its creditors the full amount to which they are entitled, to continue providing a return for its stockholders, to pay taxes to the federal government and to innumerable state and local governments, and to provide jobs for its employees. This is exactly the result envisioned by the drafters of chapter 11.

244 B.R. at 677.

Based on the record before the Bankruptcy Court, this Court finds that its finding that the Plan was proposed in good faith was not clearly erroneous. The Bankruptcy Court looked at the testimonies of various individuals who had negotiated the terms of the Joint Plan. The Bankruptcy Court also looked at the various provisions of the Joint Plan, in particular the provisions involving the resolution of the multitude of tort claims against the Debtor which claims drove the Debtor to seek bankruptcy protection. The Bankruptcy Court found that in addition to resolving the tort claims against the Debtor, the Joint Plan would: pay the Debtor's non-tort claimant creditors the full amount to which they are entitled, including taxes to various taxing authorities; provide a return to its stockholders; and allow the Debtor to continue a viable business and provide jobs for its employees. There was sufficient evidence before the Bankruptcy Court to support its finding that the Joint Plan was proposed in good faith.

Jacobs' claim that Class 5 was not an accepting class is without merit. Section 1126(c) provides that acceptance is calculated by the percentage of acceptance of those who "accepted or rejected such plan." In other words, the acceptance rate is calculated by the number of claimants who actually voted either to accept or reject the plan, not based on the number of claimants eligible to vote as Jacobs argues. 11 U.S.C. § 1126(c).

Jacobs' claim that the tort claimants were not adequately informed because Annex A to the Joint Plan, which included various documents, was not attached to the Disclosure Statement is without merit. Before the Disclosure Statement was sent out to the various creditors, hearings were held on the contents of the Disclosure Statement. A review of the Disclosure Statement shows that the tort claimants were adequately informed of the various provisions of the Joint Plan and the possible payment risks. (Conf.Hrg.Tr. 7/1/99 at 155.)

Jacobs also claims that the Proponents classified the tort claims to gerrymander votes in violation of § 1122(a). Jacobs has not produced any credible evidence to support this claim. Jacobs' claim is substantially similar to the other claims in Class 5.

All the claims in Class 5 are unsecured unliquidated personal injury claims against the Debtor. The Bankruptcy Court's finding that the claims were properly classified is supported by the record. Jacobs has not presented any evidence to support her claim that the classification of tort claims was done to obtain votes.

 Jacobs does not identify a statutory basis for her objection that claimants need more than 180 days to decide whether to elect to enter the settlement or litigation facilities. Nor does Jacobs' objection that the treatment of claims within the class is unfair because certain injuries are not adequately compensated under the Settlement Facility specify a particular statutory provision. Neither of these objections go to issues regarding classification, treatment, good faith or the best interests of creditors' test. There is no requirement under Sec. 1123(a)(4) that a plan must provide strict proportional equality of payments within a class, especially if those claims are unliquidated. There is no statutory requirement that the Bankruptcy Court weigh the strengths and weaknesses of each and every claim so that each claim receives equal value. Section 1123(a)(4) "is not to be interpreted as requiring precise equality of treatment, but rather, some approximate measure [of equality]." *In re Resorts Int'l,* 145 B.R. 412, 447 (Bankr. D.N.J.1990). The Bankruptcy Court's finding that the settlement offers to claimants in Class 5 meets the approximate measure of equality is supported by the evidence submitted at the confirmation hearing. As noted previously, the primary treatment for each claimant is the same—the option to enter the Litigation Facility. The secondary treatment is also the same for each claimant—to enter the Settlement Facility. *Classification and Treatment Op.,* 244 B.R. at 669.

Both the Bankruptcy Court and this Court have addressed the issue raised by Jacobs' objections to the composition of the Tort Claimants' committee. No fur-ther appeal was taken from the district court's decision on the issue.

With regards to Jacobs' other objections, including the best interests of the creditors objection, sufficiency of the fund objection, and punitive damages objection, for the reasons set forth above and elsewhere in this opinion, the Court affirms the Bankruptcy Court's decision that the Joint Plan satisfies the best interests of the creditors' test.

### c. Beatrix Shishido

Beatrix Shishido, *pro se,* claims that the Plan is not fair. Shishido is objects that the Plan provides for $1.4 billion in the Litigation Trust with only $400 million for the Claimants who opt into the Litigation Facility claiming that the $400 million is insufficient to pay the Claimants who elect to litigate. Shishido argues that the Debtor never intended to settle the breast implant litigation but only used the reorganization plan as another tactic to stall the settlement proceedings. She further argues that the Proponents' contention that 94% of the Claimants voted to accept the Plan is misleading because approximately 50% of the breast implant claimants did not vote. To Shishido, this means that only 40% of those eligible to vote voted in favor of the Joint Plan and therefore the cram down provisions apply to all the breast claimants classes. Shishido claims that until an actual settlement offer is proposed to each claimant, no valid vote can be established to satisfy 11 U.S.C. § 1129(a)(10). Shishido argues that most of the affirmative votes came from law offices whose interests no longer correspond with their clients. She posits that the disclosure statement was inadequate to inform claimants who were not represented by counsel. Shishido objects to the Litigation Facility's requirement of a "general causation trial" to determine whether silicones can cause any of the diseases alleged. Shishido claims that the Bankruptcy Court's reliance on the Science Panel Report in the MDL–926 and the Institute of Medicine's study is misplaced

because these reports are not accurate having been based on faulty data and having ignored the personal medical histories of women.

Most of Shishido's objections are similar to Jacobs' objections. Regarding Shishido's objection that the Litigation Trust $400 million cap is insufficient to pay Claimants, as noted above, the Bankruptcy Court did not clearly err in finding that the $400 million cap is sufficient to pay Claimants who choose to enter the Litigation Facility. Shishido's objections regarding the voting results is without merit because Section 1126(c) only requires calculation of votes based on claimants who actually cast a vote either in favor or against the plan. As to Shishido's claim that the Proponents have not offered a "true" settlement, as noted above, there is no requirement that the Bankruptcy Court weigh every single claim in order to determine whether all claims are treated equally. Shishido did not present evidence, other than her conclusory allegations, to support her next argument that most yes votes came from law offices whose interests no longer corresponds with their clients. As noted previously, Shishido's claim that the disclosure statement was inadequate to inform the claimants who were not represented by counsel is not supported by the language of the Disclosure Statement. With regards to Shishido's claim that it is not fair that all claimants who elect to litigate must participate in a general causation trial to determine whether silicones cause certain diseases, Shishido has not identified a statutory basis for this objection. This Court has noted above that any claim in the Litigation Facility is subject to the Federal Rules Civil Procedures and any procedural matters—including how to proceed with trial with similar issues may be agreed to by the parties. Regarding Shishido's claim that the MDL–926 Science Panel's find-

ings are not accurate, the credibility of the Science Panel's findings will be addressed later in the litigation in a *Daubert* hearing, on a dispositive motion and/or at trial.

#### d. *Altig Claimants*[9]

The Altig Claimants include Rita Altig, Orriette Quandt, Gloria A. Greene, Christiane Clegg, joined by 66 other claimants, including 18 spouses. The Altig Objections are based on three points. First, they claim that the Plan does not provide equal treatment for similarly situated claimants provided by 11 U.S.C. § 1123(a)(4). Second, the Altig claimants argue that the Debtor should state a specific amount it will put into the Plan as opposed to a ceiling which is currently used by the Plan. Third, the Altig Claimants contend that because the defects are legal ones, the Court has the power to approve the Plan and order the objections cured pursuant to *In re AOV Industries, Inc.*

The Altig Claimants specifically identified five objections to the Plan. First, the Plan allows each claimant one payment for rupture. The Altig Claimants assert that this limitation does not account for a claimant who has suffered multiple ruptures. Second, the Plan provides no separate settlement offers for spousal claims and unless both spouses agree to litigate the claim remains in the Settlement Facility. The Altig Claimants suggest that a method to separate payments to each spouse should be implemented because there may be conflicts between spouses, in particular when there are divorce proceedings involved or the husband or wife reside in community property states and a husband may have a share of the payment to the wife. Third, the payment schedule for those who have not manifested any injuries does not take into account inflation, especially in medical costs. Fourth, the payment plan and yearly ceilings the Debtor has to pay in any given year denies a

---

9. The Bankruptcy Court referred to these Claimants as the Morrison Claimants. *Classi-* *fication and Treatment Op.,* 244 B.R. at 655.

claimant who has settled a claim in one year the right to receive interest on the money owed to the claimant. Fifth, the Plan's elimination of claims for punitive damages is not because of an insufficient funds but because the Debtor does not wish to be subjected to those damages. The Altig claimants acknowledge that some states do not allow punitive damages but argue that for those Claimants who are in States that allow punitive damages, this constitutes unequal treatment.

■ Addressing the Altig Claimants' first objection—that the rupture payments under the Settlement Facility are insufficient because the Plan does not allow payment for multiple ruptures, as noted previously, there is no requirement under the Code that the Bankruptcy Court evaluate each and every claim in order to find the plan fair. All claims are treated equally within Class 5 because the primary treatment is the opportunity to litigate the claim in the Litigation Facility where the claim will be paid in full. The secondary treatment is the opportunity to choose to resolve the claim in the Settlement Facility where a claimant is allowed only one rupture payment. The second clause of Section 1123(a)(4) requires equal treatment unless a claimant who agrees to a less favorable treatment—such as choosing to accept a settlement offer in the Settlement Facility.

■ As to the Altig Claimants' objection that the treatment of consortium claims is unfair because it requires the breast implant claimant to agree to either settle or litigate and does not give the consortium claimant the right to independently choose either to litigate or settle. The Bankruptcy Court found that this specific provision complies with § 1123(a)(4). *Best–Interests Opinion,* 244 B.R. at 753. The Bankruptcy Court noted that in a non-bankruptcy context involving a loss of consortium claim, there is usually no settlement between the parties if both spouses, including the loss of consortium claimant, do not agree to settle all claims. 244 B.R.

at 754. The Joint Plan provides for payment of consortium claims, either under the Litigation Facility or the Settlement Facility. The Bankruptcy Court did not clearly err in finding that the Plan's provision regarding treatment of consortium claims is not prohibited by title 11.

■ The Altig Claimants next claim that the payment schedule for future claimants is not fair because the payment schedule does not take into account inflation. The Altig Claimants have not cited to any provision of the Bankruptcy Code where adjustment for inflation must be taken into account in any payment schedule. The Settlement Facility allows unmanifested claimants to qualify for disease compensation at any time within 15 years of the Joint Plan's effective date, without fear of statute of limitations defenses. Settlement Facility Agreement, Sec. 6.02(d). The evidence at the confirmation hearing supports the Proponents' position that the Joint Plan arrived at a fair, market-based global settlement option. Other than the Altig Claimants' conclusory statements, they have not presented any evidence that the payment schedule under the Settlement Facility is unfair. The same reasoning is applied to the Altig Claimants' fourth objection—that the payment plan and yearly ceiling the Debtor has to pay denies a claimant any interest on the money owed to the claimant. As noted elsewhere in this opinion, Sec. 1123(a)(4) allows different treatment of a claimant who chooses to be treated less favorably, such as choosing the settlement option. If a claimant wishes to receive payment in full then the claimant may choose the litigation option.

Regarding the Altig Claimants' last objection—the elimination of the punitive damages claims—the record supports the Bankruptcy Court's finding that the Plan's provision eliminating punitive damages is within the best interests of the creditors. *Best–Interests Opinion,* 244 B.R. at 729. (See this Court's prior analysis.) The Al-

tig Claimants have not presented any credible evidence to overcome the evidence presented at the hearing. As to the Altig Claimants' argument that the reason punitive damages were not allowed under the Plan was because in a chapter 7 scenario there would be insufficient funds to pay for the punitive damages, but that the Debtor did not want to be subjected to those damages—such a claim may be true. However, the Altig Claimants have not sufficiently refuted the evidence at the confirmation hearing that there would be insufficient funds to pay for the punitive damages as found by the Bankruptcy Court. *Best–Interests Opinion,* 244 B.R. at 728. The Bankruptcy Court's finding that the Joint Plan's disallowance of the punitive damages is proper under the Code is sufficiently supported by the facts and is not in error.

The Altig Claimants generally argue that the Bankruptcy Court or this Court has the authority to rewrite the Joint Plan. The Code states that only the proponents can modify a plan and that this Court's role on appeal is either to affirm or reverse the Bankruptcy Court's confirmation of the Joint Plan. 11 U.S.C. § 1127(b).

### e. *Lacy Appellants*

The Lacy Appellants representing certain individual's children's claims argue that the Litigation Fund Facility is underfunded and will not adequately satisfy the Children's claims. The Lacy Appellants claim that the Plan Proponents have ignored the evidence regarding the higher incidence of systemic sclerosis and esophageal dysfunction in children who are exposed to silicone gel *in utero* or through breast milk. The Proponents have therefore discounted the Children's future claims and considered them negligible under the Plan. The Lacy Appellants also argue that the Proponents engaged in witness tampering during the hearings before the Bankruptcy Court. The Lacy Appellants claim that the Proponents's argument that the children have the option of seeking a remedy in the Litigation Fund

Facility is flawed because the Litigation Fund is underfunded and will not be sufficient to satisfy the Children's claims. These Appellants further contend that because there is a 10 year latency period before the disease can be detected and many women are still of child bearing age, the Plan's provision requiring that claims be filed prior to the 15th year of the Effective Date of the Plan impedes the Children's rights, especially in many states where the statute of limitations begins when they reach the age of majority. The Plan obstructs the Children's property rights which violates their Fifth Amendment right to property. The Lacy Appellants argue that since the Plan is unconstitutional as to one class, it is unconstitutional to all classes. These Appellants contend that the Plan does not comply with 11 U.S.C. § 1129(a)(1), was not made in good faith and is not fair with respect to children's claims.

■■■ Regarding the Lacy Claimants' claim that the Joint Plan is unconstitutional as to the Children's property rights under the Fifth Amendment, the Supreme Court has held that the Fifth Amendment "does not prohibit bankruptcy legislation affecting a creditor's remedy for its enforcement against the debtor's assets, or the measure of the creditor's participation therein, if the statutory provisions are consonant with a fair, reasonable, and equitable distribution of those assets." *Kuehner v. Irving Trust Co.,* 299 U.S. 445, 452, 57 S.Ct. 298, 81 L.Ed. 340 (1937). Inasmuch as the Lacy Claimants argue that the Settlement Facility offers regarding children claims are insufficient they have also conceded that if any claimant wishes to have their claim paid in full then they have the primary option of seeking litigation against the Litigation Facility. Although the Lacy Appellants claim this is an empty promise because the Joint Plan is not adequately funded under the Litigation Facility. The Lacy Appellants support their claim of inadequate funding by noting that the Children's claims were discounted and the Pro-

ponents did not consider that silicon get induced disease has a latency period of ten (10) years and the fact that many affected women are still of child bearing age. Aware that there is no evidence in the record to rebut the pervasive testimony of experts on adequacy of the fund, the Lacy Appellants raise a serious allegation that the Proponents engaged in witness tampering during the confirmation hearing before the Bankruptcy Court. Yet, the Lacy Appellants produce only a bare assertion that their witness, Professor Douglas R. Shanklin, is now prepared to testify and made no record at the confirmation hearing regarding what his testimony would be.

The Lacy Claimants' objection under Sec. 1129(b)(1) (the cram down provision) is without merit since that section only applies if a class has rejected a plan. The Lacy Claimants are Class 5 members which class voted to accept the Joint Plan.

### f. *Pennsylvania Class 5 Claimants*

■ Certain Pennsylvania Class 5 Claimants appeal claiming that the Joint Plan treats them improperly because they are relinquishing greater rights than other Class 5 claimants, specifically, their claims against physicians. The Bankruptcy Court noted in its best interests opinion that the Pennsylvania Class 5 Claimants did not argue in their brief filed after the confirmation hearing that they were misclassified. The Bankruptcy Court noted that the Pennsylvania Claimants assert their difference based on the Pennsylvania law of informed consent, even though they failed to demonstrate that Pennsylvania law is different from the rest of the United States. The Bankruptcy Court read this as an objection under § 1129(a)(1). The Bankruptcy Court went on to fined that because of his ruling that the release and injunction provisions are not binding on rejecting claimants, Pennsylvania Claimants who rejected the plan "have nothing about which to complain" and those who accepted the plan have also accepted the release in favor of the Settling Physicians and Healthcare Providers. *Best–Interests Opinion,* 244 B.R. at 748–49. Since this Court has ruled the injunction and release provisions are applicable, the Court addresses the Pennsylvania Claimants objections under § 1123(a).

The Plan requires that § 1123(a)(4) expressly allows different treatment within a class if the class member so agrees. If the Class 5 claimants agree to settle their claim, then they are entitled to a lesser treatment, such as giving up their claim against a physician, because they choose and agree to settle their claim with the Settlement Facility. If the Pennsylvania Class 5 Claimants believe that they do not want to give up their claim against the physicians, then they may choose the litigation option where their claims will be paid in full. The Pennsylvania Class 5 Claimants are given the same treatment as all Class 5 Claimants—primarily to retain their right to litigate, and, secondarily, to settle their claim as set forth in the Amended Joint Plan. To the extent the Pennsylvania Claimants' objections are similar to those raised by the Nevada claimants, that they are given greater consideration than other class members, this Court's analysis of the Nevada Claimants' appeal is applicable to the Pennsylvania Claimants.

### 2. *Classes 6.1 and 6.2 Foreign Claimants*

#### a. *New Zealand*

The Foreign Claimants' arguments will first be summarized then will be followed by the analysis and this Court's conclusions regarding the various arguments.

Certain New Zealand resident breast implant claimants argue that the Bankruptcy Court erred in its conclusion that they are properly classified as Foreign Claimants under Class 6.1. The New Zealand Appellants argue that their claims are not substantially similar to other Foreign Claimants in Class 6.1 because they are

not subject to *forum non conveniens* dismissal.

In 1992, New Zealand enacted the Accident Rehabilitation and Compensation Insurance Act 1992 (N.A.) (the "1992 Act") which provides in § 135(5) that a person who suffered a personal injury prior to the enactment of the Act on July 1, 1992, but did not make a claim for compensation before October 1, 1992, would have their entitlement to compensation determined by whether the injury that they suffered was entitled to be covered under the 1992 Act. If their injury was not entitled to be covered under the 1992 Act, they would still be barred from pursuing a common law claim for damages. In 1995, the MDL–926 Court held that New Zealand claimants who suffered injuries between 1974 and July 1, 1992, and who had not filed statutory compensation claims by October 1, 1992, had neither an administrative nor a judicial remedy available in New Zealand, thus, they had no alternative forum to litigate their claims, other than here in the United States. In *Ashley v. Dow Corning Corp.*, 887 F.Supp. 1469, 1475 (N.D.Ala.1995), the MDL–926 Court dismissed the other foreign claimants' claims but denied the dismissal without prejudice as to the New Zealand claimants. The New Zealand Appellants argue that the 1992 Act does not bar common law actions for personal injury claims outside of New Zealand against non-residents of New Zealand.

The New Zealand Appellants also argue that the Michigan choice of law provision would apply Michigan law because New Zealand has no interest in applying New Zealand law to the New Zealand Appellants' claim. The New Zealand Appellants claim that the Proponents have not provided any evidence that the Debtor contributed to the compensation system in New Zealand as an employer in New Zealand or as a manufacturer doing business in New Zealand. The New Zealand Appellants argue that the 1992 Act does not bar common law actions for personal injury claims outside of New Zealand against non-residents of New Zealand.

### b. *Shainwald Appellants*

The Shainwald Appellants are foreign breast implant claimants represented by the Law Offices of Sybil Shainwald, P.C. The firm represents hundreds of foreign claimants from the following countries: Argentina, Belgium, Canada, France, Germany, Israel, Italy, Ireland, the Netherlands, New Zealand, South Africa, and Switzerland.

The Shainwald Appellants claim that the Bankruptcy Court erred in approving the classification of claimants. They argue that the Joint Plan violates the requirement of Bankruptcy Code §§ 1122 and 1123 because the claims within the two foreign claimants classes (Classes 6.1 and 6.2) are not substantially similar. They also argue that classifying the two foreign breast implant claimants in Classes 6.1 and 6.2 separately from the domestic breast implant claimants in Class 5 is unlawful under the § 1122 of the Act. The Shainwald Appellants further argue that the Joint Plan violates § 1123(a)(4) by providing different benefits to members of the same class. They claim that the Debtor engaged in gerrymandering when the countries were misclassified in Class 6.2 and that the Bankruptcy Court erred in treating Class 6.2 as an accepting class. The Shainwald Appellants also maintain that the Joint Plan unfairly discriminates against Class 6.2, is not fair and equitable to its members and was not proposed in good faith. The Shainwald Appellants assert that the Joint Plan violates United States Treaty obligations and violates their constitutional rights. Finally, the Shainwald Appellants argue that the Bankruptcy Court erred in excluding the proposed expert testimony of the Shainwald Claimants.

### c. *Australian Claimants*

Australian Claimants, classified under Class 6.1, contend that the Bankruptcy Court erred in confirming the Joint Plan

because the Proponents failed to satisfy their burden of establishing that the claims held by the Australian Claimants warrant separate classification from Class 5. The Australian Claimants argue that the Bankruptcy Court erred in its interpretation of *U.S. Truck* that separate classification is permitted so long as there is a "legitimate purpose." The Australian Claimants assert the inquiry should be whether the claims are similar or dissimilar and that the factors to be considered under *U.S. Truck* are whether the claimants: 1) have a different stake in the "future viability" of the debtor; and 2) have "alternative means" at their disposal to protect their unsecured claims. *U.S. Truck*, 800 F.2d at 586. The Australian Claimants argue that both the domestic and foreign claimants share, equally, a stake in the future viability of the Debtor. All tort claimants also have the same alternative means to protect their unsecured claims—either settle their claims with the Settlement Facility or litigate against the Litigation Facility. Because both the domestic and the foreign claimants have similar claims, the Australian Claimants argue that applying the two factors set forth in *U.S. Truck*, separate classification and treatment of domestic and foreign claims is not justified.

The Australian Claimants contend that the legal character of the Australian breast implant claims in Class 6.1 is not materially different from that of the domestic breast implant claims in Class 5. The Australian Claimants argue that the formula used to justify the disparate treatment of Australian women was arbitrary, capricious and unprecedented and did not support the 40% reduction in the amount of recovery from those of the Domestic Claimants. The Australian Claimants attack the evidence presented at the confirmation hearing insisting that it did not establish that the legal systems of the United States and Australia are different but instead established that the legal systems are similar. They maintain that any dispute over the substantive law applicable to claims brought in Australia is moot because some Australians have availed themselves of the benefits of the U.S. legal system such as the MDL Action and class action suits filed in Texas. The Australian Claimants assert that these claims are likely not subject to dismissal on *forum non conveniens* grounds because they were filed prior to changes in Texas law and have the benefit of pre-existing law.

Challenging the evidence presented regarding the economic distinction between domestic and foreign claims based on each country's GDP, the Australian Claimants argue that the this fails to explain the difference in the treatment of breast implant claimants based on their country of origin. The Australian Claimants insist there is also no rational, consistent principle behind the grouping of countries in Classes 6.1 and 6.2 since some of the countries in 6.2 have a GDP which is actually higher than the GDP in countries under 6.1. The Australian Claimants assert that the Proponents' reliance on the *Pfizer* mass tort class action settlement categories was misplaced. They note that the *Pfizer* case was not a bankruptcy case and the court was not bound by chapter 11 confirmation requirements. The evidence established that the percentage categories in *Pfizer* were floors on what could be paid to foreign claimants, not ceilings as in the Joint Plan. The Australian Claimants suggest they fared better under the *Pfizer* formula than they would under the terms of the Joint Plan.

The Australian Claimants believe that the more relevant case is the *Robins* case which resolved a global product liability stemming from personal injuries caused by the Dalkon Shield in a bankruptcy setting. The foreign personal injury claimants received treatment equal to that afforded to their domestic counterparts. The Australian Claimants also cite *In re Agent Orange Product Liability Litigation, In re Johns–Manville Corp., In re Eagle–Picher Indus., Inc., In re Forty-Eight Insulations, Inc.* and *In re Standard Insula-*

*tions, Inc.* to support their argument that these plans did not provide for structurally guaranteed discrimination against foreign personal injury claimants.

The Australian Claimants also maintain that because a U.S. citizen who received her implants in Australia and resides in Australia is considered a "domestic claimant" entitled to participate in Class 5 this shows that the Proponents had no valid basis for treating foreign and domestic claimants separately.

The Australian Claimants next argue that confirmation of the Joint Plan was a violation of the due process and equal protection guarantees of the Fifth Amendment to the U.S. Constitution. They claim the Joint Plan is unconstitutional because foreign claimants will receive no more than 35% or 60% of what the U.S. claimants with identical claims will receive based solely on the fact that they hail from foreign countries. The Australian Claimants assert that they are lumped in with claimants from a less-than homogenous group of countries. The evidence at the confirmation hearing shows that Australia is more like the United States than the countries with which they are categorized such as the United Arab Emirates or Kuwait.

The Australian Claimants also claim that punitive damages are available in Australia. The greater availability of juries in the U.S., the loser pays system of fee recovery in Australia, the greater availability of contingency fees in the U.S. and the relative damage awards between the U.S. and Australia does not justify a 40% reduction according to the Australian Claimants. The Australian Claimants note that the Proponents' logic in creating a separate class based on legal systems is not applied to domestic claimants even though each state may have different types of tort law and procedures. The Proponents have violated § 1122(a) based on this analysis because it requires that the claims be in the same class to be "substantially similar" and the Bankruptcy Court erred in confirming the Plan.

The Australian claimants are designated in two classes—Class 6.1 and 6D. Class 6D is made up of Australians who elect to be treated under the Australian Breast Implant Settlement Option. The Australian Claimants argue that the Proponents cannot meet their burden of establishing that claimants in Class 6.1 and Class 6D will receive the same treatment or that all of the holders of claims in Class 6D have agreed to less favorable treatment. The Proponents have been allowed to circumvent the requirements of Section 1123(a)(4) by placing this impermissible treatment in the guise of an "option" within the Joint Plan and the Settlement Option does not comply with Section 1129(a)(1).

Finally, the Australian Claimants argue that the Joint Plan was not proposed in good faith with respect to the treatment of foreign claimants. The Joint Plan arbitrarily limits foreign claimants to either 35% or 60% of the sums awarded to domestic claimants holding identical claims solely on the basis that they are not U.S. citizens. The similarly situated creditors are not treated "fairly or equally." The Debtor has refused to devote the full range of its resources to repayment of claims since the Debtor retains $1 billion in equity while the foreign claimants are entitled to only 35% or 60% of payments compared to U.S. women. The equity goes to the Debtor's shareholders, Dow Chemical and Corning, which are both wealthy Fortune 500 companies who control the Debtor's Board of Directors. Furthermore, the Australian Claimants assert that the foreign claimants were excluded from the plan negotiations. Ms. Shainwald, a member of the Tort Claimants' Committee who represents many foreign claimants, was not allowed any input into the negotiated terms affecting foreign claimants. The Australian Claimants argue that the Tort Committee is improperly constituted and is not a committee within the meaning of 11 U.S.C. § 1102(a)(1). In essence, the Australian Claimants lament

that the Tort Claimants' Committee turned its back on the foreign claimants.

### d. *Korean Claimants*

The Court allowed Yeon Ho Kim, representing certain Korean Claimants, to argue at the hearing over the Proponents' objection that the Korean Claimants had not filed an appellate brief on appeal and were not properly before the Court.

Mr. Kim argued that the Proponents' engaged in gerrymandering by their classification of foreign claimants, specifically the Korean Claimants. Mr. Kim argued there is no case law which approves classifying the foreign claimants separately. The Korean Claimants assert that the classification of the Korean Claimants in 6.2 discriminates against Asian countries noting that: Korea has a greater GDP than Greece yet Greece is classified in Class 6.1; the category 3 countries do not have the same GDP; there is no reason why Korea was placed in the same category as others with 3% GDP; and not all the countries in Class 6.1 are common law states nor a member of the European Union Community.[10]

### e. *Analysis re Classes 6.1 and 6.2*

#### 1. *Classifications of the foreign claimants*

In its Opinion on the classification and treatment of the foreign claimants, the Bankruptcy Court concluded that the Plan's classification of foreign claims complies with § 1122(a). *Classification and Treatment Op.*, 244 B.R. at 664. The Bankruptcy Court extensively analyzed the foreign claimants' objections. The Bankruptcy Court made the following general findings as to breast implant claimants:

> We begin by noting a fairly obvious point upon which there is virtually no

disagreement: all breast-implant claims, both domestic and foreign, are substantially similar. All are unsecured, unliquidated and disputed tort claims arising out of the Debtor's sale and manufacture of silicone-gel breast implants. All such claimants allege that the breast implants caused or will cause them personal injuries.

Moreover, the claims within each class of breast-implant claims are substantially similar in legal nature and character. In addition to the common characteristics noted above, claims within each class possess certain other characteristics that are unique to that class. For instance, Class 5 claimants are all citizens of the United States or residents of the Greater U.S. All class 6.1 claimants are residents of countries that either: belong to the European Union, have a common law tort system, or have a per capita GDP that is greater than 60% of the United States' per capita GDP. And all Class 6.2 claimants are residents of countries that: do not belong to the European Union; do not have a common law tort system; and do not have a per capita GDP that is greater than 60% of the United States' per capita GDP.

The real question is whether there is a legitimate reason for classifying breast-implant claims in three separate classes. As explained below, the answer to this question is yes.

*Classification and Treatment Op.*, 244 B.R. at 658. The Bankruptcy Court, applying the "legitimate reason" standard, found that based on the *Debtor's judgment,* "different breast-implant claims warrant different settlement offers is a perfectly 'legitimate reason' to classify those claims separately." *Id.* at 664 (em-

---

10. The Korean Claimants' arguments regarding classification are addressed in this opinion. The Court notes that there is no brief on appeal filed by the Korean Claimants. On January 24, 2000, the Court issued an Order allowing briefs to be filed on any appeals related to the Confirmation Order issued by the Bankruptcy Court. Because no brief on appeal was filed by the Korean Claimants, the Korean Claimants' appeals must be dismissed pursuant to the January 24, 2000 Order, Bankruptcy Rule 8001(a) and E.D.Mich. LR 41.2 for failure to prosecute the appeal.

phasis added). The Bankruptcy Court found that in ascertaining the amount it would offer the foreign claimants under the Settlement Facility, "the Debtor relied on a number of factors such as differences in substantive and procedural legal rights and differences in economic conditions." *Id.* "There is nothing arbitrary, unreasonable or irrational about using such factors for this purpose." *Id.*

Based on the testimony and evidence presented at the hearing, the Court finds that the Bankruptcy Court's finding that the classification of the foreign claimants satisfied § 1122(a) was not clearly erroneous. At the onset, it is noted that both foreign claimant classes are accepting classes. At least 66 2/3% of a class is needed to constitute an accepting class. 11 U.S.C. § 1126(c) provides that "[a] class of claims has accepted a plan if such plan has been accepted by creditors, . . ., that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, . . ., that have accepted or rejected such plan." 11 U.S.C. § 1126(c). Class 6.1 voted to accept the Plan with 78.9% voting in favor of the Plan. Initially, Class 6.2 did not meet the criteria for acceptance because Class 6.2 only had an acceptance rate of 65.8%. However, during the confirmation hearing, the parties submitted a proposed plan modification which increased the favorable percentage and made Class 6.2 an accepting class. *See In re Dow Corning Corp.*, 237 B.R. 374 (Bankr.E.D.Mich.1999). The issue of whether the Plan unfairly discriminates against *within* class members is not an issue to be determined under either Class 6.1 or Class 6.2 because the cram down requirements under § 1129(b) are not triggered since neither class is a rejecting class. 11 U.S.C. § 1129(b)(1) (A plan which meets all conditions of § 1129(a), . . . can be confirmed only if the court finds that the plan 'does not discriminate unfairly' against the *rejecting, impaired class.*) The issue only arises when an impaired class has rejected a proposed plan. In this case, both Classes 6.1 and 6.2 accepted the proposed plan.

The evidence presented by the Proponents on the costs of resolving the foreign claims was considered by the Bankruptcy Court in its finding that Classes 6.1 and 6.2 were properly classified.

The Proponents presented the testimony of three expert witnesses: Professor Basil Markesinis, Mr. Augustus Ullstein and Professor Harold Luntz. All three testified extensively on direct and on cross-examination. The background of each of the witnesses will be summarized because the Bankruptcy Court found the Proponents' experts' testimonies more credible than those presented by the objecting claimants. Professor Markesinis is a professor of law and holds chairmanships at the following institutions: the University of Oxford in England, the University of Leiden in The Netherlands and the University of Texas School of Law. He teaches in the areas of comparative law, comparative methodologies, tort law and European law. Professor Markesinis has earned four Ph.D.'s and three honorary degrees. He is a Fellow of the British Academy, a Corresponding Fellow of the royal Belgian Academy, a Fellow of the Academy of Athens, a Foreign Fellow of the royal Dutch Academy and a Member of the American Law Institute. Professor Markesinis is an expert on the tort law systems of the legal systems of Europe, including Germanic, English and Roman-esque/French, and, is knowledgeable on the proliferation and implementation of these systems to other countries. He has written extensively on comparative law, including authoring about 20 books and over 100 legal articles. Professor Markesinis served on the Pfizer Foreign Fracture Panel, appointed by the district judge in the class action case of *Bowling v. Pfizer*, No. C–1–91–256 (S.D.Ohio 1995). The panel was to determine the fair settlement levels for foreign tort claimants. *Classification and Treatment Op.*, 244 B.R. at

659–60, n. 13; Proponents' Ex. 22, curriculum vitae of Professor Markesinis; Conf. Hrg.Tr., 6/30/99 at 271–86, 7/1/99 at 11–43.

Mr. Ullstein is a practicing barrister in the United Kingdom and a Queen's Counsel. He specializes in products liability litigation in England and has knowledge regarding the tort systems and verdict values in the United Kingdom, Germany, The Netherlands and South Africa. Mr. Ullstein also served on the Pfizer Foreign Fracture Panel. 244 B.R. at 659–60, n. 14, Proponents' Ex. 23, curriculum vitae for Mr. Ullstein; Conf.Hrg.Tr., 7/1/99 at 288–292.

Professor Luntz is a professor of law at the University of Melbourne in Australia. He is knowledgeable in both the tort systems and damage awards in both Australia and New Zealand. Professor Luntz authored a number of books and articles on tort law, including "Assessment of Damages for Personal Injury and Death." The book is now in its fourth edition. He is also an editor of the Torts Law Journal in Australia and was also a member of the Pfizer Foreign Fracture Panel. *Classification and Treatment Op.*, 244 B.R. at 660, n. 15; Proponents' Ex. 24, curriculum vitae for Mr. Luntz; Conf.Hrg. 7/2/99 at 59–63.

Professor Markesinis testified that it is appropriate for the Plan to differentiate between foreign and domestic breast-implant claimants because tort recoveries in foreign legal systems are much lower than tort recoveries in the United States based on several factors, including legal, economical, and cultural factors. Conf.Hrg.Tr., 7/1/99 at 12–41. He testified the specific factors include:

The availability of strong social security system payments in foreign countries; that most tort cases in foreign countries are tried by judges, not juries; that punitive damages are typically not available in foreign countries or are available in only limited instances; that foreign countries lack American-style contingency fees; that foreign countries exhibit lower tort awards, and different, less plaintiff-friendly standards of liability; that cultural factors in foreign countries lead to a diminished propensity to litigate; that more plaintiffs proceed in foreign countries on a pro se basis; and that significant weight is given in foreign countries to semi-official medical reports completed at the direction of the government.

*Classification and Treatment Op.*, 244 B.R. at 660, n. 16; Conf.Hrg.Tr., 7/1/99 at 12–41.

These factors were also cited for the differentiation of the settlement offers between foreign countries. Conf.Hrg.Tr., 7/1/99 at 40. Specifically, Professor Markesinis testified that based on his experience on the *Pfizer* panel, the foreign countries were grouped into four different categories which he concluded was a fair and reasonable approach to determine the compensation levels for each category. Conf.Hrg.Tr., 7/1/99, at 46. The countries in this case are classified in Classes 6.1 and 6.2. The foreign countries are then placed into 4 categories similar to those in the *Pfizer* case. Class 6.1 of the foreign claims consists of countries in Categories 1 and 2. Class 6.2 consists of countries listed in Categories 3 and 4.

Professor Markesinis testified to five reasons for his opinion as to the reasonableness of the categorization. First, he testified that the categories covered a variety of legal systems effectively. Second, he contended that the process was appropriate for the eight months' time frame the panel was charged with to prepare a report. His third reason was that the data available for many of the "lesser countries" would be difficult to find. Fourth, even for the countries where data was not available, the general information the panel acquired about those countries, concerning the linkage with the major legal systems, and the purchasing and spending powers of those countries, was sufficient to allow the panel to prepare its analysis. Finally, taking all those factors together, the process used

was a pragmatic way in his opinion to proceed to resolve a major and complex kind of case. (Conf.Hrg.Tr. 7/1/99, at 49–50)

The *Pfizer* panel then formulated a translation of the U.S. compensation formula to each of the countries in the four categories. The panel began with the countries in Categories 1 and 2. Professor Markesinis testified that these countries had the most "developed" and "sophisticated" legal systems. They were countries with the most data available with higher damage awards. (Conf.Hrg.Tr., 7/1/99 at 51) In developing the formula for the Categories 3 and 4 countries, the panel faced difficulties in obtaining reliable data. (Conf.Hrg.Tr., 7/1/99 at 53) They were guided by some data or books and a variety of economic factors, including the GDP, earning powers, spending power, and cost of living for each country. (Conf. Hrg.Tr., 7/1/99, at 54). Professor Markesinis testified that as you move from the United States to England, Europe and to the east, the degree of sophistication, the available material, the use of statistics, the available figures, the substructure, and the economic substructure of the countries, with few exceptions, all become "thinner." (Conf.Hrg.Tr., 7/1/99 at 54)

Professor Markesinis testified that the panel had considerable powers and the ability to obtain information, including the opportunity to request legal opinions from practicing lawyers for countries like Japan, India and Egypt. (Conf.Hrg.Tr., 7/1/99 at 56–57)

Based on the categorization of the countries, the panel then calculated the compensation figures. Professor Markesinis concluded that the compensation figures in all the categories would have been lower absent the minimum figure attached to each category. (Conf.Hrg.Tr., 7/1/99 at 59) Professor Markesinis testified that the panel could not analyze the figures for each country in all the categories but the panel managed to come up with a pragmatic formula for each category based on various factors, including: reviewing a the tort and legal systems, the basic principles of law that applied to the lead countries, and taking account various economic factors. (Conf.Hrg.Tr., 7/1/99 at 61–63). After a fairness hearing, the district judge in the *Pfizer* case approved the settlement structure as presented by the Panel's Final Report. (Pr.Exs. 49 and 50)

Professor Markesinis then compared the formula approved in the *Pfizer* case to compensate foreign claimants to the Joint Plan's compensation formula for foreign claimants. He testified that the methodology used in the Joint Plan is "very largely" the same basis of distinction of the countries found in the *Pfizer* case. Professor Markesinis further testified that the Joint Plan was more favorable than the *Pfizer* compensation plan because the Category 6.1 claimants under the Joint Plan, which are the countries in Categories 1 and 2 in the *Pfizer* plan, would receive 60% of the American award whereas the *Pfizer* Categories 1 and 2 only received 32% of the American award. (Conf.Hrg.Tr., 7/1/99 at 67) Similarly, Professor Markesinis testified that those claimants under the Joint Plan's Class 6.2, which are the countries in Categories 3 and 4 of the *Pfizer* plan, will also receive more than the *Pfizer* claimants because Class 6.2 claimants would receive 35% of the American award compared to 16% and 8% respectively of the American award under the *Pfizer* settlement. (Conf.Hrg.Tr., 7/1/99 at 67) Professor Markesinis concluded that the proposed adoption of the *Pfizer* categorization of the countries is a "fair and reasonable and workable solution to a complex problem of this kind." (Conf.Hrg.Tr., 7/1/99 at 68.) He noted two basis for his conclusion: first, that the *Pfizer* panel spent a considerable amount of time discussing these issues with panel members who had many ideas, and second, on his 35 years' experience in teaching, researching, working, practicing law in one form or another and writing about comparative methodology. (Conf.Hrg.Tr., 7/1/99 at 69)

Mr. Ullstein testified that currently, there is no ongoing breast implant litigation in the United Kingdom for a number of reasons. Legal aid in the United Kingdom is difficult to obtain because a party must meet not only a means test, but must also satisfy a merits test and show that the cost benefit ratio is in that party's favor. (Conf.Hrg.Tr., 7/1/99 at 295) An individual who can pay for his/her own lawyer may bring litigation in the United Kingdom but generally only those who are very well off can afford litigation because of the cost to obtain experts. (Conf.Hrg.Tr., 7/1/99 at 296) In theory, conditional fees are available. However, Mr. Ullstein commented that because of the failed tobacco litigation which was handled on a conditional fee basis, a very large number of solicitors will carefully consider whether to accept substantial or difficult cases on a conditional fee basis. (Conf.Hrg.Tr., 7/1/99 at 297)

Mr. Ullstein further testified that juries are not available to hear personal injury claims. (Conf.Hrg.Tr., 7/1/99 at 301) He stated that there is a publication entitled *Guidelines for the Assessment of General Damages in Personal Injury Cases* which set out appropriate brackets for damages in various classes of injuries. Although the guidelines are not binding on the judges in the United Kingdom, the effect has been to standardize damages awards for any personal injury. The practicing English Bar knows that one starts with whatever the current figure is for quadriplegia and works down from that amount. (Conf.Hrg.Tr., 7/1/99 at 304) Punitive damages are not available in the United Kingdom. (Conf.Hrg.Tr., 7/1/99 at 310). Ullstein opined that a breast implant claimant would have a combination of difficulties in the United Kingdom, including scientific proof, the relatively low awards for cases of this nature, and the cost benefit ratio to the claimant would not be met. (Conf. Hrg. 7/1/99 at 308–309) Mr. Ullstein concluded that the settlement offer to the claimants in the United Kingdom is fair and reasonable, given the impediments to a successful prosecution of breast implant claims in the United Kingdom. (Conf.Hrg. 7/1/99 at 311) Mr. Ullstein also testified that similar factors are involved in prosecuting cases in the Netherlands, Germany and South Africa. Mr. Ullstein concluded that based on his knowledge of the systems in these countries and in his work on the *Pfizer* panel, the settlement offers under the Joint Plan are fair and reasonable on these foreign claimants. (Conf.Hrg. 7/1/99 at 322–327)

Professor Luntz, a leading expert on Australian tort law, has written a book entitled *Assessment of Damages for Personal Injury and Death*, currently being revised for its 4th edition. He cited eight reasons why damage awards are lower in Australia than in America, including: 1) cultural differences; 2) the availability of social security and universal health care benefits in Australia; 3) the difficulty in accessing the courts and the lack of a contingency fee system in Australia; 4) the cost rules in Australia which are a significant deterrent to plaintiffs; 5) bench trials in product liability cases and lack of jury trial in Australia; 6) strict liability is less frequently available; 7) actual damage awards are lower in Australia because of various factors including maximum awards for non-pecuniary loss, the appellate courts have greater powers to limit awards, loss of earnings are assessed on an after tax basis, and medical costs are paid by and reimbursed to the government; and 8) punitive damages are hardly ever available and in the last 30 years, only 40 cases allowing punitive damages have been upheld by the appellate courts. (Conf. Hrg.Tr. 7/2/99 at 62 to 76) Based on these factors, Professor Luntz offered the opinion that settlement offers to the Australian claimant should be discounted by at least 40% of U.S. values. (Conf.Hrg.Tr. 7/2/99 at 76–77)

Professor Luntz also testified that the New Zealand claims should also be discounted in the same fashion because New Zealand very often looks to Australia for

guidance on award matters. (Conf. Hrg.Tr. 7/2/99 at 85) He stated that currently, in New Zealand, there is virtually no litigation because of legislation enacted in 1972 which became effective on April 1, 1974. (Conf.Hrg.Tr.7/2/99, 83, 85) Personal injury accident claims are disposed of administratively by the Compensation Commission. (Conf.Hrg.Tr. 7/2/99 at 83–84) A claim falling outside the definition of personal injury by accident, is governed by ordinary negligence principles and a lawsuit is permitted. Since the legislation came into force in 1974, there have been no damage recoveries. (Conf.Hrg.Tr. 7/2/99 at 84) Luntz also noted that exemplary or punitive damages, although recoverable under the Accident Compensation Act, are very moderate with the guideline of approximately $50,000 New Zealand dollars maximum. (Conf.Hrg.Tr. 7/2/99 at 85) Professor Luntz opined that because there is virtually no litigation in New Zealand, the 60% rate offered to the New Zealand claimants is a very favorable settlement. (Conf.Hrg.Tr. 7/2/99 at 85)

The Bankruptcy Court found the Proponents' witnesses credible and that the foreign objectors failed to cast doubt upon their testimonies after long hours of cross-examination. *Classification and Treatment Op.*, 244 B.R. at 660. The Bankruptcy Court found the Objectors' witnesses unhelpful. *Id.*

The Australian Claimants called Professor David Partlett as a witness. Professor Partlett, originally from Australia, was the principal law reform officer of the Australian Law Reform Commission and taught at the Australian National University in Canberra, Australia for nine years. He has been a professor of law at Vanderbilt University Law School for the past 14 years and has taught advanced torts and remedies, comparative law and health law. Professor Partlett has published books and articles in the areas of professional negligence, child mental health and the law, medical malpractice, punitive damages and repressed memories. *Classification and Treatment Op.*, 244 B.R. at 661, n. 20; Australian Claimants' Ex. 1, curriculum vitae for Mr. Partlett; Conf.Hrg.Tr., 7/14/99 at 151–56.

Professor Partlett testified that the 60% discounted settlement offer is based upon a false premise. He stated it is a myth that the American tort system is a very high paying, high quantum damage tort system, especially in the product liability area and a myth that Australians do not litigate to vindicate rights and interests. (Conf.Hrg.Tr., 7/14/99 at 177) He noted it is difficult to make comparisons to the United States law because tort law is local and awards vary from state to state. The level of compensatory and punitive damages awarded differs throughout the United States and product liability is confined to a very few products, such as pharmaceuticals, medical products, asbestos and automobiles. (Conf.Hrg.Tr. 7/14/99 at 178) On cross-examination, Professor Partlett testified that he has taught only one course on comparative law, four years prior to his testimony. (Conf.Hrg.Tr. 7/14/99 at 210) He was not aware of any award of punitive damages in any product liability case in Australia. (Conf.Hrg.Tr. 7/14/99 at 222) Partlett agreed that the High Court in Australia clearly indicated that punitive damages when awarded are to be awarded only in moderation, and that punitive damages awards in Australia are less than those in the United States. (Conf.Hrg.Tr. 7/14/99 at 224, 226) Professor Partlett also agreed that it is common practice in the United States to fund products liability litigation through contingency fee arrangements and that attorneys in Australia cannot contract for attorney fees as a percentage of an anticipated recovery. (Conf.Hrg.Tr. 7/14/99 at 226) Regarding jury trials, Professor Partlett supported the Proponents' position that jury trials in tort cases are much less common in Australia than in America. (Conf.Hrg.Tr. 7/14/99 at 231) Professor Partlett admitted that a 1988 law journal article he co-authored entitled "An America's Cup for

Tort Reform?" stated that incentives to litigate in Australia are suppressed because contingency fees are unethical and the losing litigants must bear part of the successful party's costs, including attorney fees, that juries are relatively rare, that Australian courts have been reluctant to ease the burden of proof, that punitive exemplary damages are available only for intentional torts, that on the cultural level the vindication of rights through litigation is not ingrained in Australian attitudes, and described Australia as a "defendant's pleasure dome." (Conf.Hrg.Tr. 7/14/99 at 242–243)

The Shainwald Claimants presented the testimony of Edward Kellogg. Mr. Kellogg has an M.B.A. and J.D. degree and is a practicing lawyer in Atlanta, Georgia concentrating in pharmaceutical products liability cases. He has handled cases in about a dozen different states and is a barrister in England. *Classification and Treatment Op.*, 244 B.R. at 661, n. 19; Conf.Hrg.Tr., 7//15/99 at 13–14. Mr. Kellogg testified that the settlement offer made to United Kingdom claimants is not fair because the reasons advanced in favor of the discrepancies between the settlement offers are wrong, severely exaggerated, or irrelevant. (Conf.Hrg.Tr. 7/14/99 at 21) He stated that the basis for the difference in the payments is the outcomes of cases as between American and English cases which fails to take into account that the differences between American venues are oftentimes larger than the differences between any given American venue and the English practice. (Conf.Hrg.Tr. 7/14/99 at 22) It is his view that the social security benefits are not so generous in England and that there is no substantial difference between the benefits awarded in England and the benefits awarded in the United States which are also not generous. (Conf.Hrg.Tr. 7/14/99 at 24) Mr. Kellogg testified that the unavailability of punitive damages in the English practice is irrelevant because in most instances, punitive damages are not available in the United States either. (Conf.Hrg.Tr. 7/14/99 at 27)

On cross-examination, Mr. Kellogg admitted that he became a barrister in 1993 and was in England for approximately 1 year and three months, during which he was a pupil for the first 12 months, that being equivalent to being a summer law clerk in the United States. (Conf.Hrg.Tr. 7/14/99 at 86) He had never been a lead attorney on any case and had never tried a products liability case in England. (Conf. Hrg.Tr. 7/14/99 at 87) After the year and three month period, Mr. Kellogg came back to the United States and had never practiced in England as a barrister since that time. (Conf.Hrg.Tr. 7/14/99 at 88) He admitted that in comparing relative verdict values in England to the United States, he had asked an attorney for one of the party's in this case to gather information and performed no independent review of verdicts in England. (Conf.Hrg.Tr. 7/14/99 at 92) The Bankruptcy Court noted Mr. Kellogg's minimal knowledge of average recovery amounts in the English tort system and found that implicit within his testimony was an acknowledgment that tort values in the United States do indeed tend to be considerably higher than those in England. *Classification and Treatment Op.*, 244 B.R. at 660–661; Conf.Hrg.Tr. 7/14/99 at 94–103.

Based on the testimony and evidence before the Bankruptcy Court, there is sufficient evidence to support the conclusion that the foreign claimants were properly classified apart from domestic claimants. The Bankruptcy Court did not clearly err in its findings that the evidence on the record shows that tort recoveries in the United States tend to be significantly higher that those in foreign jurisdictions and that it is appropriate to differentiate between categories of foreign claimants on this basis. *Classification and Treatment Op.*, 244 B.R. at 661. His decision is further supported by case law demonstrating the attractiveness of American courts to foreign plaintiffs. *Id., citing, among others, Piper Aircraft,* 454 U.S. at 252 & n.

18, 102 S.Ct. 252 (observing that American courts are very attractive to foreign plaintiffs); *Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220, 1235 (3rd Cir.1995). The record below shows that based on a number of factors, including the amount of tort recoveries, the culture, the availability of social security and universal healthcare, the spending powers of the countries, and the tort and legal systems, classification of claims of the domestic breast implant claimants from the foreign breast implant claimants is reasonable and legitimate.

Further classification of the foreign breast implant claimants into Classes 6.1 and 6.2 is also reasonable and legitimate based on the record. Testimony showed that the classification as between the foreign claimants was based on: a review of numerous tort and legal systems; the basic principles that applied to the lead countries; and various economic factors. The record shows that the categorization of countries is a fair and reasonable and workable solution to a complex problem based on the work of the *Pfizer* panel. The *Pfizer* panel equipped with experience in teaching, research, extensive law practices and comparative methodology, spent a considerable amount of time discussing these issues. The *Pfizer* panel obtained sufficient data for many of the lead countries in Class 6.1. The data on the "lesser" developed countries now in Class 6.2 was difficult to find. However, the testimony indicates that settlement offers (based on percentages of settlement offers to domestic breast implant claimants) in both Classes 6.1 and 6.2 are much more generous than those offered in the *Pfizer* plan.

Some foreign claimants object that they were placed in the wrong class based on GDPs or the type of legal system available to them. The evidence before the Bankruptcy Court was that the Class 6.1 countries, collectively averaged 73% of the United States' per capita GDP, whereas the per capita GDP of the Class 6.2 countries averaged 18% of the United States'

per capita GDP. The testimony shows that the *Pfizer* panel discussed at length the categorizations of the countries and based on their collective experience, determined that the countries in categories 3 and 4 should receive lower settlement offers than those countries in categories 1 and 2. The testimony further shows that some countries were placed in Class 6.1 even though their GDP is less than 60% of the U.S. GDP because of their membership in and their economic ties with the European Union. One example is Greece which has adopted the EC Product Liability Directive which gives consumers throughout most of Europe certain uniform protections not available in most countries in Class 6.2. *See* Patrick Kelly & Rebecca Atree (eds.), *European Product Liabilities* 11 (1997). Given the lack of specific data regarding tort claim values, especially in those countries in Class 6.2, other data, including the GDP data and other economic factors, had to be considered in a general way. The Proponents admit that some countries may not perfectly fit into a class as the foreign claimants have asserted. They note that § 1122(a) does not require perfection in classification but by its terms merely requires that claims in the same class must be "substantially similar." Similarity is judged not by comparing claims to each other but by assessing the relationship of the claims within each class *vis a vis* the Debtor and its assets. There is no requirement that each country must have its own respective class. The classification of the foreign claimants into two classes is supported by the record and the Bankruptcy Court did not clearly err in its finding.

Although this Court may not have classified the foreign claimants as the Joint Plan has done, it is not the Court's prerogative to do so under the Code. This Court does not subscribe to any form of discrimination in classification such as "Eurocentric discrimination" as some foreign claimants have suggested the Joint Plan has done. The Court notes that the use of categoriza-

tions such as "first," "second," or "third" world countries or "more" or "less" developed countries may connote that a certain country and its people have less value and importance compared to others and has attempted to use such words sparingly. However, the Proponents have shown that verdict amounts, economic, cultural and legal differences between the countries support separate classifications of the foreign claimants in this case.

The foreign claimants object to the use of the *Pfizer* panel findings claiming that the methodology in *Pfizer* should not be followed because it was not a bankruptcy case. The foreign claimants argue there is no basis for treating foreign and domestic claimants differently citing other bankruptcy cases which treat foreign and domestic claimants the same. First, the foreign claimants cite the *Manville* bankruptcy case to support their argument that different payment levels should not be used. The *Manville* plan of reorganization did not specify differing payment levels between foreign and domestic claimants. The Proponents note that the claims resolution procedures in the *Manville* case eventually had to consider values in different jurisdictions, including foreign jurisdictions, in formulating settlement offers. *See In re Joint Eastern and Southern Districts Asbestos Litig.*, 878 F.Supp. 473, 583 (E. & S.D.N.Y.1995) (Stipulation of Settlement, Ex. A, ¶ C.I. Trust Distribution Process, ¶ C.I), *aff'd in part, vacated and remanded in part on other grounds*, 78 F.3d 764 (2d Cir.1996).

The foreign claimants also rely on *Robins* to support their argument that foreign and domestic claimants should be treated equally. Professor Georgene Vairo, the chairperson of the Dalkon Shield Claimants Trust, testified that the trustees in *Robins* knew that the value of foreign claims was lower than domestic claims but elected to offer equivalent settlements to both domestic and foreign claimants. (Conf.Hrg.Tr., 6/30/99 at 133, 157) The trustees chose to offer equal settlements

because the number of foreign claims was relatively low and the delays in structuring different settlement amounts for foreign claimants could have spawned other litigation which and caused additional delays for all claimants. (Conf.Hrg.Tr., 6/30/99 at 127–128, 131–132, 154–157, 246)

The foreign claimants suggest that the Foreign Settlement Program ("FSP") approved in the MDL–926 breast implant litigation provides equal benefits to both domestic and foreign claimants. However, Mr. Tommy Jacks testified that the foreign claimants who registered in the MDL before 1995 could receive compensation for disease claims but were ineligible for rupture compensation available to domestic claimants. (Conf.Hrg.Tr., 6/28/99 at 151–154) The proofs show that the FSP pays $10,000–50,000 to foreign claimants with ruptures, while the Revised Settlement Program ("RSP") pays domestic claimants $25,000–100,000 for the same conditions. Foreign claimants are not eligible to receive the RSP's Long–Term Benefit Program which allows domestic claimants the highest level of settlement payments of $75,000–$250,000. A foreign non-current claimant could qualify for a maximum benefit of $3,500 for disease payment. The foreign claimants' argument with respect to the treatment under the RSP is without merit.

There is no authority for the argument that settlement offers in bankruptcy actions must be structured like the *Robins* case nor for the argument that settlement offers should not be patterned after non-bankruptcy mass tort cases. Settlement offers should be based on the factual circumstances of each bankruptcy case, taking into account the status of the Debtor's assets, including, the number of creditors involved, the type of claims involved, the number of unliquidated claims involved, whether it involves a mass tort scenario and if the individual claimants who have personal injury claims are in the United States or from another country. The Proponents' use of the *Pfizer* model was ap-

propriate since that case involved a mass tort class action settlement proceeding. In a class action, a court must hold a hearing to determine whether a settlement is fair, reasonable and adequate. The Second Circuit has held that a court, in a class action setting, acts as a fiduciary for the absent class members to assure all class members receive fair and equitable treatment. *See Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2nd Cir.1995). In a bankruptcy action, the bankruptcy court must determine whether the proposed plan meets all the statutory requirements, including whether the claimants are properly classified, whether the claimants are treated fairly within the class, whether the plan is proposed in good faith and whether the plan is in the best interest of the creditors. 11 U.S.C. §§ 1122(a), 1123(a)(4), 1129(a)(3), and 1129(a)(7). The Bankruptcy Court's finding that the classifications of the foreign breast implant claimants is supported by the record.

## 2. *Good Faith*

 Some foreign claimants argue that the requirement under § 1129(a)(3) have not been met because the Joint Plan was not proposed in good faith. Specifically, the foreign claimants argue that the Tort Claimants' Committee violated its fiduciary duty to negotiate on behalf of the Foreign Claimants, turning their backs on these claimants in favor of receiving higher compensation levels for domestic claimants. The foreign claimants have not presented any evidence to support their allegations of bad faith negotiations on behalf of the Foreign Claimants. The Proponents admit that the domestic claimants are scheduled at a higher compensation levels than provided in previous plans proposed by the Debtor, but the Proponents state that the Joint Plan now provides substantially larger recoveries for *all* tort claimants. The previous plan submitted by the Debtor provided $450 million (NPV) less in overall funding to resolve the tort claims than the current Joint Plan. The current negotiated

plan offers other enhancements for the foreign claimants, including foreign-based claims centers in Europe and South America. The current Joint Plan also provides mechanisms to process claims in a claimant's own language. Other provisions in the Joint Plan includes allowing Class 6.1 claimants the option to receive their payment in local currency, providing a foreign representative on the Claimants Advisory Committee, and offering additional settlement options to Class 6.2 claimants. *See* Settlement Facility and Fund Distribution Agreement, Art. 4.

The foreign claimants argue that the Joint Plan was not proposed in good faith and that the Tort Claimants' Committee breached its fiduciary duty to the foreign claimants because it took opposing positions regarding the foreign claimants' settlement formulas. Originally, the TCC opposed the 60% and 35% settlement formulas currently in the Joint Plan. The Committee eventually agreed to the percentage rate on behalf of the foreign claimants. Mr. Tommy Jacks testified at the hearing that the independently negotiated settlements with the foreign claimants in Canada and Australia, as provided in Classes 6A–6D of the Plan, played a major role in setting the market value of the general foreign breast implant claims. (Conf.Hrg.Tr., 6/28/99, 198–99) The same formulas are used in the negotiated settlements with the foreign claimants in Classes 6A–6D and Classes 6.1 and 6.2. *Id.* Based on the record before the Bankruptcy Court, there is nothing to show that the Tort Claimants' Committee breached its fiduciary duties to the Foreign Claimants.

The foreign claimants also maintain that because the Debtor's shareholders will retain their equity interests, the Joint Plan was not proposed in good faith. The foreign claimants appear to argue that the underlying reason for the settlement offers to the foreign claimants at the 60% or 35% rate is the desire of the Shareholders to retain their equity interests. This argu-

ment is without merit based on the Bankruptcy Court's finding that all tort claimants, including the foreign claimants, would be paid full under the Joint Plan, whether the claimants choose to settle or to litigate their claims. *Best–Interests Opinion,* 244 B.R. at 722–23. Moreover, the foreign claimants do not have to choose the settlement offer but may elect to litigate and, based on the evidence at the hearing that their claim in the Litigation Facility would be paid in full.

### 3. *Best Interest*

■ The Court has found that the Bankruptcy Court did not clearly err in its finding that the Joint Plan meets the best interests to creditors test with respect to all claimants, including the Foreign Claimants. The foreign claimants' argue that a chapter 7 trustee would owe no duty to the Debtor or its Shareholders; that liquidation would produce greater value than a going concern business; and that the foreign claimants would therefore receive more in a chapter 7 liquidation than under the Joint Plan because the settlement offers to the foreign claimants would not be discounted.

■ A chapter 7 trustee's fiduciary duty goes to both the creditors and the debtor in order to maximize the value of the estate. *Myers v. Martin (In re Martin),* 91 F.3d 389, 394 (3rd Cir.1996). The foreign claimants have provided no evidence to rebut the Proponents' expert, Mr. Arthur Newman, who testified that using a liquidation analysis, the creditors under the Joint Plan would receive at least as much as they would in a chapter 7 liquidation. The foreign claimants attempted to discount Mr. Newman's testimony by stating that he has not been a chapter 7 trustee or handled a chapter 7 case. Mr. Newman testified that the chapter 7 analysis prepared for this case is similar to the analysis used in the chapter 11 cases in which he has been involved and that those analysis have incorporated consultations with chapter 7 trustees, counsel and other professionals. (Conf.Hrg.Tr., 7/14/99 at

71) Mr. Newman's testimony was not sufficiently rebutted. A chapter 7 trustee has a duty to contest claims based upon all available defenses. *Golfland Entertainment Centers, Inc. v. Peak Inv., Inc. (In re BCD Corp.),* 119 F.3d 852, 859 (10th Cir. 1997). Based on the evidence before the Bankruptcy Court, the Proponents presented sufficient evidence to support the Bankruptcy Court's finding that the Proponents have met the best interests of creditors test under 11 U.S.C. § 1129(a)(7). Under a clearly erroneous standard of review, the Bankruptcy Court did not clearly err in its findings that the Proponents met the best interest test.

### 4. *Constitutional Violations*

The Shainwald and Australian foreign claimants contend that their due process rights have been violated under the Fifth Amendment of the United States Constitution because of the Joint Plan's classification and treatment of their claims. (Shainwald Br. at 35; Australian Br. at 21–24)

■ The Bankruptcy Court did not address the constitutional issue in any of his opinions relating to the Confirmation Order. The Australian Claimants did not raise this objection before the Bankruptcy Court. The Shainwald Appellants only footnoted the constitutional issue. Neither argued the constitutional issues during the confirmation hearing. The Appellants have waived their constitutional objections to the Joint Plan because these issues were not raised before the Bankruptcy Court. *Taft Broadcasting Co. v. United States,* 929 F.2d 240, 243 (6th Cir.1991). The Appellants have cited no authority that a Bankruptcy Court or any court's approval of an order establishes a governmental action. A governmental action is required to state a constitutional claim and a "mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the government responsible for those initiatives." *Blum v.*

*Yaretsky,* 457 U.S. 991, 1002, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982).

■ To claim deprivation of due process under the Fifth Amendment, Appellants must identify a possessory interest in receiving a settlement offer from the Debtor or the right to litigate their claim in a forum of their choice. *See e.g., Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 459, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). As the Bankruptcy Court noted, "[a] settlement is a private agreement voluntarily reached between parties." *Classification and Treatment Op.,* 244 B.R. at 664. The foreign claimants may choose to either settle or litigate their claims. The foreign claimants have not shown that they have a constitutional right to a settlement offer. The Joint Plan does not deprive any claimant of the right to litigate any· of their claims through the Litigation Facility.

■ The Appellants' equal protection claim under the Fifth Amendment based on their claim that they are being treated differently than domestic breast implant claimants also fails. The Supreme Court has consistently held that there is a legitimate distinction between aliens and citizens or resident which may justify attributes and benefits for one class not accorded to the other. *Mathews v. Diaz,* 426 U.S. 67, 78, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). *See also, Piper,* 454 U.S. at 253, 256, 102 S.Ct. 252 (there is a distinction between resident or citizen plaintiffs and foreign plaintiffs, such that a foreign plaintiff's choice of forum deserves less deference than that of a resident or citizen plaintiff.)

### 5. *New Zealand Claimants/Forum non conveniens*

■ The New Zealand Claimants' argument that their claims are not substantially similar to other Foreign Claims in Class 6.1 is based on the *Ashley* decision of the MDL–926 court. The New Zealand Claimants contend that their claims have survived a *forum non conveniens* motion and they would be able to pursue their claims in the U.S. courts. In this manner they are not substantially similar to other foreign claimants who may be barred by *forum non conveniens* from pursuing claims in the U.S. courts. The New Zealand Claimants assert that because they have access to the U.S. courts they are no differently situated than domestic claimants and being in Class 6.1. The Proponents' comparisons of legal systems and substantive rights are of no moment to them as they claim they have the same legal rights as domestic claimants. In addition, New Zealand Claimants assert that their claims are more valuable than other Class 6.1 claims and they have therefore given up more consideration for equal treatment in Class 6.1. Neither the Bankruptcy Court's opinion nor the New Zealand Claimants' argument settles the question of what the outcome of a choice of law motion will be or whether additional New Zealand Claimants will survive a new *forum non conveniens* motion, assuming that the *Ashley* decision secured a U.S. forum for certain New Zealand Claimants. (The New Zealand Claimants' argument is really not a classification issue but a question of whether their claims will ultimately be dismissed in the United States courts on *forum non conveniens* grounds.) This issue rises or falls on whether the New Zealand Claimants' claims are subject to dismissal on *forum non conveniens* grounds and, if not, whether the same analysis used for other foreign claimants should apply to them. In its opinion, the Bankruptcy Court found that most, if not all of the foreign claims would likely be subject to *forum non conveniens* dismissal and that the 40 New Zealand claims which survived dismissal without prejudice pending further evidence to be submitted in *Ashley* did not support a separate classification of the New Zealand Claimants from other foreign claimants under the Plan. The Bankruptcy Court reasoned that other hurdles, such as the choice of law issues, would still face the New Zealand Claim-

ants even if they were allowed to litigate their claims in the United States. The Bankruptcy Court examined Michigan's choice of law provisions concluding that the laws in a foreign claimant's home state would likely apply to a foreign claimant's case if the case is not dismissed on *forum non conveniens* grounds. *Classification and Treatment Op.*, 244 B.R. at 662.

The *forum non conveniens* and the choice of law issues will be addressed by the District Court if the claimants choose to elect litigation. As this Court has noted previously, the classification question deals with whether the claims are substantially similar in legal and factual nature as against the Debtor. The Bankruptcy Court did not clearly err in finding that New Zealand was properly classified with other foreign claimants in Class 6.1.

### 6. *Shainwald Appellants*

In addition to the issues already addressed above, the Shainwald Appellants raise several other issues on appeal. The Shainwald Appellants claim that the Debtor engaged in gerrymandering when the countries were misclassified. The Shainwald Appellants present no evidence other than their conclusory allegations that the Proponents engaged in manipulating the classification of the countries in order to receive favorable votes.

 The Shainwald Appellants argue that the Bankruptcy Court erred when it found that the 513 Mexican and Vietnamese claimants accepted a Plan Modification in writing pursuant to Bankruptcy Rule 3019. The Mexican and Vietnamese claimants, classified in Class 6.2, originally voted to reject the Joint Plan. On July 28, 1999, these Claimants, through counsel, changed their votes converting their vote to an accepting class. The Shainwald Appellants argue that each Mexican and Vietnamese claimant should have provided in writing their change of vote accepting the Joint Plan with the modification to increase the payment to Class 6.2 claimants in the amount of $600 instead of a writing from their attorneys. The Shainwald Ap-

pellants have pointed to no authority requiring each individual claimant to submit a writing to accept a plan modification. Rule 3019 only indicates that a claimant may accept a plan modification in writing. Rule 3019 does not require each individual claimant to accept a plan modification nor does it preclude the claimant's attorney to accept a plan modification on behalf of a client. Parties are bound by the acts and omissions of their counsel. *United States v. Johnson*, 752 F.2d 206, 210–11 (6th Cir. 1985). Rule 3018(c) further states that "[a]n acceptance or rejection shall be in writing, identify the plan or plans accepted or rejected, be signed by the creditor ... or an authorized agent, and conform to the appropriate Official Form."

The Shainwald Appellants do not represent the individual Mexican and Vietnamese claimants nor have the Mexican and Vietnamese claimants appealed the Confirmation Order. The Shainwald Appellants have submitted no evidence that the individual Mexican and Vietnamese claimants did not agree with nor give their lawyers the authority to act on their behalf in accepting the modification of the plan. The Bankruptcy Court did not err in its finding that the Mexican and Vietnamese claimants' acceptance of the modification of the plan, submitted in writing on their behalf by their attorneys, constituted a proper acceptance, thereby changing Class 6.2 to an accepting class.

 The Shainwald Appellants also argue that the Bankruptcy Court erred in denying the Korean Claimants' motion to change their 1,721 accepting votes in Class 6.2 to rejecting votes. The Bankruptcy Court found that the Korean Claimants did not show cause under Bankruptcy Rule 3018(a) why their vote should be changed. Although the Korean Claimants filed an interlocutory appeal to the Bankruptcy Court's denial of their motion to change their vote and also filed an appeal to the Confirmation Order beyond the appeal period, no briefs have been filed on

appeal, despite this Court's order setting a briefing deadline of February 18, 2000 for all appeals relating to the Confirmation Order. The Shainwald Appellants do not represent the Korean Claimants. The Shainwald Claimants argue that the Korean Claimants made two mistakes when they submitted accepting votes in May 1999. The first mistake was that they believed as a condition for the accepting votes, they could continue to argue their objections to the Joint Plan. Because the Bankruptcy Court deferred its ruling on this issue until after the Korean Claimants fully participated at the confirmation hearings, this argument is moot since the Korean Claimants were able to place their objections on the record despite having accepted the Joint Plan. The second mistake was that the Korean Claimants believed that they would be able to raise objections to confirmation under the cram down provision of 11 U.S.C. § 1129(b). When the Mexican and Vietnamese Claimants accepted the Plan with certain modifications on July 28, 1999, the Korean Claimants were precluded from raising a Section 1129(b) objection since Class 6.2 then became an accepting class and Section 1129(b) only applies to a rejecting class. At the time when the Korean Claimants cast their accepting 1,721 votes in May 1999, their § 1129(b) argument was not available to them since at that time, no one had reason to believe that Class 6.2 would not be an accepting class. The Korean Claimants could not have anticipated at the time of voting that they would have a § 1129(b) argument given that they cast their 1,721 votes in favor of the Joint Plan which would indicate that with that amount of votes Class 6.2 could have been an accepting class. The Bankruptcy Court did not err in its ruling that the Korean Claimants had failed to show cause under Bankruptcy Rule 3018(a) why their votes should be changed from accepting votes to rejecting votes.

■ The Shainwald Appellants argue that Paragraph 5.12 of the Joint Plan vio-

lates certain Friendship, Commerce and Navigation Treaties (the "FCN Treaties") because the manager of the Litigation Facility has the discretion to seek dismissal of Foreign Claims, but not Domestic Claims, under the *forum non conveniens* doctrine. The Shainwald Appellants contend that the difference in the treatment is unequal treatment and violates the FCN Treaties. The FCN Treaties state that "Nationals and companies of either Party shall be accorded national treatment with respect to access to the courts of justice and to administrative tribunals and agencies within the territories of the Other Party." *Classification and Treatment Op.*, 244 B.R. at 657, quoting from the FCN treaty between The Netherlands and the United States. The Shainwald Appellants argue that the FCN Treaties essentially overturns the Supreme Court's decision in *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). In *Piper Aircraft*, the Supreme Court held that a foreign plaintiff's case may be dismissed based on *forum non conveniens* ground if certain factors are met, even though the law in another forum is less favorable to the plaintiff's chance of recovery. The Supreme Court noted that there is a distinction between resident or citizen plaintiffs and foreign plaintiffs, such that a foreign plaintiff's choice of forum deserves less deference than that of a resident or citizen plaintiff. *Id.* at 250–52, 253, 256, 102 S.Ct. 252. The Bankruptcy Court found that the Shainwald Appellants' argument was without merit. The Bankruptcy Court stated that because of the FCN treaties, a district court may be compelled to apply the same standards and factors that would apply to a similar motion made against a domestic claimant. *Classification and Treatment Op.*, 244 B.R. at 663. The treaties do not suggest that a court is precluded from considering and granting a motion to dismiss based on *forum non conveniens. Id.*

■ The Court agrees with the Bankruptcy Court's rationale on this issue.

The FCN treaties afford the foreign party equal access to the courts only. The FCN treaties do not preclude a court from dismissing a foreign claim based on substantive law such as the *forum non conveniens* doctrine. If a domestic plaintiff was faced with a *forum non conveniens* motion in a court, that court is not barred from dismissing that plaintiff's case just because the plaintiff is from another state. As noted in *Piper*, the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient. *Id.* at 256, 102 S.Ct. 252. The FCN treaties do not preclude a court from considering any defenses a party may have to a claim against it, including a *forum non conveniens* defense. *See, e.g., Pacheco de Perez v. AT & T Co.,* 139 F.3d 1368 1375 (11th Cir.1998) (the FCN Treaty only creates a procedural right to access the court which is separate from the substantive cause of action.) The Shainwald Appellants have not cited any authority which holds that the FCN Treaties preclude a court from considering a *forum non conveniens* defense or that the FCT Treaties trump the Supreme Court's decision in *Piper*.

The Shainwald Appellants' claim of unequal treatment between domestic and foreign claimants has no merit in light of the Supreme Court's statement in *Piper* that there is a distinction between resident or citizen plaintiffs and foreign plaintiffs and that "a foreign plaintiff's choice deserves less deference." *Id.* at 255–56, 102 S.Ct. 252. The Bankruptcy Code specifically states that the district court in which the bankruptcy case is pending has the authority to set the trial venue of personal injury tort claims against the Debtor either in the district where the bankruptcy case is pending or where the claim arose. 28 U.S.C. Sec. 157(b)(5). The Sixth Circuit expressly transferred all breast implant claims in the United States against the Shareholders to this district finding "related to" jurisdiction based on the chapter 11 case filed by the Debtor. *In re Dow Corning,* 86 F.3d 482 (6th Cir.1996), and *In re Dow Corning,* 113 F.3d 565 (6th Cir.1997).

The Bankruptcy Court did not err in its interpretation that the FCN Treaties do not preclude the manager of the Litigation Facility from seeking *forum non conveniens* dismissals on the foreign claims only.

The Shainwald Appellants claim that the Bankruptcy Court erred in excluding the testimony of Russell Levy and Robert Fiore, attorneys who represent foreign claimants from Britain and Germany, on the issue of whether the Plan is fair to their British and German clients under Class 6.1. The Shainwald Appellants note that the Bankruptcy Court allowed Ralph Knowles and Tommy Jacks, both attorneys who also represent claimants, to testify at the hearing. A trial court's decision to exclude an expert is reviewed under an abuse of discretion standard. *Morales v. American Honda Motor Co., Inc.,* 151 F.3d 500, 515 (6th Cir.1998).

The Bankruptcy Court did not allow the two witnesses to testify for two reasons. The Bankruptcy Court first noted that these lawyers could not both represent their clients and act as witnesses on behalf of their clients. Conf.Hrg.Tr., 6/17/99 at 176 and 255. Secondly, the Bankruptcy Court excluded their testimony because of their financial interest in the outcome of the confirmation hearing. Conf.Hrg.Tr., 6/17/99 at 220, 258.

Lawyers who would be required to serve as witnesses in a proceeding were excluded under the rules of ethics from participating in the case in any way. *General Mill Supply Co. v. SCA Services, Inc.,* 697 F.2d 704, 715 (6th Cir.1982). An attorney's testimony who represents a party in a proceeding may be discounted because the attorney is an interested party and lacks credibility. *TWM Mfg. Co., Inc. v. Dura Corp.,* 722 F.2d 1261, 1267 (6th Cir.1983). The Bankruptcy Court did not abuse his discretion in not allowing the testimonies of Messrs. Levy and Fiore on the fairness issue based on the reasons stated on the record noted above. Al-

though their testimonies may have had some relevance, their testimonies would have gone to credibility and weight instead of exclusion. However, because the Bankruptcy Court was the sole trier of fact, the decision not to allow the testimonies was not an abuse of discretion. As to Messrs. Knowles and Jacks' testimonies, Mr. Knowles was called without objection by the Shainwald Appellants as a witness and nobody objected to Mr. Jacks' testimony regarding how the plan was negotiated and as to the meaning of certain Plan provisions.

### 7. *The Australian Claimants*

The three issues remaining specifically raised by the Australian Claimants which have not been addressed elsewhere in this opinion include: 1) the factors to be considered under *U.S. Truck;* 2) the Joint Plan's inclusion of U.S. citizen breast implant claimants in Class 5 as domestic claimants even though they did not receive their implants in the United States; and 3) the Joint Plan's two classes for Australian Claimants under Classes 6.1 and 6D as violative of Sections 1123(a)(4) and 1129(a)(1).

The Australian Claimants argue that the factors to be considered to determine whether classification is proper under *U.S. Truck* are whether the claimants: 1) had a different stake in the "future viability" of the debtor, and 2) had "alternative means" at their disposal to protect their unsecured claims. *U.S. Truck,* 800 F.2d at 586.

■■■■ A review of the Sixth Circuit's opinion indicates that these are not the "factors" to be considered in determining whether classification is proper. The future viability of the debtor and the alternative means issues are the *factual* basis for the separate classification and not the standard to be considered in a classification analysis. *U.S. Truck* stands for the proposition that although there is some limit to the classification of claims, the courts have "broad discretion to determine proper classification according to the factu-

al circumstances of each individual case." *Id.*

■■■■ The Australian Claimants' argue that the Joint Plan's inclusion of claimants who are U.S. citizens but received their breast implants outside the United States in Class 5 is in error. That argument is without merit. The Supreme Court has noted that there are distinctions between plaintiffs who are either citizens or residents of the United States and foreign plaintiffs who are not U.S. citizens. In *Piper,* the Supreme Court specifically noted the distinction between resident or citizen plaintiffs and foreign plaintiffs, holding that a foreign plaintiff's choice of forum deserves less deference than that of a resident or *citizen* plaintiff. *Piper,* 454 U.S. at 250–52, 253, 256, 102 S.Ct. 252.

■■■■ The Australian Appellants' argument that the Joint Plan violates section 1123(a)(4) because the Claimants in 6.1 are not receiving precisely the same treatment as the Claimants in Class 6D is without merit. Class 6.1 is a separate class from Class 6D. Class 6D are those Australian Breast Implant Claimants who choose to receive the payment of their claims pursuant to the Australia Breast Implant Settlement Option. The Class 6D claims are paid in a manner which is generally consistent with the treatment of other Class 6.1 Claimants. Amended Joint Plan, ¶ 5.8.1. The Australian Appellants' position is that the two classes receive different treatment. Specifically, the Australian Appellants assert that Class 6D's treatment differs from Class 6.1 because the Class 6D family member claims are deemed released under the Australian Breast Implant Settlement Option. The Australian Appellants do not argue that Classes 6.1 and 6D were misclassified or that the claims in Class 6D are not substantially similar to each other.

The Australian Appellants have not shown the classification of Class 6.1 separate from Class 6D does not comply with any other provisions of the Bankruptcy Code as required under 11 U.S.C. See

1129(a)(1). The cram down provisions under § 1129(b) do not apply since both Class 6.1 and Class 6D are accepting classes. The Bankruptcy Court noted that § 1123(a)(4) only applies to treatment of claims within the same class, and, therefore does not apply to the difference of treatment, if any, between Class 6.1 and Class 6D. *Classification and Treatment Op.*, 244 B.R. at 666. In any event, although § 1123(a)(4) requires that a plan provide the same treatment for each claim within a particular class, a holder of a particular claim can agree to a less favorable treatment. 11 U.S.C. § 1123(a)(4). This Court agrees with the Bankruptcy Court that § 1123(a)(4) does not apply to the Australian Appellants' objections regarding the different treatment between Class 6.1 and Class 6D since § 1123(a)(4) only applies to within class claims. Nor does the cram down provision in § 1129(b) apply since both classes are accepting classes.

### 3. *Class 9 Other Silicone Gel Implants*

#### a. *Karen L. Hustead*

Class 9 consists of claimants who have silicone gel implants other than breast implants. Two claimants from Class 9 appealed the Bankruptcy Court's November 30, 1999 Confirmation Order. The two claimants' arguments will first be summarized followed by the Court's analysis of the parties' arguments.

Karen L. Hustead, a *pro se* non-breast implant claimant, asserts that the TCC breached its fiduciary duty by not investigating the underlying claims and issues pertaining to the non-breast implant claimants. She claims that the TCC is biased in favor of breast implant claimants. Hustead contends that the TCC's actions are in violation of the Bankruptcy Code and that the Plan cannot be confirmed because the TCC failed to adequately represent her.

Hustead received her first implant surgery around the age of 16 to correct birth defects. Hustead claims to have the same diseases as many breast implant claimants, including: polyneuropathy; connective tissue disorder; nerve damage and disfigurement to the face; cervical cod disorder; mild lymphadenopathy; prominence of lymphoid in both orapharyngeal; chronic fatigue syndrome; irritable bowl syndrome; myofascial pain and dysfunction. Hustead claims she relied on the TCC to represent her but the TCC did not adequately represent her because her implants are not included in the disease grid. She claims she and other non-breast implant claimants are improperly classified

#### b. *Helene D. Schroeder*

Helene D. Schroeder, an attorney, proceeding *pro se*, claims she suffers from a disease due to her silicone chin implant. She is a classified in Class 9. Like Hustead, Schroeder argues that the Plan discriminates against the recipients of other silicone implants by failing to include them on the disease grids applicable to breast implant claimants. Schroeder also claims that the Trustee failed to appoint a guardian for future claimants thus the Bankruptcy Court erred in confirming the plan. She argues that the Bankruptcy Court further erred in approving the Plan because the funding of the Litigation Facility was based upon unfounded assumptions about the number of non-breast implant claimants who might elect to litigate.

Schroeder contends that the non-breast implant claimants are not entitled to compensation for diseases based upon the grids set forth in the Plan even though the Plan provides disease compensation for the recipients of saline breast implant claimants. Nor does the Plan provide any explanation payment for non-breast implant claimants. Schroeder claims that the Plan unfairly favors breast implant claimants because those breast implant claimants who also have other non-breast implants are able to recover under both Class 5 and Class 9. She further claims that the classification of non-breast implant claimants

were gerrymandered and did not have the benefit of representation by unconflicted counsel. Schroeder claims that the TCC breached their fiduciary duties to the non-breast implant claimants by failing to conduct a reasonable inquiry into the nature and extent of the claims of the non-breast implant claimants and unfairly treated non-breast implant claimants.

### c. *Analysis re Class 9 Objections*

The Bankruptcy Court did not address the Class 9 Objections in any of its opinions. However, the general issues presented by the Class 9 Objectors, such as classification, treatment and good faith issues, were addressed by the Bankruptcy Court in response to the objections raised by other parties.

The Joint Plan classifies all domestic tort claims based on the Debtor's medical products, other than breast implants, in Class 9. As in Class 5 (domestic breast implant claimants), Class 9 Claimants are given the option to either litigate or settle. The Settlement Facility provides Class 9 claimants settlement options negotiated and agreed to between the Debtor and the Tort Claimants' Committee. Tort claimants in Class 9 voted in favor of the Amended Joint Plan nearly 98 percent. The only two objectors from Class 9 appear to be Hustead and Schroeder.

■ The Court will now address the Class 9 Claimants' argument that the TCC is biased in favor of breast implant claimants because the Class 9 claims are not included in the disease grid and there is no explantation payment for non-breast implant claimants. The eight attorney members of the Tort Claimants' Committee represented 132 claimants with Other Products Claims in Class 9. (Resp. of the TCC to Schroeder's Motions to Compel Disclosure and for Clarification and Reconsideration of Pre–Trial Order at 3, 8–9.) Settling Other Products Claimants will be paid out of a self-liquidating $36 million fund with payments offered which are significantly larger than those offered in the Debtor's previous plans submitted to the

Bankruptcy Court. The Settlement Facility will have the authority to distribute the balance of the $36 million fund to the most seriously injured Class 9 Claimants. Class 9 Claimants are not included in the disease grid. The Tort Claimants' Committee could not establish a proper valuation for these types of claims because of the absence of settlement or verdict history comparable to that available in the breast implant litigation. The Class 9 Objectors have not sufficiently established that disease payments should be paid to Class 9 Claimants who choose to settle. However, the Class 9 Claimants, however, have the opportunity to fully litigate the disease issue if they choose to litigate their claims instead of seeking payment from the Settlement Facility. The Class 9 Claimants also have the opportunity to litigate the explantation cost issue should they choose not to settle based on the Settlement Facility's offers relating to Class 9 Claimants.

The Class 9 Objectors claim that the Tort Claimants' Committee was biased is not supported by the record. The Committee negotiated a higher settlement grid from the previous offers made by the Debtor. The issue of the make up of the Tort Claimants' Committee was previously resolved by appeal and there is nothing in the record to support a claim that the negotiating subcommittee breached any duty owed to any claimant. Another objection raised by the Class 9 Objectors is that the Bankruptcy Court erred in approving the Joint Plant because there is no appointed guardian for future claimants. This issue also goes to the U.S. Trustee's authority to appoint committees. There is no requirement under the Bankruptcy Code for the U.S. Trustee to appoint a "guardian" for future claimants. The Supreme Court's recent decision in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) only applies to class actions and does not address the structure of bankruptcy committees and those committees' fiduciary obligation to the various creditors.

The Class 9 Objectors' claim that the Proponents engaged in gerrymandering the vote when they classified Class 9 separately from other tort claimants is not supported by the record. There is no evidence that the Class 9 claims are not substantially similar. They are all unsecured, disputed and unliquidated personal injury claims against the Debtor, based on the Debtor's silicone medical products, other than breast implants. 98% of the Class 9 claimants voted in favor of the Amended Joint Plan. If the percentage voting in favor of the Amended Joint Plan was substantially less than what the actual voting percentage was, then, perhaps the Class 9 Objectors would have a stronger argument. If the Class 9 Objectors were grouped with other personal injury claimants, then the 98% acceptance rate would have probably increased the voting percentages in other classes. The Class 9 Objectors have not sufficiently shown that the Proponents engaged in gerrymandering the votes when the other silicone implant claims where classified in Class 9.

The Class 9 Objectors also argue that the Joint Plan should not have been approved because the funding of the Litigation Facility was based on unfounded assumptions as to how many non-breast implant claimants might elect to litigate. There is sufficient testimony on the record to support the Bankruptcy Court's finding that the Litigation Facility is more than adequately funded as previously addressed above. The Class 9 Objectors have presented no credible evidence to support their claim that the Litigation Facility is not sufficiently funded nor have they submitted an alternative methodology to determine the number of non-breast implant claimants who might elect to litigate instead of settle.

#### 4. *Class 12 Claimants/Physicians Committee/Hartley Physicians*

The Physicians Committee and physicians represented by Harley Hampton, argue that the Amended Joint Plan does not provide physicians with equal treatment under § 1123(a)(4). They argue that the settlement option under the Joint Plan requires the physicians who have *both* reimbursement and direct claims against the Debtor to give up more consideration than those physicians who only have a reimbursement claim and no direct claim against the Debtor. The Physicians' Committee argue that the two types of claims differ in character, and, the approval of the Amended Joint Plan with the classification of the claims all in one class was in error, in violation of § 1123(a)(4).

The Physician Claims are in Class 12. Class 12 includes claims by physicians arising out of the Debtor's medical products, including reimbursement claims, such as claims by physicians against the Debtor where the physicians may be found liable to implant plaintiffs, and direct tort claims against the Debtor by the physicians, such as loss of reputation, based on the Debtor's misrepresentation to the physicians as to the safety of the Debtor's implant products. The Amended Joint Plan allows the physicians to choose between litigation and settlement. The settlement option is not a monetary option but provides the physicians protection, by way of releases (except for malpractice claims) obtained under the Joint Plan, on the physicians' behalf, from any Settling Personal Injury Claimants, and the Litigation Facility's obligation to cover certain claims made against settling physicians by Non–Settling Personal Injury Claimants. In exchange, the Settling Physicians must release all of their Class 12 claims, including any direct claim they may have against the Debtor. 91.4% of the claimants in Class 12 voted to accept the Plan. The Bankruptcy Court noted the uniqueness of these creditors/claimants and so recognized when the Bankruptcy Court approved an official committee to represent the interest of all the physician claimants. *Classification and Treatment Op.*, 244 B.R. at 665.

 The Bankruptcy Court held that Class 12 was properly classified. *Classification and Treatment Op.*, 244 B.R. at 665. The only requirement regarding classification under § 1122(a) is whether the claims are substantially similar. As noted by the Bankruptcy Court, all physicians could potentially have both derivative and direct claims against the Debtor. *Id.* at 665–66. The Bankruptcy Court did not clearly err in its finding that both of the physicians' potential direct and derivative claims are properly classified in Class 12. The physician claims, whether direct or derivative, are nonpriority, unliquidated and disputed unsecured claims. All of the claims arise out of the physician's use of the Debtor's products—from the same action—the physician's use of the implants on the breast implant claimants.

 Inasmuch as the physicians argue that their claims are receiving disparate treatment, in violation of § 1123(a)(4), the second half of the statute expressly allows for disparate treatment, so long as the class member agrees to a different treatment. If the physician claimant accepts the Class 12's settlement option, then the physician agrees to a different treatment than the physician claimant who chooses to litigate both the derivative and direct claims. The Bankruptcy Court did not err in its finding that there is no violation of § 1123(a)(4) by restricting the settlement option to those physicians who agree to give up all of their claims, including their direct claims against the Debtor.

### 5. *Class 15 Claimants/United States*
#### a. *United States' Claims*

The United States is designated in the category, Class 15, the Government Payors claims. Class 15 consists of claims filed by governments seeking to recover the costs of medical treatment that the governments either paid for or provided as a result of injuries allegedly caused by products manufactured by, or containing materials supplied by, the Debtor. *Class 15 Cram Down Opinion*, 244 B.R. at 708. Class 15 is composed of three claimants—the United States, the Canadian Provinces of Alberta and Manitoba. Alberta and Manitoba each filed one claim. The United States filed four claims on behalf of the Department of Defense (the "DOD"), the Department of Veteran's Affairs (the "VA"), the Indian Health Services Division of the Department of Health and Human Services (the "IHS"), and the Health Care Financing Administration (the "HCFA"). *Id.* at 709. The Canadian Class 15 creditors voted their two claims in favor of the Amended Joint Plan but withdrew their two claims prior to Confirmation in favor of certain treatment that their claims will be afforded pursuant to the British Columbia Class Action Settlement Agreement (the "B.C. Agreement"). The United States voted its four claims against the Amended Joint Plan, which made Class 15 a rejecting class. The Proponents seek confirmation of the Amended Joint Plan pursuant to 11 U.S.C. § 1129(b)(1).

The Amended Joint Plan provides for Class 15 claims as follows:

> Unless a different treatment is agreed to by the Proponents and the affected Claimants, the Proponents shall seek to have the Class in Class [ ] 15 ... estimated for distribution on or before the Confirmation Date. The Estimated Amount of any such Claim will be paid ... by the Claims Administrator on, or as soon as practicable after, the Effective Date. If not estimated for distribution on or before the Confirmation Date, such Claims will be channeled to the Litigation Facility for purposes of Claim liquidation and paid (subject to the terms of the Settlement Facility Agreement and the Funding Payment Agreement) when Allowed.

Amended Joint Plan, Sec. 5.13.5.

 The United States bases its right to recover claims under the Medicare Secondary Payer ("MSP") statute, 42 U.S.C. § 1395y(b), and the Medical Care Recovery Act ("MCRA"), 42 U.S.C.

§§ 2651–53. The MSP requires, in most cases, that available private insurance, including liability insurance, replace Medicare as the primary source of payment for medical care provided to Medicare beneficiaries. The United States is not required to prove tortious conduct by Dow Corning in order to recover under the MSP statute. The United States need only show that Dow Corning made or is required to make payments to or on behalf of a Medicare beneficiary. The United States may assert its MSP rights in a direct cause of action against the Debtor. 42 U.S.C. § 1395y(b)(2)(b); 42 C.F.R. §§ 411.21, 411.24(e), (g). The United States may recover double damages from Dow Corning, if it does not make appropriate arrangements to provide for payment of the United States' claims. 42 U.S.C. §§ 1395y(b)(3)(A), 1395y(b)(2)(B)(ii).

▌ The MCRA allows the United States to recover from a tortiously liable third party those costs the United States incurred under federal programs sponsored by the DOD, VA, IHS and HCFA. Under the MCRA, the United States has a subrogation claim to the beneficiary's claim and a direct cause of action against Dow Corning. 42 U.S.C. § 2651(b).

The Plan Proponents have contested the validity of the United States' claims. The United States claims it has been unable to access the proof of claim information necessary to allow the United States to identify with certainty those Personal Injury Claimants who received medical care treatment from the United States or had their medical care paid for by the United States. The United States argues four grounds in support of the reversal of the Bankruptcy Court's November 30, 1999 Confirmation Order.

First, the Joint Plan does not "provide the same treatment for each claim or interest of [Class 15], unless the holder of a particular claim or interest agrees to a less favorable treatment" as required by 11 U.S.C. § 1123(a)(4). The United States claims that the Canadian Government Pay-ors in Class 15 received more favorable treatment because of the B.C. Settlement. The Bankruptcy Court found that the Joint Plan provides "an approximate measure of equality" which the United States argues is not supported by the evidence. The United States argues that the treatment between the United States and the Canadian Government under the B.C. Settlement differs in three areas: 1) the identification of Government Payor Claims; 2) resolution of Government Payors Claims in relation to the related Personal Injury Claims; and 3) remedies available when the Government Payor Claims is not properly resolved.

As to the identification issue, the B.C. Settlement provides that the Settlement Class Member shall provide the Claims Administrator with notice of the Subrogation Claims. In contrast, the Joint Plan has no comparable provision and requires that the Government Payor provide the Claims Administrator with the identity of the Personal Injury Claimant, with sufficient particularity. The United States has been unable to identify these claimants because it has not been allowed access to the claim database. In addition, the notification provisions in the B.C. Settlement are more favorable to the Canadian Government Payor than those under the Joint Plan and the Confirmation Order. The Canadian Government Payor can remain passive during the settlement process. The Canadian Government Payor Claims are resolved before any payment is disbursed. The United States claims that it may not receive notification until 24 hours after a settlement amount has been agreed to and payment is not delayed to the Personal Injury Claimant until the Government Payor claim is resolved. The United States argues that the notification procedure treats its claims differently from those of the Canadian Government Payors.

Under the resolutions procedures, the B.C. Settlement Claims Administrator holds the amount payable in trust until the Claims Administrator receives instructions

from both the Settlement Class Member and the third party, that the Subrogation Claim has been resolved. Under the B.C. Settlement, there is coordination if a consensual resolution is not reached between the Personal Injury Claimant and the Debtor. The British Columbia Court shall adjudicate the dispute and give direction to the Claims Administrator regarding disposition of the Subrogation Claim notification provisions. There is no payment to the Personal Injury Claimant until after the dispute has been resolved and the Claims Administrator receives direction from the British Columbia Court. In contrast, the United States' claim will be tied up in the Litigation Facility while the Settlement Facility makes the payment without any procedure for resolution of the related claim.

The Canadian Government Payor is provided with two significant protections of their claims which are not provided under the Joint Plan. If there is no consensual settlement with the Government Payor, the dispute is sent to a local court for resolution of just the division issue. The Joint Plan has no procedure for resolving disputes because the Joint Plan does not contemplate such a joint resolution of the Personal Injury Claim and the related Government Payor Claim. The B.C. Settlement provides the Government Payor recourse against Dow Corning if the Settling Personal Injury Claimant fails to notify the Claims Administrator of the Government Payor Claim. Under the Joint Plan, the Government Payor must pursue its remedies solely against the Personal Injury Claimant and not Dow Corning. The United States argues that its claims are being treated differently from those of the Canadian Government Payor because the United States does not have a remedy against Dow Corning.

Second, the United States claims that the Joint Plan is not "fair and equitable" to the dissenting Class 15 creditors as required by 11 U.S.C. § 1129(b)(1). The United States claims that under the MSP,

there is no requirement that the United States must show existence or proof of tort liability against a third party in order for the United States to recover the payments on behalf of a Medicare beneficiary. If the Settlement Facility makes a payment to a Personal Injury Claimant, the United States is entitled to reimbursement. The Medicare beneficiary has the obligation to notify the United States of the settlement but the Claims Administrator also has an obligation to inquire from the beneficiary if the beneficiary is a Medicare beneficiary. The Joint Plan provides that once the Settlement Facility makes the payment, the right to recover from the Settlement Facility is "cut off." The United States claims this violates the "absolute priority" rule. This is inconsistent with the United States' rights under federal law. The United States' claim only remains with the Personal Injury Claimant.

Third, the Confirmation Order does not comply with the requirement that it must have been "proposed in good faith and not by means forbidden by law" as required by 11 U.S.C. § 1129(a)(3). The United States argues that the Joint Plan allows Dow Corning to avoid compliance with the requirements under the MSP and the MCRA. Both statutes provide the United States with a direct right to recover from Dow Corning. The Plan Proponents failed to propose the plan in good faith because the United States' claims are extinguished against the Debtor once the Settlement Facility makes a payment to the Settling Personal Injury Claimant.

Fourth, the United States argues that the Plan extinguishes the United States' claims against the Insurers and is not proposed in good faith. The broad release and injunction provisions are contrary to law and are not in good faith. (The injunction issue is addressed in the injunction arguments regarding the December 21, 1999 opinion.)

In response, the Proponents claim that the United States' claims remain disputed and are limited to reimbursement benefits

to as many as 15,049 (15,048 according to the Bankruptcy Court) separate and identified federal beneficiaries under the Class 5 Breast Implant Claimants. The United States' claims average approximately $2,500.00 per reimbursement. Giving the United States the full benefit of the doubt, its four claims add up to only a few million dollars, compared to the billions of dollars in total claims against the Debtor under the Joint Plan. This is the context within which the United States argues that it is oppressed under the Joint Plan. The Class 15 Claims were not estimated before the Confirmation Date. If Class 15 Claims are eventually allowed, the Proponents argue that the Litigation Facility will become exclusively liable for the Class 15 Claims. The United States' claims were the subject of summary judgment motions in the Bankruptcy Court. . The Proponents claim that the United States cannot prove that Dow Corning's products caused the specific injuries or conditions for which the MCRA Claimants paid or provided medical services. The Proponents argue that the United States' claims are treated the same as the Canadian claims and that the Canadian provinces have agreed to a different treatment. The Proponents claim that the treatment of all Class 15 claims—those of foreign governments and the United States alike—is fundamentally the same. The Class 15 claimants can attempt to settle their claims with the Debtor and the personal injury claimants. If the claims are not settled then the claims are channeled to the Litigation Facility where they will be paid from the settlement fund in full. The Proponents also argue that section 6.8 of the Amended Joint Plan will equally apply to all allowed Class 15 claims to the extent that the claims purport to include notification, determination, and resolution of the rights requested by the United States. The Proponents assert that any perceived difference in treatment by the United States is solely a function of the agreements between the Canadian provinces and the Class 6C personal injury claimants under the B.C. Agreement and

not a function of the Joint Plan's treatment of Class 15 claims.

The Joint Plan provides that if Class 15 claims remain in dispute and not estimated for distribution before the Confirmation Date, those claims will be channeled to the Litigation Facility for purposes of liquidation and payment. Amended Joint Plan, ¶ 5.13.5. To date, the United States' Class 15 claims remain in dispute and not estimated for distribution.

The Bankruptcy Court found that the Canadian Provinces of Alberta and Manitoba have effectively agreed to a different treatment from what the Amended Joint Plan provides by refraining from pursuing their claims in the Litigation Facility in favor of the treatment provided under the B.C. Agreement. *Class 15 Cram Down Opinion,* 244 B.R. at 709. For the reasons set forth below, the Court finds that the Bankruptcy Court has not erred in its conclusion that the United States' claims are not treated unequally from the B.C. Settlement.

### b. *Within-in Class 15 Treatment*

The United States' § 1123(a)(4) argument is based on a comparison between the Amended Joint Plan and the British Columbia Class Action Settlement Agreement ("B.C.Agreement"). The United States first argues that the notice provisions provided in the Joint Plan are less favorable to the United States than those provided in the B.C. Agreement. Under the B.C. Agreement, the Canadian Breast Implant Claimant must serve notice to the Claims Administrator regarding any Canadian governmental interest in their settlement. The Amended Joint Plan does not require a settling personal injury claimant to notify the Claims Administrator regarding any governmental interest in their settlement. The United States next argues that the resolution procedure on disputed claims provides less favorable treatment under the Amended Joint Plan. The Amended Joint Plan provides that if the governmental entity and the underlying

claimants resolve the distribution of any settlement then the Settlement Facility will abide by the agreement between the claimant and the governmental entity. Otherwise, the Amended Joint Plan provides that each governmental entity should resolve its reimbursement claim with the underlying claimant in accordance with that governmental's entity's laws. The BC Settlement Agreement provides that the B.C. Claims Administrator hold the money in dispute until the claim is resolved in a British Columbia Court. The United States' third argument is that the remedies under the Amended Joint Plan and the B.S. Settlement Agreement are different because the B.C. Settlement Agreement provides recourse against the Debtor if a claimant fails to notify the B.C. Claims Administrator notice of the Government Payor claim whereas the United States does not have such a recourse against the Debtor when a claimant fails to provide notice of the United States' claim.

Regarding the notice provision argument, the Bankruptcy Court noted that there is a notice provision under the Settlement Facility Agreement allowing a governmental entity to submit to the Settlement Facility Claims Administrator a request for notification with respect to any resolution of a breast-implant claim for which it asserts a right of reimbursement. *Classification and Treatment Op.*, 244 B.R. at 672. The Bankruptcy Court found that the Settlement Facility Agreement's notice provision is no less favorable to the United States than the B.C. Agreement. *Id.* at 673.

The Court finds that the Bankruptcy Court did not err in its conclusion. Not only does the Settlement Facility Agreement provide for notice, the governmental entity will be able to access the claimants' identities once the confidentiality projections are lifted at Confirmation. *Id.* at 672–73. The notice to the claimants regarding loss of confidentiality will also contain a notice that they may have certain obligations to notify the Government of an intent to resolve their claim and that they should either notify the Government or the Claims Administrator that the United States may have a competing interest in the claim. *Id.* The United States' argument that the notice provision is less favorable under the Amended Joint Plan because the breast implant claimant under the B.C. Settlement must provide notice to the B.C. Settlement Claims Administrator is unavailing given that once the confidentiality has been lifted, the United States will have access to the claimants' identity and the United States will then be able to access its files in order to compare the names with the disclosed claimants' names. *Id.* at 673. Under the B.C. Settlement, Alberta and Manitoba must wait until the claimants notify the B.C. Settlement Administrator as to whether there are government claims of reimbursement. The notice provision under the Amended Joint Plan does not provide less favorable treatment than the B.C. Settlement.

As to the resolution procedure argument under the settlement portion, the Court finds that the Amended Joint Plan does not provide less favorable treatment than the B.C. Settlement procedures. Both procedures provide that if the governmental entity settles its claim with the underlying claimant, then the Settlement Facility will abide by the resolution procedures agreed to by the government lienholders and the underlying claimants. If there is no settlement between the parties, the Amended Joint Plan provides that each governmental entity should resolve its reimbursement claim with its underlying claimants pursuant to that government's laws. The B.C. Settlement provides that the B.C. Claims Administrator hold the money until the claim is resolved in a British Columbia Court. A reading of the Amended Joint Plan indicates that it does not interpret the laws of any of the governmental entities in Class 15. The Amended Joint Plan provides that the Claims Administrator

will abide by the MDL Court's [11] interpretation of that government's procedures. The Amended Joint Plan also provides that the governmental entity may request an injunction if the settlement distribution is not settled.

The United States has not agreed to any settlement distribution agreement with the Debtor, unlike Alberta and Manitoba which have agreed to the settlement distribution procedure set forth in the B.C. Settlement. The Court finds that the Amended Joint Plan does not purport to interpret the United States' laws regarding settlement distribution but allows the United States to present its arguments to this Court, the reviewing Court over the Settlement Facility, for an interpretation as to the settlement distribution procedure to be used by the Claims Administrator. If the United States believes that its laws for settlement distribution are the same as the procedures set forth in the B.C. Settlement, then the United States can present its argument before this Court. The Amended Joint Plan does not preclude the United States from requesting the same procedures set forth in the B.C. Settlement. The Court finds that the Amended Joint Plan settlement distribution resolution procedures are not less favorable than the procedures set forth in the B.C. Settlement.

Addressing the United States' third argument on the treatment issue, the Court finds that this argument is unavailing. Paragraph 4 of Section 6.3 of the B.C. Agreement does not provide the Canadian provinces recourse against Dow Corning if the settling Personal Injury Claimant fails to notify the B.C. Claims Administrator of the Canadian provinces' claim. The specific language only states that if a subrogation claim by a Canadian province is not settled, then the *underlying claimant* must indemnify Dow Corning against the

Canadian province's subrogation claim. Should the Canadian provinces seek to recover on their unreimbursed subrogation claim, as the Bankruptcy Court noted, they will then have a direct claim against the Debtor which will be channeled to the Litigation Facility, which is the same manner the claims of the United States, or any other governmental entity, is treated under the Amended Joint Plan. *Classification and Treatment Op.*, 244 B.R. at 673. The Amended Joint Plan does not preclude the United States from directly asserting any claim against the Debtor. These claims are channeled to the Litigation Facility which treatment is similar treatment to the treatment of unresolved subrogation claims under the B.C. Settlement.

 Although the treatment provided to the United States' claims under the Amended Joint Plan is not identical to the treatment extended to Alberta and Manitoba under the B.C. Settlement, identical treatment is not what § 1123(a)(4) requires. Within-class treatment only requires that there is an approximate measure of equality. *Classification and Treatment Op.*, 244 B.R. at 673; *cf. In re Middle Plantation of Williamsburg, Inc.*, 47 B.R. 884, 892 (E.D.Va.1984); *In re Central Medical Center, Inc.*, 122 B.R. 568, 575 (Bankr.E.D.Mo.1990); *In re Resorts Int'l*, 145 B.R. 412, 447 (Bankr.D.N.J. 1990). The Bankruptcy Court did not clearly err in finding that all Class 15 claims received similar treatment.

### c. *Cram Down/Fair and Equitable Treatment*

 Section 1129(b)(1) allows for confirmation of a plan against a non-accepting class and allows for discrimination against the non-accepting class only when that discrimination is "unfair." 11 U.S.C. § 1129(b)(1). Unfair discrimination is not defined under the Bankruptcy Code but

---

**11.** Since the retirement on April 3, 2000 of the Honorable Sam C. Pointer, the presiding judge of MDL–926, the undersigned now has the responsibility over the Settlement Facility

pursuant to the Settlement Facility and Fund Distribution Agreement, Art. § 1.06 and the Amended Joint Plan of Reorganization, Art. § 1.53.

the prevailing view is that a plan will not unfairly discriminate if there is "a rational or legitimate basis for discrimination and [if] the discrimination [is] ... necessary for the reorganization." *Crosscreek*, 213 B.R. at 537. Section 1129(b)(2)(B) applies to the determination of whether a plan is fair and equitable to a rejecting class of unsecured creditors which provides:

> (2) For purposes of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirement:
>
> > (B) With respect to a class of unsecured claims—
> >
> > > (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
> > >
> > > (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B).

The Bankruptcy Court found that because all Class 15 claims are channeled to the Litigation Facility for resolution, unless different treatment is agreed to, and since Class 15 claimants who obtain judgments against the Litigation Facility will be paid in full by the Settlement Facility, the Plan satisfies the provision in subsection (i) that the plan provide the holder of the claim to receive or retain the value equal to the allowed amount of such claim. *Class 15 Cram Down Opinion*, 244 B.R. at 711–12. However, the United States argues that its claims are being cut-off in the Settlement Facility if a breast-implant claimant chooses to settle a claim with the Settlement Facility. Every time a settling breast-implant claimant against whom the United States has a potential subrogation claim sits down at the negotiating table with the Settlement Facility and reaches a settlement, the United States claims its share should be taken off the top. Because the Amended Joint Plan does not afford the United States this claim in the Settlement Facility, the United States argues that its claim is not being paid in full.

The Bankruptcy Court found this argument to be without merit for a number of reasons. First, the Bankruptcy Court noted that the claimant's choice to settle with the Settlement Facility is a settlement discussion, which is not an action or proceeding as contemplated under the MSP, 42 U.S.C. § 1395y(b)(2)(B)(ii) or the MCRA, 42 U.S.C. § 2651(b). The Bankruptcy Court stated that "[n]othing in either statute entitles the Untied States to barge its way into private settlement negotiations." *Class 15 Cram Down Opinion*, 244 B.R. at 712. Second, the Bankruptcy Court found that the United States does not possess claims against the Settlement Facility under the Amended Joint Plan since all its claims are channeled to the Litigation Facility. *Id.*

The Bankruptcy Court did not clearly err in its finding that the Amended Joint Plan does not unfairly discriminate against the United States' claims since its claims will be paid in full, if allowed. As discussed above, the Amended Joint Plan does not interpret the rights of the United States under the MSP but leaves that interpretation to this Court, if necessary. The notice to be sent out to claimants informing them of the loss of confidentiality if they choose to settle will notify the claimants of the United States' potential claim against them and directs the claimant to either contact the United States or the Settlement Administrator regarding the United States' potential claim. The United States, under the Amended Joint Plan, can either contact the Settling Breast Implant Claimant or, if necessary, seek injunctive relief from this Court to enjoin the Claims Administrator's payment to the claimant consistent with applicable law, as interpreted by this Court. If the breast implant claimant refuses to settle,

then the United States may fully assert its rights in the Litigation Facility.

### d. *Good Faith*

■■■ The United States argues that the Amended Joint Plan was not proposed in good faith under 11 U.S.C. § 1129(a)(3) because it violates "other laws" such as the MSP. Essentially, the United States repeats the same argument it made claiming the Plan was not "fair and equitable." The Bankruptcy Court found that the Amended Joint Plan was proposed in a legitimate effort to rehabilitate a solvent but financially distressed company because of the thousands of personal injury claims against it. For the same reasons set forth above, the Amended Joint Plan was proposed in good faith because it does not violate the MSP. The procedures set forth in the Amended Joint Plan as to how the United States may assert its rights does not violate the MSP. Although the United States does not have a claim against the Settlement Facility, under the Joint Amended Plan, the United States has the opportunity to contact the breast implant claimant to settle its claim, or, seek injunctive relief before this Court to enjoin the Claims Administrator from paying the Claimant, if this Court were to find that the applicable allowed such injunctive relief. Should the breast implant claimant refuse to settle, the United States can fully assert its rights against the Litigation Facility. The Court finds that the Amended Joint Plan that the United States has not established that the Joint Amended Plan was not filed in good faith in violation of 11 U.S.C. § 1129(a)(3).

### e. *Motion to Compel*

On May 28, 1999, the Proponents filed a Joint Motion for Summary Judgment Disallowing the United States' claims, or, in the alternative, that the claims be limited to the 15,048 reimbursement claims relating to those names identified by the United States. On September 2, 1999, a hearing was held on the Proponents' Joint Motion for Summary Judgment. On Sep-

tember 29, 1999, the United States filed a Second Motion to Compel Discovery from Dow Corning and a hearing was held on the motion on October 21, 1999. On October 29, 1999, the United States filed the instant appeal from the Bankruptcy Court's October 27, 1999 order entitled "Order on Motion to Compel." The Bankruptcy Court entered its Confirmation Order on November 30, 1999, along with an opinion on the cram down provision relating to the United States' Class 15 claims. On June 22, 2000, the Bankruptcy Court entered its opinion on the Proponents' Joint Motion for Summary Judgment. The United States has filed notices of appeal on the Bankruptcy Court's opinion and order relating to the Proponents' Joint Motion for Summary Judgment. At this time, the appeals have not been briefed by the parties.

■■■■■■ 28 U.S.C. § 158(a) states in pertinent part:

(a) The district courts of the United States shall have jurisdiction to hear appeals

(1) from final judgments, orders, and decrees;

\*　　\*　　\*　　\*　　\*　　\*

(3) with leave of the court, from other interlocutory orders and decrees;

of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title.

28 U.S.C. § 158(a). In bankruptcy cases, the finality requirement is considered "in a more pragmatic and less technical way than in other situations." *In re Cottrell,* 876 F.2d 540, 541–42 (6th Cir.1989); *In re Dow Corning,* 86 F.3d 482 (6th Cir.1996). Where an order in a bankruptcy case finally disposes of discrete disputes within the larger case, it may be appealed immediately. *In re Dow Corning,* 86 F.3d at 488. "A 'final' decision generally 'ends the litigation on its merits and leaves nothing for the court to do but execute the judgment.'" *In re Sun Valley Foods Co.,* 801

F.2d 186, 189 (6th Cir.1986), *quoting Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945). Review of final orders is mandatory but review of interlocutory orders is left to the federal district court's discretion. *In re American Freight System, Inc.*, 153 B.R. 316 (D.Kan. 1993); *In re Bradford*, 192 B.R. 914, 916 (E.D.Tenn.1996). Federal courts are reluctant to hear interlocutory appeals. *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981). In determining whether to review an interlocutory appeal, based on 28 U.S.C. § 1292(b), an appeal may be taken from an interlocutory order only where the order involves a controlling question of law as to which there is substantial ground for a difference of opinion and an immediate appeal may materially advance the ultimate termination of the litigation. *In re Bradford*, 192 B.R. at 916. The appellant bears the burden of establishing exceptional circumstances warranting review of an interlocutory order. *Id.*

Under the collateral order doctrine of *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), it is not always necessary that a judgment terminate an action before an appeal may be brought. The collateral order doctrine permits appellate review of decisions which "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Id.* at 546, 69 S.Ct. 1221; *In re Dow Corning*, 86 F.3d at 488. A collateral order may be reviewed when it: 1) conclusively determines the disputed question; 2) resolves an important question completely separate from the merits of the action; and 3) is effectively unreviewable on appeal from final judgment. *In re Dow Corning*, 86 F.3d at 488; *Pacor, Inc. v. Higgins*, 743 F.2d 984, 988 (3d Cir.1984).

The United States presents three issues on appeal based on the Bankruptcy Court's October 27, 1999 Order: 1) that the Bankruptcy Court erred by limiting the United States to the 15,048 persons identified as of October 27, 1999; 2) that the Bankruptcy Court erred in denying the United States full access to identifying information about breast implant recipients; and 3) that the Bankruptcy Court erred in denying the United States access to market share information. The United States argues that the October 27, 1999 order constitutes a final order since its claims are effectively limited to the 15,048 claimants it has identified. Although the United States argues that the October 27, 1999 order is not an order granting partial summary judgment in favor of the Proponents, it argues that the Bankruptcy Court's "Order on Motion to Compel" is final on the issue limiting the United States to 15,048 claimants which issue was brought before the Bankruptcy Court by way of the Proponents' Joint Motion for Summary Judgment.

The Proponents argue that the appeal regarding the claims allowed or disallowed by the Bankruptcy Court is interlocutory and is premature since the Bankruptcy Court, as of the filing of the United States' appeal, had not ruled on the balance of the Proponents' Joint Motion for Summary Judgment. The Proponents assert that the Bankruptcy Court's October 27, 1999 Order regarding the disallowance of the United States' claims and limiting the claims to 15,048 claimants was essentially an order granting partial summary judgment in the Proponents' favor. The Proponents further argue that the Bankruptcy Court's discovery rulings on access to proofs of claim and market share are also interlocutory.

This Court's review of the October 27, 1999 "Order on Motion to Compel" indicates that the order is an interlocutory order as to the discovery issues. The Court will not review that portion of the order because the United States has not

set forth sufficient reasons that controlling question of law as to which there is substantial ground for a difference of opinion is involved in the Bankruptcy Court's order. The United States has not shown that an immediate appeal may materially advance the ultimate termination of the litigation given that at the time the appeal was filed, the Bankruptcy Court had not ruled on the summary judgment motion filed by the Proponents.

 With regards to the disallowance of the United States' claim limiting its claim to the 15,048 identified individuals, the Court finds that essentially, the Bankruptcy Court did in fact partially grant the Proponents' Joint Motion for Summary Judgment on this issue. When the October 27, 1999 order was issued by the Bankruptcy Court, briefs had been filed and a hearing held on the Proponents' Joint Motion for Summary Judgment. There is no dispute that the Proponents not only sought to disallow the United States' claims in their Joint Motion for Summary Judgment but alternatively sought to limit the United States' claims to the 15,048 individuals identified by the United States. Because the October 27, 1999 order partially granted the United States' Joint Motion for Summary Judgment, the Bankruptcy Court's order is an interlocutory order since it does not fully dispose of the issues before the Bankruptcy Court. As the United States notes in its Reply Brief, the Bankruptcy Court's order did not contain a Fed.R.Civ.P. 54(b) notation that an entry of judgment as to fewer than all claims can be entered "only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." (United States' Reply Brief, p. 7) Based on this statement, the United States concedes that there has been no judgment entered as to the Bankruptcy Court's October 27, 1999 Order regarding the disallowance of the United States' claims and limiting the claims to 15,048 individuals identified by the United States, therefore, the October 27, 1999 Order is an interlocutory order. An order granting partial summary judgment is interlocutory. *Leonard v. Socony–Vacuum Oil Co.,* 130 F.2d 535 (7th Cir.1942).

The Court also declines to review the October 27, 1999 Order under the collateral order review doctrine. Although the order may have conclusively determined the disputed question at issue, it does not resolve an important question completely separate from the merits of the rest of the summary judgment motion nor is the matter unreviewable on appeal from final judgment.

Even if this Court were to grant an interlocutory appeal on this issue, because the October 27, 1999 Order is lacking in findings of fact either based on the requirements of Fed.R.Civ.P. 56 or based on the language of the order, it would be impossible for this Court to review the merits of the United States' arguments at this time. *See Terry Barr Sales Agency, Inc. v. All–Lock Co.,* 96 F.3d 174, 178 (6th Cir.1996). The matter would have to be remanded to the Bankruptcy Court for further findings of fact on the disallowance issue. Because the Bankruptcy Court has since issued its order and opinion on the Proponents' Joint Motion for Summary Judgment on the United States' proofs of claim, and the United States has filed appeals from the order and opinion, the matter will be reviewed by this Court since there is no dispute that the Bankruptcy Court's June 22, 2000 opinion and order is a final order. The Court declines to review the United States' appeal of the Bankruptcy Court's October 27, 1999 Order at this time.

#### f. *This Court's Order re Notice*

 The Government claims that this Court had no jurisdiction to enter the order on December 24, 1999 which modified the Bankruptcy Court's November 30, 1999 Order regarding when the confidentiality notice should be sent to the claimants. The Government argues that because the Proponents failed to appeal the

underlying Confirmation Order, this Court has no authority to modify the Confirmation Order. In its reply brief, the Proponents claim this Court has broad power and since they are seeking only a limited procedural relief, this Court has jurisdiction over that limited request. The Proponents cite to Fed.R.Civ.P. 62 and Bankruptcy Rules 7062 and 8005.

Rule 62 provides the district court authority to stay proceedings pending appeal. Bankruptcy Rule 7062 allows for stay of proceedings from an automatic stay. Bankruptcy Rule 8005 allows for stay pending appeal.

 There is no dispute that the November 30, 1999 Confirmation Order is a final and appealable order. *In re Wade,* 991 F.2d 402, 406 (7th Cir.1993). A party may appeal a final order to the district court under 28 U.S.C. § 158(a)(1). The Bankruptcy Rules provide that a notice of appeal must be filed with the clerk within 10 days of the date of the entry of the judgment or order appealed from. Bankr.R. 8001 and 8002. The Advisory Committee's Note to Rule 8001 states that "a notice of appeal be filed whenever a litigant seeks to secure appellate review by the district court or bankruptcy appellate panel." The filing of a timely notice of appeal is jurisdictional and filing a timely notice of cross-appeal is also jurisdictional where an appellee wishes to attack part of a final judgment. *S.E.C. v. Youmans,* 729 F.2d 413 (6th Cir.), *cert. denied sub nom, Holliday v. S.E.C.,* 469 U.S. 1034, 105 S.Ct. 507, 83 L.Ed.2d 398 (1984). There is also no dispute that the Proponents did not appeal the Confirmation Order with regards to the notice provision.

It is true that the Proponents appear to seek limited relief of the Confirmation Order. However, the Government's argument that this Court has no jurisdiction over the request since the Proponents failed to timely file an appeal of the Confirmation Order has merit. It could be likened to a final judgment entered by this Court under a non-bankruptcy civil action where a party thereafter files a motion before the Court of Appeals to change one provision in the order without that party filing an appeal before the Court of Appeals. The Proponents have not cited sufficient authority to support their position, especially since they did not file an appeal of the Confirmation Order on the notice provision issue.

If the Court were to consider the motion as a Motion for Stay Pending Appeal, generally, it is the appellant who files such a motion in conjunction with the notice of appeal. There is no dispute that the Proponents did not follow the procedures set forth in Bankruptcy Rule 8005 which states that it must first be presented to the bankruptcy judge.

 A party seeking a stay must meet the following four factors which apply to an appeal of a bankruptcy court's order to the district court: 1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; 2) the likelihood that the moving party will be irreparably harmed absent the stay; 3) the prospect that others will be harmed if the court grants the stay; and 4) the public interest in granting the stay. *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 153 (6th Cir.1991); *In re First South Savings Ass'n,* 820 F.2d 700, 709 (5th Cir.1987).

 The Government claims that the Proponents were unable to meet the factors. The Proponents admit that they are not challenging the propriety of the notices, thus, the Proponents cannot demonstrate that it would likely succeed on the merits. Although this Court thought so at the time, the Proponents have not shown that they would suffer irreparable harm if the date was not moved from December 24, 1999, other than "confusion" by the claimants. The Proponents have not cited any authority on this issue. In any event, if they were going to suffer irreparable harm, then the issue should have been brought timely before the Bankruptcy

Court rather than waiting 20 days after the Confirmation Order was issued. The Government argues that the claimants themselves are the ones harmed by the stay because the Confirmation Order provides that the claimants have until March 1, 2000 to decide whether to maintain her claim. Delaying the notice only shortens the time the claimants have to make the election. The stay may have served the public interest based on the holiday season, however, the Government points out that they too have rights, one of which is to determine which claimants have requested benefits under the Medicare Trust Fund. The issue of whether the Claims Administrator is available is irrelevant according to the Government because it does not affect the issue of whether a claimant should disclose her identity to the Government.

 Although not addressed by the parties, the motion could have been construed as a writ of mandamus. However, the Supreme Court has shown general reluctance to grant writs of mandamus. *Mallard v. United States District Court,* 490 U.S. 296, 109 S.Ct. 1814, 1822, 104 L.Ed.2d 318 (1989). Writs of mandamus may be granted when two conditions exist. First, "petitioners must show that they lack adequate alternative means to obtain the relief they seek...." *Id.* 109 S.Ct. at 1822. Second, petitioners must show that their right to the issuance of the writ is "clear and indisputable." *Id.*

 The Proponents have not shown that they lacked alternative means to obtain relief. They did not first seek the concurrence of the Government. They did not seek relief at an earlier time when the Bankruptcy Court was available. The

Proponents have not shown that they have a "clear and indisputable" right to amend the Confirmation Order to change the notice from the December 24, 1999 date.

Because there is no basis for the Court's jurisdiction over the entry of the December 24, 1999 order which modified the November 30, 1999 Confirmation Order's notice provision, the Court sets aside the December 24, 1999 Order.

## IX. CASE MANAGEMENT ORDER

 Article Seven of the Amended Joint Plan of Reorganization provides certain conditions precedent before confirmation, including the District Court having entered the Case Management Order ("CMO"). Amended Joint Plan, ¶ 7.1.2. The CMO is defined as "the order to be entered by the District Court pursuant to which the Claims of Non–Settling Personal Injury Claimants shall be resolved, which order shall be in substantially the form negotiated and agreed to by the Debtor, the Shareholders and the Tort Committee and attached as an exhibit to the Litigation Facility Agreement." Amended Joint Plan, ¶ 1.25. On February 4, 1999, the Proponents filed with the Bankruptcy Court and distributed to interested claimants a proposed CMO. In its January 24, 2000 Scheduling Order regarding the various appeals of the Confirmation Order, this Court requested comments on the proposed CMO. The Proponents thereafter submitted a revised CMO with minor changes to conform the terminology of the CMO to the Plan, particularly as to certain defined terms, and to clarify that the timetable for processing cases pursuant to the CMO is tied to the Effective Date of the Plan.[12] The proposed revised CMO does

12. The Effective Date of the Amended Joint Plan is "the first Business Day (a) that is at least 11 days after the Confirmation Date; (b) on which no stay of the Confirmation Order is in effect; and (c) on which all conditions to effectiveness of this Plan have occurred or been waived." Amended Joint Plan, ¶ 1.59. One of the conditions to the effective date of the plan includes "[n]o timely-filed appeal shall have been taken from the Confirmation Order challenging, directly or indirectly, the validity and enforceability of the releases and injunctions described in sections 8.3 and 8.4 of the Plan and/or limits the required funding as set forth in the Funding Payment Agreement for the release, satisfaction and discharge of all claims in Classes 5 through 19 of the Plan (collectively, *"Release/Funding Is-*

not differ in any material respect from the original draft CMO made available to the Bankruptcy Court and other interested parties. The following parties filed comments on the proposed CMO: The Nevada Claimants, the United States, the Official Committee of Physician Claimants, Helene D. Schroeder, Marti Jacobs, and the Altig Claimants.

The Proponents claim that the proposed CMO is a product of extensive and hard-fought negotiations between the Plan Proponents conducted with the substantial assistance of the Special Master. The CMO reflects a delicate balance of compromises between the needs and aspirations of the Tort Claimants Committee and the Debtor. The Proponents claim that the CMO is a principal tool for the implementation of the Amended Joint Plant in the resolution of the claims of the Non–Settling Personal Injury Claimants. For these reasons, the proposed CMO submitted by the Proponents cannot be casually recast to accommodate the specific desires of one or more objectors. Absent a clear demonstration of a legal defect involving a material adverse impact on due process rights, the Proponents argue that the CMO should be entered in its current form.

This Court has reviewed the parties comments to the proposed CMO and finds that many of the objections to the CMO are based on those parties' arguments on the substance of their appeals, which have now been addressed by the Court. The Nevada Claimants made specific proposed changes to the proposed CMO to conform to their arguments on appeal.

The Nevada Claimants, Schroeder and the Altig Claimants argue that some of the cases should be tried in state courts or other venues. However, in the bankruptcy context, this Court is bound by 28 U.S.C. § 157(b)(5) which states that personal injury tort claims "shall be tried in the district

court in which the bankruptcy case is pending, or in the district court in which the claim arose, as determined by the district court in which the bankruptcy case is pending." 28 U.S.C. § 157(b)(5). Although the CMO provides in certain circumstances that a case may be tried in the state courts upon recommendation by the Special Master and approval by all parties to the case and the Litigation Facility, the Court will review any such recommendation in light of 28 U.S.C. § 157(b)(5) and will not enter any order in violation of said statute. Amended Joint Plan, ¶¶ 1, 12.

The United States raises its discrimination argument also addressed in its appeal brief. Although the Proponents assert that the United States does not have standing under the CMO, the Court finds that the United States does have standing under the CMO given that its claims in Class 15 are channeled to the Litigation Facility. The United States also argues against the privilege documents provision in the CMO which govern how privilege documents are handled during the litigation process. However, this Court will resolve any disputes regarding documents to be admitted at trial. The CMO does not prohibit a party from filing motions before the Court after the initial entry of the CMO.

The Physicians Claimants' Committee and Marti Jacobs argue that the entry of the CMO is premature given the appeals before the Court. Because the Court has addressed the merits of the parties' appeals in this matter, the entry of the CMO at this time is appropriate and in keeping with the language of the Amended Joint Plan.

The parties objecting to the CMO have not shown that their due process rights would be violated in the entry of the CMO. The Court will enter the CMO, as proposed by the Proponents, with minor

---

sues "), or, if such an appeal regarding any Release/Funding issue shall have been filed, such appeal shall have been denied or dismissed and such releases and injunctions and

such limits of required funding shall have been affirmed in all respects pursuant to a final Order." Amended Joint Plan, ¶ 7.2.1.

changes, such as the proper address, telephone numbers, and case numbers. It is noted that the CMO is only the initial case management order in this matter. As noted above, the CMO does not prohibit a party choosing litigation in this matter from filing a motion before this Court to seek relief from the Court in that party's case.

## X. CONCLUSION

The Court is very much aware that numerous interested parties have waited over five years for the resolution of this matter since the Debtor filed its petition for bankruptcy in May 1995 and that many more who filed actions against the Debtor before it filed for bankruptcy have waited a much longer period of time. Depending on how the parties in this matter proceed after reviewing this Court's decision, the wait may be longer. However, the Court notes that in this country's judicial system, with its rules and procedures enacted by Congress, all parties, including the thousands of personal injury claimants, the many other creditors, the Government, the Debtor and other interested parties, are allowed the opportunity to pursue any claims and arguments they believe they may have to the fullest extent possible under the law and the judicial system. The United States' Constitution and the rules and laws governing the judicial system, although they may not be perfect, were enacted to ensure that all parties' due process rights are observed by the courts. This Court is aware that this case is one of the largest mass tort bankruptcy actions ever filed in this country's judicial system and that many lives are affected by the outcome of the case. This Court has attempted to ensure that all the litigants and parties before it have had the opportunity to fully present their concerns within the procedural rules and laws governing the action and the judicial system. The Court will attempt to do so in the future. The Court is mindful that many parties with the assistance of the Courts' Special Master have attempted to negotiate a consensual agreement in this case—some have been successful and some have not. However, the Court has observed that the parties before this Court and the Bankruptcy Court have worked diligently on behalf of their clients' interest and, if proceeding *pro se*, on their own behalf, to ensure that their rights are protected. This Court commends all the parties involved in this matter for their patience and hard work.

For the reasons set forth above, the Court AFFIRMS the Bankruptcy Court's November 30, 1999 Order Confirming the Joint Amended Plan and REVERSES the Bankruptcy Court's December 21, 1999 Opinion on the release and injunction provisions issue. The Case Management Order is entered in Master Docket Case No. 00–CV–00001–DT.